**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 3\|5\|2 CAPITAL GP LLC, on behalf of 3\|5\|2 CAPITAL ABS MASTER FUND LP, | Case No. _____ |
| Plaintiff, | |
| -against- | **COMPLAINT** |
| RYAN WEAR, TYLER SADEK, JORDAN CHIRICO, WATER STATION MANAGEMENT LLC, REFRESHING USA, LLC, CREATIVE TECHNOLOGIES, LLC, C3 CAPITAL, INC., REVL CAPITAL MANAGEMENT LLC, REVL SECURITIES LLC, CREATIVE TECHNOLOGIES FLORIDA, LLC, WATERSTATION TECHNOLOGY II LLC, WATERSTATION FINANCE COMPANY, LLC, WATERSTATION TECHVENTURE LLC, WST FRANCHISE SYSTEMS LLC, WST AZ PROPERTIES, LLC, WSM CAPITAL FUNDING, INC., WS SPV 1, LLC, REFRESHING ARIZONA, LLC REFRESHING CALIFORNIA L.L.C., REFRESHING CAROLINAS LLC, REFRESHING COLORADO LLC, REFRESHING FLORIDA LLC, REFRESHING GEORGIA LLC, REFRESHING GREAT LAKES, LLC, REFRESHING GREAT PLAINS LLC, REFRESHING KENTUCKY LLC, REFRESHING LAS VEGAS, LLC, REFRESHING MID-ATLANTIC LLC, REFRESHING MIDWEST LLC, REFRESHING MIDWEST REAL ESTATE LLC, REFRESHING MONTANA, LLC, REFRESHING NEW ENGLAND, LLC, REFRESHING NEW MEXICO LLC, REFRESHING OHIO LLC, REFRESHING TEXAS, LLC, REFRESHING UTAH, LLC, REFRESHING USA MERGER SUB LLC, REFRESHING WASHINGTON LLC, VENDPRO LLC, BEVTECK TECHNOLOGIES LLC, SUMMIT MANAGEMENT SERVICES LLC, IDEAL PROPERTY INVESTMENTS LLC, IDEAL INDUSTRIAL PARK LLC, IDEAL AZ PROPERTY INVESTMENTS, LLC, 2129 | **JURY TRIAL DEMANDED** |

ANDREA LANE, LLC, 3209 VAN BUREN LLC,
ICE & WATER VENDORS LLC, K-2
ACQUISITION, LLC, K-2 MFG LLC, SMOKEY
POINT HOLDINGS LLC, PISTOL INC., EMERY
DEVELOPMENT LLC, ARIZONA WATER
VENDORS INCORPORATED, 1118 VIRGINIA
STREET LLC, 11519 SOUTH PETROPARK
LLC, TCR PLUMBING LLC, FLAGSTAFF
PLUMBING, LLC, 70 NORTH GARDEN
AVENUE LLC, 701 EDEN LLC, AURORA
BUILDING PRODUCTS LLC, 3422 W
CLARENDON AVE LLC, 1206 HEWITT AVE
LLC, GOLDEN STATE VENTURES, LLC,
GOLDEN STATE VENDING, LLC, VALLEY
VENDING, LLC, DRINK UP VENTURE LLC,
and JOHN DOES 1-1000,

               Defendants.

Plaintiff 3|5|2 Capital GP LLC ("352 GP"), on behalf of 3|5|2 Capital ABS Master Fund

LP (the "352 Fund"), by and through its undersigned counsel, alleges against defendants Ryan

Wear ("Wear"), Tyler Sadek ("Sadek"), Jordan Chirico ("Chirico"), Water Station

Management, LLC ("Water Station Management"), Refreshing USA, LLC ("Refreshing

USA"), Creative Technologies, LLC ("Creative Technologies"), C3 Capital, Inc. ("C3

Capital"), REVL Capital Management LLC ("REVL"), REVL Securities LLC ("REVL

Securities"), Creative Technologies Florida, LLC ("Creative Technologies Florida"),

Waterstation Technology II LLC ("Waterstation Technology"), Waterstation Finance

Company, LLC ("Waterstation Finance"), Waterstation Techventure LLC ("Waterstation

Techventure"), WST Franchise Systems LLC ("WST Franchise"), WST AZ Properties LLC

("WST AZ Properties"), WSM Capital Funding, Inc. ("WSM Capital Funding"), WS SPV 1,

LLC ("WS SPV 1"), Refreshing Arizona, LLC ("Refreshing Arizona"), Refreshing California

L.L.C. ("Refreshing California"), Refreshing Carolinas LLC ("Refreshing Carolinas"),

Refreshing Colorado LLC ("Refreshing Colorado"), Refreshing Florida LLC ("Refreshing Florida"), Refreshing Georgia LLC ("Refreshing Georgia"), Refreshing Great Lakes, LLC ("Refreshing Great Lakes"), Refreshing Great Plains LLC ("Refreshing Great Plains"), Refreshing Kentucky LLC ("Refreshing Kentucky"), Refreshing Las Vegas, LLC ("Refreshing Las Vegas"), Refreshing Mid-Atlantic LLC ("Refreshing Mid-Atlantic"), Refreshing Midwest LLC ("Refreshing Midwest"), Refreshing Midwest Real Estate LLC ("Refreshing Midwest Real Estate"), Refreshing Montana, LLC ("Refreshing Montana"), Refreshing New England, LLC ("Refreshing New England"), Refreshing New Mexico LLC ("Refreshing New Mexico"), Refreshing Ohio LLC ("Refreshing Ohio"), Refreshing Texas, LLC ("Refreshing Texas"), Refreshing Utah, LLC ("Refreshing Utah"), Refreshing USA Merger Sub LLC ("Refreshing USA Merger Sub"), Refreshing Washington LLC ("Refreshing Washington"), VendPro LLC ("VendPro"), BevTeck Technologies LLC ("BevTeck Technologies"), Summit Management Services LLC ("Summit Management"), Ideal Property Investments LLC ("Ideal Property Investments"), Ideal Industrial Park LLC ("Ideal Industrial Park"), Ideal AZ Property Investments, LLC ("Ideal AZ Property Investments"), 2129 Andrea Lane, LLC ("2129 Andrea Lane"), 3209 Van Buren LLC ("3029 Van Buren"), Ice & Water Vendors LLC ("Ice & Water Vendors"), K-2 Acquisition, LLC ("K-2 Acquisition"), K-2 MFG LLC ("K-2 MFG"), Smokey Point Holdings LLC ("Smokey Point Holdings"), Pistol Inc. ("Pistol"), Emery Development LLC ("Emery Development"), Arizona Water Vendors Incorporated ("Arizona Water Vendors"), 1118 Virginia Street LLC ("1118 Virginia Street"), 11519 South Petropark LLC ("11519 South Petropark"), TCR Plumbing LLC ("TCR Plumbing"), Flagstaff Plumbing, LLC ("Flagstaff Plumbing"), 70 North Garden Avenue LLC ("70 North Garden Avenue"), 701 Eden

LLC ("701 Eden"), Aurora Building Products LLC ("Aurora Building Products LLC"), 3422 W Clarendon Ave LLC ("3422 W Clarendon Ave"), 1206 Hewitt Ave LLC ("1206 Hewitt Ave"), Golden State Ventures, LLC ("Golden State Ventures"), Golden State Vending, LLC ("Golden State Vending"), Valley Vending, LLC ("Valley Vending"), Drink Up Venture LLC ("Drink Up Venture," collectively without Wear, Sadek, Chirico, REVL, and REVL Securities, the "Wear Entities") and John Does 1-1000 (collectively, "Defendants"), as follows:

## INTRODUCTION

1.      This case arises out of a massive fraud perpetrated against the 352 Fund and its investors, principally by defendant Water Station Management and its owner Wear.  As described herein, Wear and Water Station Management have been operating a Ponzi scheme for years, and between 2022 through 2024, misappropriated more than $100 million of bond proceeds that were provided by the 352 Fund, in order to facilitate that scheme and for other improper purposes.  Wear and Water Station Management were only able to accomplish that fraud by entering into a common enterprise with the Wear Entities, Chirico (a 352 Fund insider), and Water Station Management's then-Chief Financial Officer ("CFO"), Sadek, as well as through the gross negligence and willful misconduct of REVL, the entity responsible for ensuring that the bond proceeds were used to purchase assets that would collateralize the bonds. As a result of their misconduct, the bond proceeds were misappropriated, siphoned to Ponzi scheme participants (including, on information and belief, Chirico), or diverted to or for the benefit of Wear and other companies under his ownership and control.

2.      Water Station Management and another Wear-owned company, Creative Technologies, held themselves out as the manufacturer, operator and manager of thousands of

self-service water station machines, known as WST-700s, which filter water from a local source for purchase by consumers (the "Water Machines").  The purported business model of Water Station Management was twofold.  Water Station Management allegedly owned and managed thousands of Water Machines, at a supposed value of $8,500 per machine, from which Water Station Management would collect revenue when customers purchased filtered water.  Water Station Management also sold "franchises," or "joint ventures," under which third-party investors could purportedly purchase Water Machines that would be placed and managed by Water Station Management for a fee, with the remaining revenue generated by the machines being paid to the investors.  Wear and Water Station Management also agreed to guarantee to some franchisees a "too good to be true" fixed return of as much as 28% on their investments in lieu of payments tied to fluctuating revenues.

3.     On April 29, 2022, Chirico, as the portfolio manager for the 352 Fund, directed the 352 Fund and an affiliate to purchase $15 million of Class B bonds issued by Water Station Management.  Subsequently, the 352 Fund acquired ownership of all of the affiliate's Class B bonds.  Another investor, non-party Heartland Financial USA, Inc. ("Heartland Financial"), purchased $60 million of Class A bonds.  Under the bond indenture, proceeds from the bonds could only be used by Water Station Management to purchase Water Machines, which would then collateralize the bonds and generate revenue to enable principal and interest payments.

4.     Chirico's investment decision was hopelessly conflicted.  At the same time Chirico was directing the 352 Fund and its affiliate to invest in Water Station Management's bonds, he had also invested $7 million in Water Station Management franchises through a company, C3 Capital, that he owned jointly with his wife.  The franchise investment was made

with a cash down payment coupled with a loan obtained from the Small Business Administration.  Wear then rebated to Chirico the bulk of the cash down payment he had made.  Chirico also arranged for his brother, his parents and various friends and neighbors to acquire Water Station Management franchises.

5.      After directing the 352 Fund and its affiliate to invest more than $15 million in Water Station Management bonds, Chirico subsequently "sold" his interest in C3 Capital to Wear's company, Creative Technologies, for $7.2 million.  On information and belief, the funds used by Creative Technologies to buy out Chirico's personal investment were the proceeds of the bonds that Chirico had caused the 352 Fund to purchase.

6.      REVL was appointed as the Collateral Manager for the bond offering and was responsible for ensuring that the bond proceeds were only released for the purpose of purchasing Water Machines.  REVL was also responsible for providing information about the performance of the Water Machines on a monthly basis, and reporting to the bondholders and U.S. Bank, the Trustee appointed under the bond indenture, any failure by Water Station Management to comply with its obligations under the indenture.

7.      By no later than August 2023, REVL knew that thousands of Water Station Machines allegedly purchased with the bond proceeds did not exist and that millions of dollars of bond proceeds had not been used by Water Station Management for their intended purpose.  REVL attempted to perform a physical inspection of the machines that Water Station Management claimed both to own and to use as collateral for the bonds.  REVL determined that 163 of the 164 machines in its sample set for inspection did not exist.  REVL then discovered that more than 3,000 machines that were supposed to be operating in Family Dollar stores, and

in other locations, were "actually missing."  It was eventually discovered that revenue that Water Station Management had been reporting as having been generated by Water Machines was instead being generated by other food and beverage vending machines owned by a separate Wear-affiliated company, Refreshing USA.  Wear, or those acting under his direction, had installed modems associated with the Water Machines onto the Refreshing USA vending machines to conceal the fact that Water Station Management had not used the bond proceeds to purchase Water Machines, and that the vast majority of those machines did not exist.

8.      There was (or should have been) no doubt, by at least August 2023, that Water Station Management was perpetrating a fraud.  To this point, Water Station Management had been submitting to REVL purchase orders and invoices for the purchase of Water Machines, all to convince REVL to authorize the release of bond proceeds for those purchases—but those machines did not exist.  The purchase orders and invoices were falsified.  The collateral and revenue reports that purported to show the machines were installed and generating revenue were likewise fabricated.  On information and belief, instead of purchasing and operating Water Machines, Water Station Management used the bond proceeds primarily to pay "franchisees" their guaranteed returns on their "investment," or to buy out franchisees who had raised complaints about the business—a classic Ponzi scheme.  Because Chirico was owed money in connection with his "investment" in the scheme, and his friends and family were likewise "investors," he stood to directly, personally benefit from these payouts.  On information and belief, the bond proceeds were also diverted to Wear himself, or to or for the benefit of his other companies, the Wear Entities.

9.    REVL only reported what it discovered to Wear and Chirico.  REVL served notice to Wear that Water Station Management had 90 days to "cure" this incurable situation. That notice, though, was ineffective because REVL took absolutely no action after the expiration of the 90 days.  More egregiously, on information and belief, REVL never reported to U.S. Bank, as Trustee, that most of the machines that were supposed to collateralize the bonds did not exist, nor did it provide U.S. Bank with any opportunity to take the necessary actions to preserve the value of the bonds.  And throughout this entire time period, REVL Securities provided the 352 Fund with monthly mark-to-market valuations representing that the bonds continued to be worth their full purchase price, even though REVL affirmatively knew that the majority of the collateral backing the bonds did not exist.

10.    Then, in December 2023, despite being fully aware of the ongoing fraud at Water Station Management, Chirico made the inexplicable decision to cause the 352 Fund and its affiliate to buy out the Class A bondholder at a purchase price of $57.6 million.  There was no legitimate business or investment rationale for quadrupling the exposure of the 352 Fund to Water Station Management when Chirico knew that Water Station Management was committing a fraud, and that the bonds were undercollateralized by tens of millions of dollars (if not more).  On information and belief, one contributing factor to Chirico's decision was to remove any oversight by the Class A investor, which would allow him to loosen the indenture's restrictions and requirements for the benefit of Water Station Management, and direct further funds from the 352 Fund to Water Station Management to prop up the failing company and the ongoing Ponzi scheme.  On further information and belief, Chirico was also actively supporting the Ponzi scheme.

11.     By no later than January 2024, Water Station Management was insolvent and unable to meet basic day-to-day funding obligations, including making payroll.  REVL had confirmed that thousands of Water Machines that were supposed to have been purchased with bond proceeds were "missing."  In a January 2024 telephone call with Wear and his CFO, Sadek, Chirico (who recorded the call) acknowledged that the 352 Fund's $87.9 million bond investment was undercollateralized by at least $46 million.  On that call, Sadek admitted this was "***the largest franchise fraud in the history of the United States***" and told Wear that he "***was going to jail***."  Notwithstanding his having knowledge of the fraud, and on information and belief in furtherance of that fraud, Chirico directed the 352 Fund to upsize the bond offering and, in February 2024, provided Water Station Management with an additional $19 million of funds.  He also authorized an amendment to the indenture to remove any restrictions on Water Station Management's use of those funds, and purportedly waived numerous events of default caused by Water Station Management's fraud and insolvency.  On information and belief, a portion of the proceeds acquired by Water Station Management was used to pay off franchisees to continue the Ponzi scheme, including more than $900,000 sent to Chirico himself.

12.     On or around February 16, 2024, Chirico colluded with Wear to further damage the 352 Fund, all for the benefit of the fraudulent enterprise.  The Trustee, on behalf of the bondholders, held a lien over all of the assets of Water Station Management.  On February 20, 2024, Chirico caused the 352 Fund to instruct the Trustee to release all liens over the Water Machines, vainly attempting to extinguish the security interest over the remaining approximately $41 million of collateral securing the bonds.  The Trustee followed Chirico's instruction and, on February 21, 2024, filed a UCC-3 financing statement that announced that

the Water Machines were no longer subject to the bondholder's security interest.  Chirico's and Wear's conspiracy was designed to render the 352 Fund's $106.9 million investment in these "asset-backed securities" almost completely unsecured, and to prevent the 352 Fund from being able to exercise any remedies with respect to its collateral.

13.     Throughout this period, Chirico never disclosed his personal conflicts of interest to the 352 Fund, that Water Station Management was committing fraud, that the Water Machines securing the bonds largely did not exist, or that he was directing the 352 Fund to substantially increase its exposure while it was already undercollateralized by tens of millions of dollars. Chirico deliberately provided vague and misleading explanations for increasing the 352 Fund's positions and for changes to the indenture's terms to convince the 352 Fund's investment manager, and other stakeholders, to "sign off" on those changes, while withholding critical information that would have caused any rational investment manager to cease contributing to the Water Station Management scheme and take immediate action to protect investors.

14.     As of April 5, 2024, the balance of funds in Water Station Management's interest reserve account at U.S. Bank remained below the "Interest Reserve Required Balance" for fifteen days, thereby triggering an event of default under the indenture.  U.S. Bank issued a notice of event of default on May 28, 2024.  On June 20, 2024, Water Station Management failed to make a required interest payment, and U.S. Bank issued an additional notice of event of default that day.  On July 2, 2024, U.S. Bank issued default notices to Water Station Management after receipt of written direction to do the same from the 352 Fund, thereby accelerating the unpaid principal and interest under the bonds.  As of the filing of this complaint,

the events of default have not been waived or cured, and all rights and remedies of the 352 Fund under the indenture have been accelerated.

15.    By this complaint, the 352 Fund seeks compensation and other relief for the injury that it and its investors have sustained due to the conspiracy, fraud, breaches of fiduciary duty, gross negligence, and breaches of the bond indenture described herein.

## PARTIES

16.    3|5|2 Capital GP LLC is a Cayman Islands limited liability company that acts as the general partner of the 352 Fund and, under Cayman Islands law, is authorized to bring this action on behalf of the 352 Fund.

17.    On information and belief, defendant Wear is an adult individual and citizen of the State of Washington, with an address of 1029 154th Street NW, Marysville, Washington, 98271.  On further information and belief, Wear is, *inter alia*, the current Chief Executive Officer and owner of Creative Technologies and Water Station Management, and the former Chief Executive Officer of Refreshing USA.  On information and belief, Wear is the ultimate owner and/or control person of all of the Wear Entities.

18.    Defendant Sadek is an adult individual and citizen of the State of Indiana, with an address of 1636 Central Avenue, Indianapolis, Indiana, 46202.  Sadek was the CFO of Water Station Management.  On information and belief, Sadek was also a franchisee.

19.    Defendant Chirico is an adult individual and citizen of the State of Indiana, with an address of 1121 Laurelwood, Carmel, Indiana, 64032.  Chirico was the former portfolio manager of the 352 Fund and an employee of Leucadia Asset Management LLC ("Leucadia")

beginning on May 28, 2020 until he was terminated on June 5, 2024.  Chirico was also a franchisee of Water Station Management.

20.     On information and belief, defendant Water Station Management is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Water Station Management is majority owned and controlled by Wear.

21.     On information and belief, defendant Refreshing USA is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing USA is majority owned and controlled by Wear.

22.     On information and belief, defendant Creative Technologies is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, Creative Technologies is majority owned and controlled by Wear.

23.     On information and belief, defendant C3 Capital is a corporation organized and existing under the laws of Indiana with its principal place of business located at 1121 Laurelwood, Carmel, Indiana, 64032.

24.     On information and belief, defendant REVL is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1921 Walnut Street, 2nd Floor, Philadelphia, Pennsylvania, 19103.

25.    On information and belief, defendant REVL Securities is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1921 Walnut Street, 2nd Floor, Philadelphia, Pennsylvania, 19103.

26.    On information and belief, defendant Creative Technologies Florida is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2129 Andrea Lane, Fort Myers, Florida 33912.  On further information and belief, Creative Technologies Florida is majority owned and controlled by Wear.

27.    On information and belief, defendant Waterstation Technology is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Waterstation Technology is majority owned and controlled by Wear.

28.    On information and belief, defendant Waterstation Finance Company is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Waterstation Finance is majority owned and controlled by Wear.

29.    On information and belief, defendant Waterstation Techventure is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Waterstation Techventure is majority owned and controlled by Wear.

30.    On information and belief, defendant WST Franchise is a limited liability company organized and existing under the laws of Washington with its principal place of

business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, WST Franchise is majority owned and controlled by Wear.

31.    On information and belief, defendant WST AZ Properties is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 2581 W Erie Street, Chandler, Arizona, 85224.  On further information and belief, WST AZ Properties is majority owned and controlled by Wear.

32.    On information and belief, defendant WSM Capital Funding is a corporation organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Wear is the Chief Executive Officer and Director of WSM Capital Funding.

33.    On information and belief, defendant WS SPV 1 is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, WS SPV 1 is majority owned and controlled by Wear.

34.    On information and belief, defendant Refreshing Arizona is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 4237 E Magnolia Street, Phoenix, Arizona, 85034.  On further information and belief, Refreshing Arizona is majority owned and controlled by Wear.

35.    On information and belief, defendant Refreshing California is a limited liability company organized and existing under the laws of California with its principal place of business located at 83750 Citrus Ave, Suite 1, Indio, California, 92201.  On further information and belief, Refreshing California is majority owned and controlled by Wear.

36.     On information and belief, defendant Refreshing Carolinas is a limited liability company organized and existing under the laws of North Carolina with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Carolinas is majority owned and controlled by Wear.

37.     On information and belief, defendant Refreshing Colorado is a limited liability company organized and existing under the laws of Colorado with its principal place of business located at 1120 Elkton Drive, Suites J, Colorado Spring, Colorado, 80907.  On further information and belief, Refreshing Colorado is majority owned and controlled by Wear.

38.     On information and belief, defendant Refreshing Florida is a limited liability company organized and existing under the laws of Florida with its principal place of business located at 2129 Andrea Lane, Fort Myers, Florida, 33912.  On further information and belief, Refreshing Florida is majority owned and controlled by Wear.

39.     On information and belief, defendant Refreshing Georgia is a limited liability company organized and existing under the laws of Georgia with its principal place of business located at 131 Bells Ferry Lane, Marietta, Georgia, 30066.  On further information and belief, Refreshing Georgia is majority owned and controlled by Wear.

40.     On information and belief, defendant Refreshing Great Lakes is a limited liability company organized and existing under the laws of Illinois with its principal place of business located at 1400 Greenleaf Ave, Elk Grove Village, Illinois, 60007.  On further information and belief, Refreshing Great Lakes is majority owned and controlled by Wear.

41.     On information and belief, defendant Refreshing Great Plains is a limited liability company organized and existing under the laws of Oklahoma with its principal place of

business located at 2915 N. Classen Suite 120-F, Oklahoma City, Oklahoma, 73106. On further information and belief, Refreshing Great Plains is majority owned and controlled by Wear.

42.     On information and belief, defendant Refreshing Kentucky is a limited liability company organized and existing under the laws of Kentucky with its principal place of business located at 2732 Grand Ave Suite 122, Everett, Washington, 98201. On further information and belief, Refreshing Kentucky is majority owned and controlled by Wear.

43.     On information and belief, defendant Refreshing Las Vegas is a limited liability company organized and existing under the laws of Nevada with its principal place of business located at 1810 E Sahara Ave Suite 212 #1579, Las Vegas, Nevada, 89104. On further information and belief, Refreshing Las Vegas is majority owned and controlled by Wear.

44.     On information and belief, defendant Refreshing Mid-Atlantic is a limited liability company organized and existing under the laws of Pennsylvania with its principal place of business located at 1505 Branagan Drive, Tulleytown, Pennsylvania, 19007. On further information and belief, Refreshing Mid-Atlantic is majority owned and controlled by Wear.

45.     On information and belief, defendant Refreshing Midwest is a limited liability company organized and existing under the laws of Indiana with its principal place of business located at 230 E 16th Street, Indianapolis, Indiana, 46202. On further information and belief, Refreshing Midwest is majority owned and controlled by Wear.

46.     On information and belief, defendant Refreshing Midwest Real Estate is a limited liability company organized and existing under the laws of Indiana with its principal place of business located at 230 E 16th Street, Indianapolis, Indiana, 46202. On further information and belief, Refreshing Midwest is majority owned and controlled by Wear.

47.     On information and belief, defendant Refreshing Montana is a limited liability company organized and existing under the laws of Montana with its principal place of business located at 1924 North Avenue West, Missoula, Montana, 59801.  On further information and belief, Refreshing Montana is majority owned and controlled by Wear.

48.     On information and belief, defendant Refreshing New England is a limited liability company organized and existing under the laws of New Hampshire with its principal place of business located at 2626 Brown Avenue, Unit D, Manchester, New Hampshire, 03103. On further information and belief, Refreshing New England is majority owned and controlled by Wear.

49.     On information and belief, defendant Refreshing New Mexico is a limited liability company organized and existing under the laws of New Mexico with its principal place of business located at 3101 Yale Boulevard, Albuquerque, New Mexico, 87106.  On further information and belief, Refreshing New Mexico is majority owned and controlled by Wear.

50.     On information and belief, defendant Refreshing Ohio is a limited liability company organized and existing under the laws of Ohio with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Ohio is majority owned and controlled by Wear.

51.     On information and belief, defendant Refreshing Texas is a limited liability company organized and existing under the laws of Texas with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Texas is majority owned and controlled by Wear.

52.     On information and belief, defendant Refreshing Utah is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at 586 W 9320 S, Sandy, Utah, 84070.  On further information and belief, Refreshing Utah is majority owned and controlled by Wear.

53.     On information and belief, defendant Refreshing USA Merger Sub is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing USA Merger Sub is majority owned and controlled by Wear.

54.     On information and belief, defendant Refreshing Washington is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Florida is majority owned and controlled by Wear.

55.     On information and belief, defendant VendPro is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, VendPro is majority owned and controlled by Wear.

56.     On information and belief, defendant BevTeck Technologies is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, BevTeck Technologies is majority owned and controlled by Wear.

57.     On information and belief, defendant Summit Management Services is a limited liability company organized and existing under the laws of Washington with its principal place

of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Summit Management Services is majority owned and controlled by Wear's father, Richard Wear.

58.    On information and belief, defendant Ideal Property Investments is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Ideal Property Investments is majority owned and controlled by Wear.

59.    On information and belief, defendant Ideal Industrial Park is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, Ideal Industrial Park is majority owned and controlled by Wear.

60.    On information and belief, defendant Ideal AZ Property Investments is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 4237 E Magnolia Street, Phoenix, Arizona, 85034.  On further information and belief, Ideal Industrial Park is majority owned and controlled by Wear.

61.    On information and belief, defendant 2129 Andrea Lane is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at 2129 Andrea Lane, Fort Myers, Florida, 33912.  On further information and belief, 2129 Andrea Lane is majority owned and controlled by Wear.

62.    On information and belief, defendant 3209 Van Buren is a limited liability company organized and existing under the laws of Wyoming with its principal place of business

located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, 3239 Van Buren is majority owned and controlled by Wear.

63.     On information and belief, defendant Ice & Water Vendors is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119.  On further information and belief, Ice & Water Vendors is majority owned and controlled by Wear.

64.     On information and belief, defendant K-2 Acquisition is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, K-2 Acquisition is majority owned and controlled by Wear.

65.     On information and belief, defendant K-2 MFG is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119.  On further information and belief, K-2 MFG is majority owned and controlled by Wear.

66.     On information and belief, defendant Smokey Point Holdings is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, Smokey Point Holdings is majority owned and controlled by Wear.

67.     On information and belief, defendant Pistol is a corporation organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, Wear is the Chief Executive Officer and Director of Pistol.

68.     On information and belief, defendant Emery Development is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Emery Development is majority owned and controlled by Wear.

69.     On information and belief, defendant Arizona Water Vendors is a corporation organized and existing under the laws of Arizona with its principal place of business located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119.  On further information and belief, Wear is the Chief Executive Officer and Director of Arizona Water Vendors.

70.     On information and belief, defendant 1118 Virginia Street is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, 1118 Virginia Street is majority owned and controlled by Wear.

71.     On information and belief, defendant 11519 South Petropark is a limited liability company organized and existing under the laws of Texas with its principal place of business located at 602 S Meadow Avenue, Odessa, Texas, 79761.  On further information and belief, 11519 South Petropark is majority owned and controlled by Wear.

72.     On information and belief, defendant TCR Plumbing is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, TCR Plumbing is majority owned and controlled by Wear.

73.     On information and belief, defendant Flagstaff Plumbing is a limited liability company organized and existing under the laws of Arizona with its principal place of business

located at 1612 N West Street, Suite 122, Flagstaff, Arizona, 86004.  On further information and belief, Flagstaff Plumbing is majority owned and controlled by Wear.

74.     On information and belief, defendant 70 North Garden Avenue is a limited liability company organized and existing under the laws of Illinois with its principal place of business located at 70 North Garden Avenue, Roselle, Illinois, 60172.  On further information and belief, 70 North Garden Avenue is majority owned and controlled by Wear.

75.     On information and belief, defendant 701 Eden is a limited liability company organized and existing under the laws of North Carolina with its principal place of business located at 125 S King Street, Suite 2A, Jackson, Wyoming, 83001.  On further information and belief, 701 Eden is majority owned and controlled by Wear.

76.     On information and belief, defendant Aurora Building Products is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Aurora Building Products is majority owned and controlled by Wear.

77.     On information and belief, defendant 3422 W Clarendon Ave is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, 3422 W Clarendon Ave is majority owned and controlled by Wear.

78.     On information and belief, defendant 1206 Hewitt Ave is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, 1206 Hewitt Ave is majority owned and controlled by Wear.

79.     On information and belief, defendant Golden State Ventures is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Golden State Ventures is majority owned and controlled by Wear.

80.     On information and belief, defendant Golden State Vending is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Golden State Vending is majority owned and controlled by Wear.

81.     On information and belief, defendant Valley Vending is a limited liability company organized and existing under the laws of Montana with its principal place of business located at 1924 North Avenue W, Missoula, Montana, 59801.  On further information and belief, Valley Vending is majority owned and controlled by Wear.

82.     On information and belief, defendant Drink Up Venture is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119.  On further information and belief, Drink Up Venture is majority owned and controlled by Wear.

83.     On information and belief, John Does 1-1000, are believed to be individuals and entities who received payments from the bond proceeds.

## JURISDICTION AND VENUE

84.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the 352 Fund asserts civil causes of action arising under the laws of the United States

and, in particular, the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), as codified at 18 U.S.C. §§ 1962 and 1964(c), *et seq.*

85.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the 352 Fund's remaining state and common law claims as those claims are so related to the 352 Fund's federal claims that they form part of the same case or controversy.

86.     This Court may exercise personal jurisdiction over defendants Wear, Water Station Management, REVL, and REVL Securities because they purposefully availed themselves of the New York forum, and transacted business in New York pursuant to C.P.L.R. § 302(a)(1), by entering into an indenture and related transactions, including the Water Station Management LLC Management Agreement dated as of April 29, 2022 between REVL and Water Station Management.   Under Section 12.9 of the indenture, Wear, Water Station Management, REVL, and REVL Securities all agreed to "SUBMIT[] TO THE EXCLUSIVE PERSONAL JURISDICTION OF, AND . . . AGREE[] THAT ALL PROCEEDINGS RELATING HERETO SHALL BE BROUGHT ONLY IN ANY COURT OF THE STATE OF NEW YORK SITTING IN THE COUNTY OF NEW YORK, AND APPELLATE COURTS THEREFROM."

87.     This Court may exercise jurisdiction over the remaining Defendants, and venue properly lies in the Southern District of New York, pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that any Defendants residing in any other district be brought before this Court.   As noted above, this Court has personal jurisdiction over, at least, defendants Wear, Water Station Management, REVL, and REVL Securities because they purposefully availed themselves of the New York forum by entering into the indenture and related agreements.  There

is no other district in which a court would have personal jurisdiction over all of the alleged co-conspirators, because:  (i)  there appears to be no basis to subject defendants Chirico and Sadek (who are subject to general personal jurisdiction in Indiana) to personal jurisdiction in the State of Washington, where Wear and the majority of the Wear Entities are subject to general personal jurisdiction; and (ii) there appears to be no basis to subject Wear and the Wear Entities to personal jurisdiction in the State of Indiana, where Chirico and Sadek are subject to general personal jurisdiction.  Moreover, as is set forth in detail below, the facts alleged demonstrate a single nationwide RICO conspiracy exists.

88.     Venue is also proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the 352 Fund's claims, including the execution of the indenture and the related transactions, occurred in New York.

## I.     The Water Station Enterprise

89.     On information and belief, defendant Wear, in association with defendants Sadek and Chirico, created, operated, and controlled a web of companies, including Water Station Management, the Wear Entities, C3 Capital, and other unknown affiliated entities, all for the purpose of funneling monies to themselves that should have been used to purchase Water Machines.

90.     On information and belief, the foregoing Defendants operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are a group of associated persons and legal entities that share a common purpose to engage in a Ponzi scheme and defraud the 352 Fund and its investors in connection with the bonds purchased from Water Station Management. These Defendants worked together as a common unit to achieve their fraudulent purpose and

have done so since at least April 2022—long enough to allow them to succeed in misappropriating over $100 million in bond proceeds.

91.     Although Wear is the linchpin of the enterprise, the enterprise exists separate and apart from Wear and the pattern of activity in which the enterprise engages.

92.     Each of the other members has a distinct role in the enterprise.

93.     Sadek served as CFO of Water Station Management and, in that role, on information and belief, he authorized the fabrication of documentation that the members of the enterprise used to access proceeds under the bonds so that they could be misappropriated.  He also provided personal funds to Water Station Management to ensure its survival in the face of possible defaults so that the enterprise could continue to carry on its fraudulent purpose.

94.     Chirico, as the 352 Fund's portfolio manager, authorized numerous investments in Water Station Management through bond purchases and knowingly aided and abetted the transfer of bond proceeds to the Wear Entities and/or other members of the enterprise, including to his own company, C3 Capital.

95.     On information and belief, C3 Capital was the recipient of bond proceeds and was used by Chirico to conceal his personal investments in Water Machines and otherwise misappropriate funds.

96.     On information and belief, the remaining Wear Entities were either recipients of bond proceeds, recipients of assets purchased with bond proceeds, transferees of collateral under the bonds, or otherwise aided and abetted the enterprise in its purpose to misappropriate bond proceeds as well as monies that belonged to franchisees.

97.     On information and belief, the enterprise has been ongoing at least since April 2022, and each of its members have engaged in at least two predicate acts of racketeering activity within ten years of each other, including commercial bribery, and utilizing the federal wires to transfer and receive fraudulently obtained funds.

## II.     Chirico's "Investment" with Water Station Management

98.     In or around April 2018, prior to becoming portfolio manager of the 352 Fund, Chirico—through a closely held company called C3 Capital—entered into a common business arrangement with Wear and Water Station management.

99.     Specifically, Chirico caused C3 Capital to invest approximately $7 million in the acquisition of Water Station Management franchises under a franchise agreement, funded in part by Small Business Administration loans.  C3 Capital purportedly acquired approximately 700 Water Machines pursuant to this arrangement, all of which were to be placed, operated and managed by Water Station Management for a fee.  Chirico then subsequently agreed with Wear, on behalf of Water Station Management, that in lieu of being paid based on a percentage of revenue generated by these machines, C3 Capital would be paid a flat rate of return of 15% per annum.   Notwithstanding that Chirico represented to the Small Business Administration that he had used personal funds as a deposit for the purchase of the Water Machine franchises, Chirico has subsequently admitted that the bulk of the down payment was rebated to him by Wear.

100.    On information and belief, Chirico also persuaded his friends and family to become "franchisees" of Water Station Management, such that each invested capital for the "purchase" of Water Machines in return for guaranteed fixed rates of return.

101.    Further on information and belief, Wear and Water Station Management entered into numerous such agreements with other "franchisees" around the country, under which the franchisee paid for Water Machines that would be installed and managed by Water Station Management, in return for a guaranteed flat rate of return for as much as 28% per annum.  A number of those investors have since filed lawsuits across the United States, accusing Wear and Water Station Management of running a Ponzi scheme in which the machines never existed, or the same machines with unique serial numbers were fraudulently "sold" numerous times to different investors.  These investors have claimed that the returns paid by Water Station Management were not paid out of revenue generated by Water Machines, but by funds raised by new franchisees, loans, or other sources.

### III.    Chirico Creates the 352 Fund as Portfolio Manager

102.    On May 28, 2020, Chirico joined Leucadia to establish a new investment strategy and manage investment funds (*i.e.*, the 352 Fund and managed accounts).  Chirico had previously sought employment with Leucadia but was not hired at the time because he lacked a sufficient investment track record.  Several years later, after developing a track record, Chirico reached out to Leucadia and stated that his strategy would be to acquire a portfolio of asset-backed securities, loans and other financial instruments on behalf of the 352 Fund to obtain long term returns on investments secured by collateral.  In that role, Chirico was the senior-most

position in a three-person (later four-person) team.  As portfolio manager, Chirico owed

fiduciary duties of good faith and loyalty to the 352 Fund and its investors.

**IV.   Chirico Directs the 352 Fund to Invest in Water Station Management**

103.    In or around April 2022, Chirico arranged for the 352 Fund and its affiliate to

invest in Water Station Management through a bond offering.  Pursuant to an indenture dated

April 29, 2022, Water Station Management issued Class A notes in the aggregate principal

amount of $56,250,000, and Class B notes in the aggregate principal amount of $15,000,000.

Non-party Heartland Financial purchased the Class A notes, and Chirico caused the 352 Fund

and its affiliate to purchase the Class B notes.

104.    U.S. Bank was the Trustee under the indenture.

105.    The purported business rationale for Water Station Management's issuance of

the bonds was to obtain capital to purchase and deploy Water Machines.  Those Water Machines

were supposed to be either: (i) new machines manufactured by Water Station Management's

affiliate, Creative Technologies; or (ii) machines that had previously been sold to franchisees,

which would be repurchased and then operated for the exclusive benefit of Water Station

Management.  The Water Machines and the revenue they generated were supposed to secure

Water Station Management's payment obligations under the bonds, such that the obligations

would be at least 100% secured by collateral at all times.

106.    Section 10.2 of the indenture required that the proceeds of the bonds were to be

maintained in a segregated account at U.S. Bank (the "Acquisition Account"), which was

pledged as additional security for the bonds.  Funds on deposit in the Acquisition Account could

only be withdrawn by Water Station Management upon receipt by the "Trustee" (U.S. Bank) of

a "Withdrawal Certificate" executed by Water Station Management and approved by the "Collateral Manager" (REVL) for the purpose of acquiring Water Machines, defined as "Eligible Assets."   Section 7.6(e) of the indenture expressly prohibited Water Station Management from using the bond proceeds for any purpose other than making a one-time prepayment on certain warehouse leases (not at issue here) or for purchasing Water Machines.

107.   Pursuant to the Granting Clauses of the indenture, U.S. Bank, as Trustee, was granted a first priority security interest in all assets of Water Station Management (with limited, irrelevant exceptions), including all existing Water Machines and all such machines purchased by Water Station Management in the future, for the benefit of the holders of the bonds.  On April 29, 2022, U.S. Bank filed a UCC-1 financing statement, number 2022-119-1619-8, perfecting the security interest granted under the indenture.

108.   Pursuant to a Management Agreement dated as of April 29, 2022, between Water Station Management and REVL (the "Collateral Management Agreement"), REVL was appointed as the Collateral Manager under the indenture.  As the Collateral Manager, REVL agreed, *inter alia*, "to provide certain kinds of asset management, reporting and administrative services" in respect of the collateral and the notes under the indenture "for the benefit of the holders of the Notes," as described more fully therein.

109.   REVL's responsibilities included, *inter alia*, the obligation to "review and approve in writing to the Trustee … each acquisition" of a Water Machine to the extent purchased with the bond proceeds, based on proper documentation provided by Water Station Management demonstrating such purchase.  The documentation and information were required to include, *inter alia*, invoices or purchase orders, model and serial numbers, locations, retailers,

purchase prices, and a withdrawal certificate.  REVL was required to review that information, verify good title to each Water Machine to be acquired, and confirm in writing to the Trustee that any assets purchased using bond proceeds was an "Eligible Asset"—*i.e.*, a Water Machine.

110.    REVL also had numerous reporting obligations related to the financial condition of Water Station Management and the integrity of the collateral securing the bonds.  For example, REVL was required to provide to U.S. Bank monthly Excel files containing information about the Water Machines owned by Water Station Management, monthly balance sheet and cash activity as related to the bond facilities, quarterly performance reports, and monthly ad-hoc analytics as requested by the noteholders for all pledged and non-pledged assets.

## V.    Chirico's Undisclosed Conflicts of Interest

111.    Upon joining Leucadia, Chirico was required to disclose any outside business interests.  While Chirico disclosed that he owned C3 Capital, he never disclosed that, through C3 Capital, he had a $7 million investment with Wear and Water Station Management at the time he was orchestrating the purchase of Water Station Management's bonds on behalf of the 352 Fund.  In response to subsequent inquiries about his C3 Capital investment, Chirico continued to conceal his ownership of Water Station Management franchises.

112.    On or about September 30, 2022, five months after the bond transaction closed, C3 Capital obtained a promissory note from Wear in the amount of $1,900,000 at an interest rate of 15% per annum, the same rate of return guaranteed on Chirico's franchise investments. It is unclear why Wear agreed to pay $1,900,000 to Chirico.  On that same day, $3.6 million was wired by Water Station Management to pay off Chirico's Small Business Administration loan.

31

113.    On information and belief, on November 15, 2022, seven months after the bond transaction closed, Chirico and his wife caused C3 Capital to sell 100 of its Class A shares to Wear's other company, Creative Technologies, with a stated purchase price of $7,259,000.

114.    Chirico was also conflicted because of the Water Station Management franchises owned by his family and friends.   Water Station Management failed to make payments with regard to these Chirico-related franchise holdings.   As these franchisees were at risk of defaulting on their Small Business Administration loan obligations, Chirico personally paid them a total of $300,000 for the purpose of servicing their debts and discouraging them from commencing litigation against Water Station Management and Wear.  Wear agreed to refund to Chirico the $300,000 he paid to his friends and family.

115.    Chirico never disclosed to the 352 Fund that Wear owed him $1,900,000 under a promissory note or that Creative Technologies owed more than $7 million for the purchase of 100 shares of C3 Capital.  Nor did Chirico ever disclose that his friends and family owned franchises with Water Station Management and therefore stood to benefit from Water Station Management's use of bonds proceeds to purchase Water Machines from the franchisees, or conversely, to lose their investments if Water Station Management were to default on the bonds or otherwise become insolvent.  Chirico also did not disclose that Wear had promised to repay him the $300,000 that Chirico had paid to his family and friends who were Water Station Management franchisees.  These conflicts provided strong incentives to Chirico to maintain, and later increase, the 352 Fund's bond positions with Water Station Management and continue to prop up the company even after it became clear that it was engaged in fraud.

116.    Non-party Kaiwing Fung ("Fung"), the former Head of Credit for the 352 Fund, also failed to adequately disclose that he owned Water Station Management franchises at the time of the 352 Fund's investment.

## VI.    The First and Second Indenture Supplements and Waivers

117.    Following the issuance of the bonds in April 2022, and during the months that followed, Water Station Management regularly provided REVL with documentation that purported to show that Water Station Management was purchasing Water Machines to induce REVL to authorize the release of bond proceeds.  Water Station Management also provided monthly operational, financial and collateral reports intended to demonstrate that the Water Machines were installed and generating revenue.

118.    For example, on September 15, 2022, Wear, on behalf of Water Station Management, executed a withdrawal certificate purporting to authorize U.S. Bank to release $3,569,150 of bond proceeds, which was supposed to be used to purchase 442 Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  In the withdrawal certificate, Wear and Water Station Management confirmed that "the funds so withdrawn will be solely used to fund the purchase of Eligible Assets pursuant to the indenture and Purchase and Sale Agreement."

119.    However, contrary to Wear and Water Station Management's representations, Water Station Management did not purchase Water Machines with this money.  Only $1.2 million of the approximately $3.5 million of bond proceeds was transferred to Creative Technologies, the purported manufacturer of Water Machines.  On information and belief, the

remaining funds were transferred to either some (or all) Wear Entities or to franchisees to pay their guaranteed returns.

120.    For instance, on September 16, 2022, at least $200,000 of bond proceeds was transferred to Refreshing USA, a Wear-owned affiliate.  Similarly, on September 19, 2022, Water Station Management transferred bond proceeds to a franchisee named Todd Gerig.  This payment reflected a "12% fixed return" that Water Station Management had guaranteed to Mr. Gerig in a July 19, 2019 service and management agreement.

121.    The 442 Water Machines that were supposed to have been purchased by Water Station Management with the September 15, 2022 withdrawal did not exist.

122.    Likewise, on September 20, 2022, Water Station Management executed a withdrawal certificate purporting to authorize U.S. Bank to release $3,294,600 of bond proceeds to purchase 408 Water Machines, all identified by particular serial numbers.  Wear and Water Station Management again confirmed that "the funds so withdrawn will be solely used to fund the purchase of Eligible Assets pursuant to the Indenture and Purchase and Sale Agreement."

123.    However, at least $775,000 of these funds were diverted to Wear's affiliated company, Refreshing USA.  On information and belief, the remaining funds were sent to other Wear Entities and franchisees.  For example, on September 21, 2022, Water Station Management transferred bond proceeds to another franchisee named Lou Wittenberg.  The Water Machines that were identified by serial number to be purchased with the withdrawn funds did not exist.

124.    In addition, the documentation that Water Station Management provided to U.S. Bank and REVL to induce them to release bond proceeds contained serial numbers of Water

Machines that double counted, and sometimes triple counted, modem device IDs.  This meant that certain Water Machines had been reporting inflated revenue.

126. Following this deception, Wear and Water Station Management continued to represent that the proceeds of the bonds had been spent on Water Machines, and that those machines were generating revenue sufficient to cover Water Station Management's obligations under the bonds.

126. On or about January 23, 2023, Chirico directed the 352 Fund to authorize the First Indenture Supplement and Waiver, pursuant to which Water Station Management issued $19,875,000 of additional Class A notes, purchased by non-party Heartland Financial, and $5,300,000 of additional Class B notes, purchased by the 352 Fund and its affiliate.  The 352 Fund later acquired all of the Class B notes purchased by its affiliate.

127. On or about June 5, 2023, Chirico directed the 352 Fund to authorize the Second Indenture Supplement and Waiver, which, at Wear's request, provided a more favorable servicing fee of 20% to Water Station Management and permitted Water Station Management to direct U.S. Bank to withdraw up to $1,552,200 from the Acquisition Account.

**VII.   REVL Discovers the Fraud But Fails to Take Action**

128. On information and belief, as early as June 2023, REVL began to suspect that there were inaccuracies in the information reported by Wear and Water Station Management concerning the Water Machines.  REVL hired an outside firm to perform on-site inspections where the Water Machines were supposedly located.  As reported by REVL in an email dated August 11, 2023, sent to Wear and Chirico (but not to U.S. Bank or Heartland Financial or anyone from Leucadia), the outside firm visited 164 locations identified by Water Station

Management as having operating Water Machines.  Of the 164 locations visited, 163 "had **NO WST-700** machines located on site."  (Emphasis in original).

129.    In response, Wear provided a number of false excuses and explanations, such as that the machines had been "re-routed" because of unavailable utilities, lack of space or competition from other machines.

130.    On August 16, 2023, REVL reported to Wear and Chirico that further investigation revealed that "3000+" Water Machines that were intended to be installed at Family Dollar stores and other locations "are actually missing."

131.    On September 12, 2023, REVL reported to Chirico that REVL had performed further on-site inspections at warehouses that Wear had represented contained Water Machines. During that inspection, REVL was unable to locate any of the "3,500 machines we're not seeing any revenue on."  That is nearly *half* of the machines that Water Station Management claimed that it had purchased and put into operation, and that secured the bonds.

132.    In a subsequent email on September 12, 2023, REVL informed Wear, with a copy to Chirico, that, "since this remains unresolved, the ***90 day cure period has started and you have until 11/29/2023*** to either demonstrate the collateral is in good working condition collecting revenue or deposit the cash used to buy those machines back into the collection account.  If neither of these is complete, 100% of available cash flow will be used to pay down the debt, and there will be no cash released for servicing."  (Emphasis in original).

133.    REVL's email apparently referred to Section 7.4(f) of the indenture, which provides that if a Water Machine "is in need of maintenance or repairs, the Issuer shall have ninety (90) days from the date the Issuer becomes aware of such Asset's need for maintenance

or repair to make such repairs and maintenance," or to return the bond proceeds associated with the purchase of that machine to the Acquisition Account at U.S. Bank.  However, on information and belief, REVL never informed U.S. Bank, as Trustee, or anyone from Leucadia (other than Chirico) that it discovered a substantial number of Water Machines did not exist, that Wear and Water Station Management had lied about their existence and location, or even that REVL had purported to invoke a 90 day cure period under the indenture.

134.    Based on REVL's discoveries, REVL knew that the documents and information provided by Water Station Management to demonstrate that bond proceeds would be used to purchase Water Machines were fabricated, and that Water Station Management's reports concerning the location, operations and revenue of those machines were false and misleading. Any one of those facts constituted a breach of the indenture and demonstrated that Water Station Management was engaged in an ongoing fraud as to the bondholders.  Nonetheless, on information and belief, REVL never informed U.S. Bank, as Trustee for the bonds, of these discoveries.

135.    Worse, over the next several weeks, REVL continued to authorize the release of bond proceeds, totaling $357,458, from the Acquisition Account at U.S. Bank to Water Station Management for the supposed purchase of Water Machines.  In so doing, REVL knowingly joined the ongoing conspiracy, in order to continue to collect fees, conceal the fact that REVL had breached its duties to monitor and ensure the integrity of the bond collateral, and permit the Wear Entities to continue their operations.  REVL's release of the bond proceeds substantially assisted the ongoing scheme.

136.    During this period, on information and belief, Water Station Management was not using the bond proceeds to purchase Water Machines.  It was instead using those funds to pay franchisees that were complaining about Water Station Management's failure to pay amounts purportedly due on their "investments."  Wear and Water Station Management also diverted bond proceeds to pay other creditors of Water Station Management and Wear's other companies, and/or to Wear himself, all in violation of the indenture.

137.    On information and belief, REVL also learned that Wear arranged to have modems associated with the bond collateral deposit funds into approximately twenty-seven different bank accounts associated with Wear through the Wear Entities, instead of to the bank accounts that were pledged as security for the bonds, as required under the indenture.

138.    On November 29, 2023, the purported 90 day "cure period" expired, without Water Station Management doing anything to identify or provide operating Water Machines, to explain why they were missing, or otherwise address the major problems identified by REVL. That same day, Wear emailed non-party Cantaloupe, a payment processor, and copied REVL, requesting that Cantaloupe redirect modems corresponding to separate food and beverage vending machines that he owned through the Wear Entities, including, but not limited to, Refreshing USA, Refreshing Mid-Atlantic, and Refreshing Midwest, to the Water Station Management account.  Wear and Water Station Management did so to make it appear that revenue was being generated by Water Machines, while obfuscating the fact that those machines did not actually exist.

139.    Because REVL was copied on Wear's email, it was fully aware of this deception. REVL still did nothing.  On information and belief, REVL still failed to inform U.S. Bank about

the missing collateral, the fraud, the use of other food and beverage machines to conceal the fraud, or that a 90 day cure period had expired and an event of default had occurred.

140.    Throughout this period, Chirico used REVL Securities as a purported "independent" third party to mark the value of the bonds to market, for purposes of reporting the value of the bonds to investors.  The employees of REVL Securities responsible for valuing the bonds were the same individuals at REVL who knew that the collateral was missing, that Water Station Management had been committing fraud, and that an event of default had occurred.  REVL Securities nonetheless continued to mark the value of the bonds at or within 99% of par value throughout the fall of 2023, further helping to conceal these crucial facts. REVL Securities only later marked the Series A bonds to 82% of par to reflect the price at which Heartland Financial sold those bonds in December 2023 (as described below), but continued to mark the Series B bonds within 99% of par value up until the point when U.S. Bank declared an event of default in May 2024.  If the bonds had been valued correctly to reflect the obvious risks associated with the missing collateral and ongoing fraud, U.S. Bank and the 352 Fund's investors would have been immediately alerted to the serious problems underlying this investment.  By providing inflated marks to conceal the fraud, REVL Securities knowingly joined the conspiracy and enabled the Wear Entities to continue their operations, thereby substantially assisting the ongoing scheme.

141.    At this point, Water Station Management was insolvent and had defaulted on its interest payment obligations to the bondholders.  That default had been cured only by millions of dollars in personal loans made to Water Station Management by its own CFO, Sadek, on December 5, 2023.

142.    Because REVL Securities failed to value the bonds correctly, and because REVL failed to inform U.S. Bank of the events of default and fraud of which it had actual knowledge, they prevented U.S. Bank from formally declaring an event of default, ceasing the further withdrawal of bonds proceeds, preserving and or attempting to foreclose against the collateral, or taking any other steps to preserve value for the bondholders.

**VIII.    The Third Indenture Supplement and Purchase of the Class A Notes**

143.    Chirico was equally aware that Wear and Water Station Management were engaging in fraud and were unable to provide the collateral necessary to secure the bonds, having received the above reports and emails from REVL.  He was also aware that Water Station Management was in serious financial distress and unable to pay creditors in the ordinary course of its business, including required interest payments on the bonds, or even to make payroll.

144.    Instead of informing U.S. Bank of these critical facts or taking any action to protect the investors in the 352 Fund, Chirico inexplicably directed the 352 Fund ***to more than quadruple its exposure to Water Station Management*** by purchasing the vast majority of the Class A notes from Heartland Financial.  On or about December 20, 2023, Chirico negotiated and reached an agreement for the 352 Fund and its affiliate to purchase $70.125 million of Class A notes for 82 cents on the dollar, thereby increasing its investment in Water Station Management to $87.925 million.

145.    There is no legitimate or good faith business justification for directing the 352 Fund to purchase the Class A notes with knowledge of the ongoing fraud perpetrated by Water Station Management, that tens of millions of dollars of collateral did not exist (and probably never existed), and that Water Station Management was effectively insolvent.  However, by

taking Heartland Financial out of the deal, Chirico was able to ensure that Heartland Financial would not insist on declaring an event of default and putting Water Station Management out of business. On information and belief, one contributing factor to Chirico's decision was to remove any oversight by Heartland Financial, which would allow him to loosen the indenture's restrictions and requirements for the benefit of Water Station Management, and direct funds from the 352 Fund to Water Station Management to prop up the failing company and the ongoing Ponzi scheme. By doing so, Chirico was actively supporting the Ponzi scheme.

146.    If a default occurred, Chirico and his friends and family would likely never recover on their investments in Water Station Management. However, loosening the restrictions on Water Station Management's use of bond proceeds would enable Wear to continue to funnel money to franchisees, and perpetuate the Ponzi scheme. Indeed, in a September 2023 text message exchange with his wife, who was a co-owner of C3 Capital, Chirico expressed that he was "pissed at Ryan [Wear]" because "he's not going to be able to make our 300k payment on time either from selling C3 so need to address that as well." When his wife asked, "Does that worry you about the bond deal," Chirico responded: "Yes for bond deal ***but I care as much or more about the personal investors that are with him still*** ..." (Emphasis added).

147.    Removing Heartland Financial also allowed Chirico to make changes to the terms of the indenture that would loosen the restrictions on Water Station Management's ability to use the funds, to purportedly waive the numerous events of default of which Chirico was aware, and provide changes to the collateral provisions that would favor Water Station Management and help prop up the failing business while it continued to make payments to other creditors, or to franchisees.

148.    After Heartland Financial was taken out of the deal, on December 20, 2023, Chirico directed the 352 Fund to authorize the Third Indenture Supplement and Waiver.  That agreement loosened the restrictions on the Acquisition Account and allowed Water Station Management to withdraw bond proceeds up to $970,000 for *any* purpose.  It also allowed Water Station Management to provide substitute collateral for the assets originally pledged under the indenture, which it never did.

149.    In explaining the business rationale for the amendment to Leucadia, Chirico misleadingly stated that the goals were the "Release of the $$ in the [Acquisition Account] fund of the deal [because] the originator is no longer acquiring new assets" and to provide for "Substitution of collateral – for the purpose of replacing any non-performing assets."  At no point did Chirico disclose that he was removing the restrictions on Water Station Management's use of the bonds proceeds because it otherwise could not meet basic day-to-day obligations, such as payroll, that Water Station Management was "no longer acquiring new assets" because, in fact, it had never used the bond proceeds to acquire Water Machines in the first place, or that the assets were "non-performing" because they were the subject of a fraudulent scheme and did not exist.

## IX.    The Fourth and Fifth Indenture Supplement, and Upsize of the Bonds

150.    On January 25, 2024, REVL confirmed to Chirico that, after further investigation, it could not find the majority of the 6,500 Water Machines that were supposedly

purchased using the bond proceeds, and that were supposed to be the collateral securing the bonds.

151.    Around this time, on information and belief, Wear admitted to Chirico what had already been confirmed by REVL on December 2, 2023: that more than 80% of the modems that were supposed to be on Water Machines to direct and report revenue generated by those machines were not on Water Machines at all.  Instead, Wear (or someone acting at his direction) had set up modems on food and beverage vending machines operated by some of the Wear Entities to falsely report revenue generated by those vending machines as revenue generated by the Water Machines.  The purpose of that deception was to help cover up the fact that Wear and Water Station Management had not been purchasing Water Machines with the bond proceeds, but had instead been diverting those funds for their own purposes, including to facilitate the ongoing Ponzi scheme with the Water Station Management franchisees.

152.    In a telephone call on January 29, 2024, between Wear, Sadek, and Chirico (and recorded by Chirico), Chirico admitted that he believed, *in the best case*, there were only $41 million of Water Machines that existed and collateralized all of the Water Station Management bonds.  Sadek admitted that Water Station Management was "*the largest franchise fraud in the history of the United States,*" and told Wear that he was "*going to jail*."

153.    Moreover, during January 2024, non-party Fung learned that the specific Water Station Machines that he had purchased as part of his franchise investment had also been "sold"

to other franchisees.  Fung promptly advised Chirico that Water Station Management had sold identical assets to multiple parties.  He did not alert anyone else.

154.    Notwithstanding that Chirico was entirely aware that the investment in the bonds was undercollateralized by at least $46 million, and that Water Station Management had defrauded the 352 Fund, Chirico again directed the 352 Fund to pump millions of dollars into Water Station Management.  On February 2, 2024, Chirico directed the 352 Fund to enter into the Fourth Indenture Supplement and Waiver, pursuant to which the 352 Fund purchased an additional $15 million in Class A notes and $4 million in Class B notes, raising the 352 Fund's total exposure to $106.9 million.  He further purported to waive, as events of default under the indenture, Water Station Management's misuse of the proceeds of the bonds, fraudulent misrepresentations about the existence of the collateral, failure to provide financial statements since at least November 2023, and numerous other serious breaches of the indenture.

155.    To obtain the necessary signatures from Leucadia for the bond upsize and amendment, Chirico directed a 352 Fund employee to draft a misleading email explanation that purposely avoided any mention of the dire state of the investment.  For example, the email falsely stated that the purpose of the upsize was to "increase [the] collateral base and support long term revenue growth of the collateral securing the bond deal," even though he knew that Water Station Management had no plans to purchase Water Machines or any other assets that could be used as collateral, but instead that the bond proceeds would be used to meet ordinary business expenses because the company was insolvent, and to pay out franchisees on their "investments."  Chirico also suggested that the amendment would allow Water Station Management to "kick out underperforming collateral and replace [it] with stronger revenue

performing assets," without mentioning that the Water Machines—the supposed collateral—were "underperforming" because the majority of them did not exist.  He falsely described the waivers of events of default as relating to a "technical EOD on the real estate assets," without mentioning that he was also purporting to waive the right to declare an event of default because of the major ongoing fraud and misuse of bond proceeds.  In Schedule C to the Fourth Indenture Supplement and Waiver, which set forth the list of actions and events subject to the waiver, the descriptions of these egregious actions and events were made deliberately vague to avoid alerting the signatories to the true nature and extent of Water Station Management's fraud and other misconduct.

156.    Two weeks later, on February 14, 2024, Chirico authorized the Fifth Indenture Supplement and Waiver, which purported to authorize Water Station Management to withdraw bond proceeds from the Acquisition Account at U.S. Bank for any purpose whatsoever, without receiving authorization from REVL as Collateral Manager.

157.    On information and belief, the reason that Chirico directed the 352 Fund to provide an additional $19 million of funding to Water Station Management, to waive material events of default, and loosen restrictions on withdrawals of the bond proceeds, was to continue to prop up the failing company until such time as it could pay its obligations to Chirico, his friends and family.

## X.    The Purported Release of Collateral

158.    After directing the 352 Fund to provide more funds to Water Station Management, Chirico and Wear then agreed on a plan that would allow Water Station Management to take back full control of the Water Machines that did exist and the revenue they

generated.  On information and belief, Wear and Chirico intended to use those Water Machines to generate further funds (either through sales of the machines, by pledging the machines as collateral to obtain other loans, or collecting the revenue they generated) to keep the scheme going until it could find a new counterparty to refinance the Wear Entities' outstanding obligations.  Wear has claimed that the release rendered the 352 Fund's $106.9 million exposure to Water Station Management completely unsecured.

159.    On February 20, 2024, Chirico and Wear entered into an agreement that purported to direct U.S. Bank to release all of the Water Machines, including the revenue they generated, from the lien under the indenture that secured the bonds.

160.    The purported release of the security interest was induced by the fraud of Wear and Water Station Management, and Chirico's complete abandonment of the interest of the 352 Fund.  The 352 Fund received no benefit whatsoever by the purported release of collateral.   Any such purported release of a security interest should be voided as a product of the fraudulent scheme.

161.    Although the 352 Fund held a lien over all of Water Station Management's assets, the Water Machines were the only collateral of any value at the time.

162.    On February 29, 2024, unaware of the ongoing fraudulent scheme, U.S. Bank followed the direction in the February 20, 2024, agreement and authorized the filing of a UCC-3 statement to amend the existing UCC-1 statement that perfected the original lien in the indenture as to all assets of Water Station Management.  The UCC-3 statement reported that the Water Machines were now purportedly excluded from the lien.  As a direct result of Chirico's and Wear's scheme, the 352 Fund was left as a purportedly unsecured creditor.

XI.     **U.S. Bank Declares Two Events of Default**

163.    On or about March 20, 2024, the balance of Water Station Management's "Interest Reserve Account" fell below the balance required to be maintained in such account, pursuant to Sections 1.1 and 5.1 of the indenture.

164.    On March 20, 2024, U.S. Bank notified Water Station Management that it had a fifteen day grace period, or until the close of April 4, 2024, to remedy the shortfall before an event of default would be triggered under Section 5.1(a)(iii) of the indenture.  By April 5, 2024, Water Station Management had failed to provide the required funds or remedy the shortfall, thereby triggering an event of default.

165.    On May 28, 2024, U.S. Bank issued a notice of default to Water Station Management based on the shortfall in the Interest Reserve Account.

166.    Chirico was terminated by Leucadia and therefore from his role as portfolio manager of the 352 Fund effective June 5, 2024.

167.    On June 20, 2024, Water Station Management was required to make interest payments on the Class A and B notes under Sections 5.1(a)(i) and (ii) under the indenture.  Water Station Management failed to make the interest payments, and that day, U.S. Bank issued another notice of an event of default to Water Station Management based on Water Station Management's failure to "make any interest payments when due under the Class A Notes" and failure to "make any interest payments when due under the Class B Notes."

168.    Pursuant to Section 5.2 of the indenture, on July 1, 2024, the 352 Fund sent U.S. Bank written direction causing U.S. Bank to issue default notices to Water Station Management,

declaring the principal of the notes and all accrued and unpaid interest thereon to be immediately due and payable.

169.    Although U.S. Bank issued a default notice, at the time of the filing of this complaint, Water Station Management has failed to remedy the default or repay outstanding principal and interest, as required under the indenture.

170.    Pursuant to Section 5.10 of the indenture, the 352 Fund, as the noteholder, has the absolute and unconditional right to "receive payment of the principal of and interest of" the Water Station Management bonds and "to institute suit for the enforcement of any such payment . . . ."

171.    Moreover, pursuant to an agreement dated July 1, 2024, the Trustee has agreed that the 352 Fund has the right to institute these proceedings and take all other necessary steps to enforce rights under the indenture as to Water Station Management.

## CAUSES OF ACTION

### Count I: Violations of 18 U.S.C. § 1962(a)
### (Against Wear, Sadek, Chirico,
### C3 Capital, and the Wear Entities)

172.    The foregoing paragraphs are incorporated as if expressly set forth herein.

173.    The 352 Fund is a corporate entity, and therefore constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

174.    Wear, Sadek, Chirico, C3 Capital, and the Wear Entities, are natural persons and business entities, and therefore each constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

175.    The foregoing Defendants operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are a group of associated persons and legal entities that:  (i) share a common purpose to engage in a Ponzi scheme and defraud the 352 Fund and its investors in connection with the bonds; (ii) have ongoing relationships and work together as a common unit to achieve such purpose; and (iii) each of these persons and entities have worked together since at least April 2022, which is long enough to allow them to achieve their purpose.

176.    The foregoing Defendants engaged in at least two acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1), including wire fraud under 18 U.S.C. § 1343, within ten years of each other.

177.    The Defendants engaged in wire fraud because they devised a scheme to defraud the 352 Fund by using false pretenses, such as fabricated purchase orders and revenue reports, which were transmitted by electronic mail and wires across various states for the purpose of executing the scheme.

178.    For example, on September 15, 2022, and separately, on September 20, 2022, Wear and Sadek prepared fraudulent withdrawal certificates and corresponding invoices and bills of sale for the purported purchase of Water Machines (which was never intended to be performed), and which were sent to U.S. Bank and REVL via electronic mail to induce the release of proceeds under the bonds.  Those proceeds were then directed to the Wear Entities, who had knowledge of the scheme through their principal, Wear.

179.    In addition, Defendants falsely created the appearance that revenue was being generated by Water Machines when in fact it was being derived from other sources such as food and beverage machines or franchisees' investments.  For example, Wear instructed Cantaloupe,

the non-party payment processor, to redirect the modems corresponding to the food and beverage vending machines to the account designated for the Water Machines. Chirico learned of this fact but did not disclose this information to U.S. Bank or Leucadia and instead concealed this modem switch. On information and belief, the remaining Defendants aided and abetted Wear in transferring the modems. The appearance of this revenue was provided by way of false reports purportedly indicating that revenue which was being generated by Water Machines, and these reports were communicated to the 352 Fund and U.S. Bank.

180.   Sadek assisted and participated in the enterprise by authorizing the fraudulent withdrawal certificates, bills of sale, invoices and reports and loaning Water Station Management monies to prevent an event of default, thereby allowing it to continue to operate the enterprise. On information and belief, Sadek also owned franchises and received payments for his franchises from the proceeds of the bonds.

181.   C3 Capital assisted and participated in the enterprise by receiving bond proceeds from the time the bond was issued until the sale of its shares to Creative Technologies (which, upon information and belief, acquired those shares also with bond proceeds), and by being the mechanism by which Chirico concealed his personal investment in the Water Machine franchises and his ongoing involvement in the fraud.

182.   Wear, the Wear Entities, Chirico and C3 Capital also engaged in commercial bribery under N.Y. Penal Law § 180.03 and 180.08 when they agreed that Wear and the Wear Entities would confer to Chirico and C3 Capital more than $7 million dollars, purportedly to acquire shares of C3 Capital, but in fact in order to influence Chirico's decision to invest the 352 Fund's capital in Water Station Management bonds as part of the fraudulent scheme. These

are acts of bribery that are chargeable under New York state law and are punishable by imprisonment for more than one year. They therefore constitute predicate acts under 18 U.S.C. § 1961(1)(A).

183. At all relevant times, the enterprise was engaged in and had activities that affected interstate commerce, since the bond proceeds were transferred from the 352 Fund's bank accounts in New York to the Defendants, primarily located in Washington, which then further distributed the bond proceeds throughout the United States.

184. The foregoing Defendants received income from the proceeds of the bonds, which was derived, directly or indirectly from a pattern of racketeering, that such Defendants used or invested to continue to operate the above-described enterprise in violation of 18 U.S.C. §§ 1962(a).

185. The above-referenced acts were undertaken by the foregoing Defendants with the same or with similar intent, results, accomplices, victims or methods of commission, or are otherwise related by distinguishing characteristics and are not isolated instances. Such acts are a regular method by which Defendants have conducted and continue to conduct the affairs of the enterprise.

186. The 352 Fund's right to repayment has been frustrated by the enterprise's misconduct, including by the enterprise's actions to waive the 352 Fund's claims for prior breaches of the indenture and the purported release of the 352 Fund's collateral. Accordingly, notwithstanding the 352 Fund's efforts to pursue all avenues to collect its debt, including via the acceleration of the debt, the 352 Fund has been unable to recover the amounts it is owed because of the waivers and releases discussed above.

187.    As a direct and proximate result of the foregoing Defendants' investment and use of the bond proceeds to establish and operate their commerce-affecting enterprise, the 352 Fund has been injured and damaged in an amount of not less than $106.9 million dollars, before trebling and not including punitive damages.

188.    The 352 Fund has also been damaged by Chirico's receipt of more than $7 million in commercial bribes, described above, and in turn may recover the monies that were paid to its faithless agent.

**Count II: Violations of 18 U.S.C. § 1962(c)**
**(Against Wear, Sadek,  Chirico,**
**C3 Capital, and the Wear Entities)**

189.    The foregoing paragraphs are incorporated as if expressly set forth herein.

190.    The 352 Fund is a corporate entity, and therefore constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

191.    Wear, Sadek, Chirico, C3 Capital, and the Wear Entities are natural persons and business entities, and therefore each constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

192.    The foregoing Defendants operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are a group of associated persons and legal entities which:  (i) share a common purpose to engage in a Ponzi scheme and defraud the 352 Fund and its investors in connection with the bonds; (ii) have ongoing relationships and work together as a common unit to achieve such purpose; and (iii) each of these persons and entities have worked together since at least April 2022 which is long enough to allow them to achieve their purpose.

193.   The foregoing Defendants are associated with the enterprise as founders and principals of its members.

194.   The enterprise exists separate and apart from Wear.

195.   The enterprise exists separate and apart from the pattern of activity in which it engages.   On information and belief, the enterprise began with the legitimate acquisition of Water Machines and continued to grow through fraud.

196.   Each of the foregoing Defendants has a distinct role in the enterprise.

197.   Wear and the Wear Entities operate the fraud by, *inter alia*:  (i) falsifying documentation relating to the franchisee's purported purchase of the Water Machines, including bills of sale;  (ii) falsifying documents related to Water Station Management's purported purchase of the Water Machines as collateral, including, but not limited to, withdrawal certificates, bills of sale, invoices, and reports; (iii) using proceeds of the bonds to either pay back older franchisees, purchase food and beverage vending machines, or otherwise divert funds to improper purposes; (iv) using modems attached to food and beverage vending machines to inflate the appearance of revenues being purportedly generated by Water Machines.

198.   Sadek assisted and participated in the enterprise by authorizing the fraudulent withdrawal certificates, bills of sale, invoices and reports and loaning Water Station Management monies to prevent an event of default, thereby allowing it to continue to operate the enterprise.   On information and belief, Sadek also owned franchises and received payments for his franchises from the proceeds of the bonds.

199.   Chirico assisted and participated in the enterprise by causing the 352 Fund to invest additional monies in Water Station Management so that it could continue to pay back

franchisees, including himself, providing the false appearance that it was a profitable business while it further induced additional investments, and otherwise operate the fraud.  On information and belief, Chirico also owned franchises through C3 Capital and received payments for his franchises from the proceeds of the bonds.  On further information and belief, Chirico sold his franchisees back to Wear and the Wear Entities and was paid back by proceeds from the bonds.

200.    C3 Capital assisted and participated in the enterprise by knowingly receiving bond proceeds from the time the bonds were issued until the sale of C3's shares to Creative Technologies (which, upon information and belief, acquired those shares also with bond proceeds), and by being the mechanism by which Chirico concealed his personal investment in the Water Machine franchises and his ongoing involvement in the fraud.

201.    At all relevant times, the foregoing Defendants were employed by or associated with the enterprise and conducted and participated in its affairs through a pattern of racketeering activity under 18 U.S.C. § 1961(5) because the Defendants engaged in at least two predicate acts of racketeering activity within ten years of each other.

202.    At all relevant times, the foregoing Defendants were engaged in and had activities that affected interstate commerce, since the bond proceeds were transferred from the 352 Fund's accounts in New York to the Defendants, primarily located in Washington, which then further distributed the bond proceeds throughout the United States.

203.    The foregoing Defendants engaged in at least two, but likely more, acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1) including wire fraud under 18 U.S.C. § 1343, within ten years of each other.

204.     The Defendants engaged in wire fraud because they devised a scheme to defraud the 352 Fund by using false pretenses, such as fabricated purchase orders and revenue reports, which were transmitted by electronic mail and wires across various states for the purpose of executing the scheme.

205.     For example, on September 15, 2022, and separately, on September 20, 2022, Wear and Sadek prepared fraudulent withdrawal certificates and corresponding invoices and bills of sale for the purported purchase of Water Machines (which was never intended to be performed), and which were sent to U.S. Bank and REVL via electronic mail to induce the release of proceeds under the bonds.  Those proceeds were then directed to the Wear Entities, who had knowledge of the scheme through their principal, Wear.

206.     In addition, Defendants falsely created the appearance that revenue was being generated by Water Machines when in fact it was being derived from other sources such as food and beverage machines or franchisees' investments.  For example, Wear instructed Cantaloupe, the non-party payment processor, to redirect the modems corresponding to the food and beverage vending machines to the account designated for the Water Machines.  Chirico also learned of this fact through REVL but did not disclose this information to U.S. Bank or Leucadia and instead concealed the modem switch.  On information and belief, the remaining Defendants aided and abetted Wear in transferring the modems.  The appearance of this revenue was provided by way of false reports purportedly indicating that revenue which was being generated by Water Machines and such reports were communicated to the 352 Fund and U.S. Bank.

207.     Wear, the Wear Entities, Chirico and C3 Capital also engaged in commercial bribery under N.Y. Penal Law § 180.03 and 180.08 when they agreed that Wear and the Wear

Entities would confer to Chirico and C3 Capital more than $7 million dollars, purportedly to acquire shares of C3 Capital, but in fact in order to influence Chirico's decision to invest the 352 Fund's capital in Water Station Management bonds as part of the fraudulent scheme. These are acts of bribery that are chargeable under New York state law and are punishable by imprisonment for more than one year. They therefore constitute predicate acts under 18 U.S.C. § 1961(1)(A).

208.    At all relevant times, the foregoing Defendants were employed by or associated with the enterprise and conducted and participated in its affairs through a pattern of racketeering activity under 18 U.S.C. § 1961(5) because the Defendants engaged in at least two predicate acts of racketeering activity within ten years of each other.

209.    The foregoing Defendants directed and controlled the enterprise, and their participation in the enterprise was made possible, in whole or in part, by the pattern of racketeering.

210.    The above-referenced acts were undertaken by the foregoing Defendants with the same or with similar intent, results, accomplices, victims or methods of commission, or are otherwise related by distinguishing characteristics and are not isolated instances. Such acts are in fact a regular method by which Defendants have conducted and continue to conduct the affairs of the enterprise.

211.    The 352 Fund's right to repayment has been frustrated by the enterprise's misconduct, including by the enterprise's actions to waive the 352 Fund's claims for prior breaches of the indenture and the purported release of the 352 Fund's collateral. Accordingly, notwithstanding the 352 Fund's efforts to pursue all avenues to collect its debt, including via

the acceleration of the debt, the 352 Fund has been unable to recover the amounts it is owed because of the waivers and releases discussed above.

212. As a direct and proximate result of the foregoing Defendants' pattern of racketeering, the 352 Fund has been injured and damaged in an amount of not less than $106.9 million dollars, before trebling and not including punitive damages.

213. The 352 Fund has also been damaged by Chirico's receipt of more than $7 million in commercial bribes, described above, and in turn may recover the monies that were paid to its faithless agent.

**Count III: Violations of 18 U.S.C. § 1962(d)**
**(Against Wear, Sadek, Chirico,**
**C3 Capital, Wear Entities, REVL, and REVL Securities)**

214. The foregoing paragraphs are incorporated as if expressly set forth herein.

215. Defendants Wear, Sadek, Chirico, C3 Capital, and the Wear Entities, knowingly embraced the purposes and objectives of the above-reference enterprise, agreed to commit predicate acts in furtherance thereof, and conspired to violate the provisions of 18 U.S.C. §§ 1962(a) and (c).

216. The foregoing Defendants knew that they were engaged in a conspiracy to commit the predicate acts, including, but not limited to, the fabrication of Water Machine and Water Station Management documentation for the purpose of soliciting the release of bond proceeds by U.S. Bank, that such acts were part of the racketeering activity, and the participation and agreement of each was necessary to allow the commission of this pattern of racketeering activity.

217.    Upon learning that the bond proceeds had not been utilized to acquire Water Machines, as required under the indenture, REVL authorized further disbursements of bond proceeds.  REVL also helped to conceal the ongoing fraud.  In doing so, REVL knowingly joined the ongoing conspiracy in order to continue to collect fees and permit the Wear Entities to continue their operations.  REVL's release of the bond proceeds substantially assisted the ongoing scheme.

218.    Similarly, by providing inflated marks, REVL Securities knowingly joined the conspiracy, in order to continue to collect fees and permit the Wear Entities to continue their operations, thereby substantially assisting the ongoing scheme.  After Chirico was terminated from the 352 Fund, REVL Securities refused to provide additional marks.

219.    On information and belief, each of the foregoing Defendants specifically knew about and agreed to facilitate the scheme described above because the volume and frequency of the fraudulent activity and the continuance of this scheme could not have occurred without the consent and knowing collusion of the foregoing Defendants.

220.    On information and belief, none of the Defendants have withdrawn or otherwise disassociated themselves from the above-referenced conspiracy or the other members of the conspiracy.

221.    As a direct and proximate result of the foregoing Defendants' conspiracy, their acts of racketeering activity, the overt acts taken in furtherance of that conspiracy, and their violations of 18 U.S.C. § 1962(d), the 352 Fund has been injured and damaged in an amount of not less than $106.9 million dollars, before trebling and not including punitive damages.

222.    The 352 Fund has also been damaged by Chirico's receipt of more than $7 million in commercial bribes, described above, and in turn may recover the monies that were paid to its faithless agent.

223.    Pursuant to 18 U.S.C. § 1964(c), the 352 Fund is entitled to threefold its damages, plus interest, costs, and attorneys' fees.

### Count IV:  Common Law Fraud
### (Against Wear and Water Station Management)

224.    The foregoing paragraphs are incorporated as if expressly set forth herein.

225.    At all relevant times, Wear was the owner and chief executive officer of Water Station Management.

226.    After entering into the indenture in April 2022, Wear and Water Station Management provided false and misleading documentation to REVL to induce REVL to authorize the release of bond proceeds for the stated purpose of purchasing Water Machines.  In fact, that documentation was fabricated, and the majority of purported purchases of Water Machines never occurred.

227.    Wear and Water Station Management continued to provide false and misleading reports concerning the operation of the business, source of revenues, and the installation and operations of the Water Machines that were supposedly purchased with the proceeds of the bonds.  These false and misleading reports were provided to cover up the fact that Wear and Water Station Management had fraudulently diverted the proceeds of the bonds, and to induce the bondholders to refrain from declaring an event of default or otherwise taking steps to protect their investments.  Those false reports further induced the bondholders to authorize amendments to the indenture that were favorable to Water Station Management.

228.    Wear and Water Station Management furthered their deception by using modems attached to other food and beverage vending machines, owned by Refreshing USA, to falsely report revenue generated by those vending machines as revenue generated by Water Machines. The purpose of that deception was to further hide the fact that Water Station Management was improperly diverting the bond proceeds and had not used those proceeds to purchase Water Machines.

229.    The Trustee, on the 352 Fund's behalf, reasonably relied on the false representations and reports described herein when deciding to release the bond proceeds to Water Station Management, which were then misappropriated.

230.    As a result of these Defendants' misconduct, the 352 Fund has been unable to recover any of the more than $100 million in bond proceeds paid to Water Station Management.

231.    The 352 Fund has also been damaged by Chirico's receipt of more than $7 million in commercial bribes, described above, and in turn may recover the monies that were paid to its faithless agent.

232.    As a direct and proximate result of these Defendants' fraud, the 352 Fund has been damaged in an amount to be determined at trial, but no less than $106.925 million.

### Count V:  Aiding and Abetting and Conspiracy to Commit Fraud
### (Against Wear, the Wear Entities, Chirico,
### C3 Capital, REVL, REVL Securities, and Sadek)

233.    The foregoing paragraphs are incorporated as if expressly set forth herein.

234.    At all relevant times, Wear was the owner, in whole or in part, and/or a principal of the Wear Entities, specifically including, Water Station Management, Creative Technologies, and Refreshing USA.  On information and belief, Creative Technologies also acquired shares

of C3 Capital from Chirico and his wife in November 2023.  Wear's knowledge and intent in committing the fraud described above is therefore imputed to these company defendants.  Each of these affiliated companies and Wear agreed to commit the fraud and participate in the fraudulent scheme described herein and provided substantial aid and assistance to each other through the commission of wrongful and overt acts in order to accomplish that goal.

235.    Wear and Water Station Management misrepresented that Water Station Management had purchased the Water Machines as required under the indenture, failed to disclose that the majority of purported purchases of Water Machines never occurred, and misrepresented that the Water Machines had been purchased and were installed in locations around the country and were generating revenue.

236.    Creative Technologies was the manufacturer of Water Machines that Water Station Management was supposed to purchase using the proceeds of the bonds.  To facilitate the fraud of Wear and Water Station Management, Creative Technologies submitted false and misleading purchase orders, invoices and other documentation, intended to fraudulently induce REVL to approve the withdrawals of bonds proceeds for the purpose of purchasing the Water Machines.  In fact, that documentation was fabricated, and no such purchases took place.

237.    Refreshing USA was the recipient of bond proceeds to which it had no right, and allowed the use of modems attached to food and beverage vending machines that it owned to falsely report that revenue generated by those machines was being generated by Water Machines owned by Water Station Management in order to conceal the fact that Water Station Management had diverted the bonds proceeds and not used those proceeds to purchase Water Machines.

238.    On information and belief, C3 Capital received bond proceeds from the time the bond was issued until the sale of its shares to Creative Technologies.  Chirico also used C3 Capital as a mechanism to conceal from the 352 Fund both his personal investment in the Water Station Management franchises and his ongoing involvement in the fraud.

239.    By at least August 2023, Chirico knew that Wear and Water Station Management were perpetrating the fraudulent scheme described herein.  He agreed to help conceal and help perpetrate that fraud in order to prop up the failing Water Station Management business and Ponzi scheme and increase the chances that he and his friends and family would be paid out on their "investments" with Water Station Management.

240.    By at least August 2023, REVL knew that Wear and Water Station Management were perpetrating the fraudulent scheme described herein.  REVL permitted the proceeds of bonds to be released for improper purposes, did not monitor the bonds' collateral, and did not report to U.S. Bank that it had reason to know Water Station Management failed to comply with its obligations under the indenture and was committing a massive fraud.

241.    By at least August 2023, REVL Securities knew that Wear and Water Station Management were perpetrating the fraudulent scheme described herein.  After the 352 Fund and its affiliate purchased the Series A bonds from Heartland Financial in December 2023, REVL Securities continued to mark the Series A bonds at 82% of par to reflect the price at which Heartland Financial sold those bonds.  Similarly, REVL Securities continued to mark the Series B bonds within 99% of par value up until the point when U.S. Bank declared an event of default in May 2024.

242.    On information and belief, Sadek served as CFO of Water Station Management. In his role as CFO, he was responsible for managing Water Station Management's finances, tracking its cash flows, and undertaking major financial decisions on its behalf.  On information and belief, he authorized the fraudulent withdrawal certificates, bills of sale, invoices and reports.  In addition, on December 5, 2023, Sadek personally loaned Water Station Management monies to prevent an event of default, thereby continuing to artificially prop up Water Station Management.  Based on a phone conversation recorded by Chirico in January 2024, Sadek was expressly aware that Water Station Management was a fraud and a Ponzi scheme, yet continued to take actions to conceal and advance the fraudulent enterprise.

243.    On information and belief, the remaining Wear Entities were either recipients of bond proceeds, transferees of the Water Machines, or entities that otherwise aided and abetted the fraudulent scheme by, *inter alia*, misdirecting and concealing the bond proceeds.

244.    The Trustee, on the 352 Fund's behalf, reasonably relied on the false representations and reports described herein when deciding to release the bond proceeds to Water Station Management, which were then misappropriated.

245.    As a result of these Defendants' misconduct, the 352 Fund has been unable to recover any of the more than $100 million in bond proceeds paid to Water Station Management.

246.    The 352 Fund also waived numerous events of default, and purportedly released the limited collateral securing its bonds to its own detriment based on the material misrepresentations and omissions by these Defendants.

247. The 352 Fund has also been damaged by Chirico's receipt of more than $7 million in commercial bribes, described above, and in turn may recover the monies that were paid to its faithless agent.

248. The wrongful misconduct of Wear, the Wear Entities, Chirico, C3 Capital, REVL, REVL Securities, and Sadek concealed the fraud, the conspiracy to commit fraud, and their aiding and abetting of the fraud.

249. As a result of the aiding and abetting of the fraud, the 352 Fund suffered damages in an amount to be determined at trial, but no less than $106.925 million.

### Count VI: Breach of Fiduciary Duty
### (Against Chirico)

250. The foregoing paragraphs are incorporated as if expressly set forth herein.

251. Chirico served as the 352 Fund's portfolio manager and was an employee of Leucadia, and as a result, owed the 352 Fund fiduciary duties, including, but not limited to, the duties of good faith and loyalty.

252. Chirico breached those fiduciary duties by, *inter alia*: (i) failing to disclose to the 352 Fund and Leucadia that Wear owed him substantial sums; (ii) failing to disclose to the 352 Fund and Leucadia that his friends and family owned franchises with Water Station Management; (iii) failing to disclose to the 352 Fund and Leucadia that Wear and Water Station Management were engaging in fraud; (iv) failing to disclose to the 352 Fund and Leucadia that he knew that Water Machines were missing from the locations at which Water Station Management had represented them to be; (v) failing to disclose to the 352 Fund and Leucadia that revenue was being generated by the Water Machines that did exist was being diverted to over 20 different bank accounts associated with Wear and his companies; (vi) failing to disclose

that REVL had invoked a 90 day cure period under the indenture that Wear and Water Station Management failed to cure; (vii) causing the 352 Fund to quadruple its exposure to Water Station Management while knowing the above; and (viii) by misleading the 352 Fund and Leucadia regarding the business rationale for the Third Indenture Supplement and Waiver.

253.    In addition, Chirico breached his fiduciary duties by, *inter alia*:  (i) not disclosing to the 352 Fund and Leucadia that he learned that 80% of the modems that were supposed to be on Water Machines to direct and report revenue by those machines were not on those machines; (ii) not disclosing that he believed, as of January 29, 2024, there was only $41 million worth of collateral securing the 352 Fund's bonds; (iii) causing the 352 Fund to acquire an additional $19 million in bonds while knowing that the bonds were under-collateralized by at least $46 million; (iv) causing the 352 Fund to waive any events of default under the indenture; (v) misleading the 352 Fund and Leucadia regarding the rationale behind the February 2024 upsize of $19 million; (vi) authorizing the fifth indenture supplement which allowed WSM to withdraw bonds proceeds for any purpose whatsoever without authorization from the collateral manager; (vii) purporting to release the 352 Fund's primary security for the bonds by entering into an agreement releasing any lien over the Water Machines which did exist.

254.    As a result of Chirico's breaches of his fiduciary duties, the 352 Fund has been damaged in an amount not less than $106.925 million.

**Count VII:  Aiding and Abetting Breach of Fiduciary Duty
(Against Wear, Water Station Management, Creative Technologies,
Refreshing USA, Sadek, REVL, and REVL Securities)**

255.    The foregoing paragraphs are incorporated as if expressly set forth herein.

256.    During the relevant period, Wear, Water Station Management, Creative Technologies, Refreshing USA, Sadek, REVL, and REVL Securities knew that Chirico was a portfolio manager at the 352 Fund and was trading on its behalf.  As set forth above, each of them knowingly participated in Chirico's breach of his fiduciary duty and provided substantial assistance through the commission of wrongful and overt acts.

257.    Wear and Water Station Management knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by misrepresenting that Water Station Management was a legitimate business and that it owned the Water Machines identified in Exhibit D to the indenture, failing to disclose that the majority of purported purchases of Water Machines never occurred, and failing to disclose that Water Machines were missing from the locations in which they were represented to be.

258.    Creative Technologies knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by submitting false and misleading purchase orders, invoices and other documentation, intended to fraudulently induce REVL to approve the withdrawals of the bonds' proceeds for the purpose of purchasing Water Machines.

259.    Refreshing USA was the recipient of bond proceeds to which it had no right, and knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by allowing the use of modems attached to food and beverage vending machines that it owned to falsely report that revenue generated by those machines was being generated by Water

Machines owned by Water Station Management, in order to conceal the fact that Water Station Management had diverted the bonds proceeds and not used those proceeds to purchase Water Machines.

260.    On information and belief, Sadek knowingly participated and provided substantial assistance in his capacity as CFO of Water Station Management, by authorizing the creation and release of fraudulent documentation which was used to authorize the release of bond proceeds, including, but not limited to, withdrawal certificates, bills of sale, invoices and reports.

261.    REVL knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by failing to ensure that proceeds of the bonds were only released and used to purchase Water Machines, failing to monitor the bonds' collateral, and failing to report to the 352 Fund and U.S. Bank that it had reason to know Water Station Management failed to comply with its obligations under the indenture and was committing a massive fraud.

262.    REVL Securities knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by continuing to mark the Series A bonds at 82% of par (reflecting the price at which Chirico had caused the 352 Fund to purchase the bonds), and continuing to mark the Series B bonds at 99% of par value up until the point when U.S. Bank declared an event of default in May 2024, despite knowing that collateral was missing, that Water Station Management had been committing fraud, and that an event of default had occurred.

263.    As a result of the aiding and abetting of Chirico's breaches of his fiduciary duties, the 352 Fund has been damaged in an amount not less than $106.925 million.

**Count VIII:**
**Breach of Indenture – Failure to Pay Principal and Interest**
**(Against Water Station Management)**

264.    The foregoing paragraphs are incorporated as if expressly set forth herein.

265.    The indenture is a valid and enforceable agreement.  Water Station Management is a party to the indenture, and the 352 Fund, as noteholder, is an express, intended third-party beneficiary to the indenture entitled to enforce its terms.

266.    Pursuant to Section 2.7 of the indenture, "[p]rincipal and interest in the Notes shall be payable on each Payment Date . . . ."

267.    Under Section 7.1 of the indenture, Water Station Management is required to "duly and punctually pay the principal of, interest on and all other amounts payable on or in respect of the Class A Notes and Class B Notes, each in accordance with the terms of the Class A Notes or Class B Notes, as applicable, and this Indenture."

268.    Under Section 5.10 of the indenture, the 352 Fund, as the noteholder, has the absolute and unconditional right to "receive payment of the principal of and interest of" the Water Station Management bonds and "to institute suit for the enforcement of any such payment . . . ."

269.    Water Station Management has failed to duly and punctually pay the principal and interest owing under the Class A and B notes held by the 352 Fund.

270.    Specifically, on March 20, 2024, the balance of funds in Water Station Management's interest reserve account at U.S. Bank fell below the "Interest Reserve Required Balance" and it was provided notice of the same by U.S. Bank.  As of April 5, 2024, the shortfall

in the interest reserve account was not remedied, thereby constituting an event of default pursuant to Section 5.1(a)(iii).

271.   On May 28, 2024, U.S. Bank provided notice of an event of default to Water Station Management relating to its failure to maintain the Interest Reserve Required Balance.

272.   Subsequently, on June 20, 2024, Water Station Management was required to make payments of principal and interest on the notes under Section 2.7 of the indenture.  Water Station Management did not make interest payments on the Class A and Class B notes, thereby constituting another event of default pursuant to Sections 5.1(a)(i) and (ii).

273.   On June 20, 2024, U.S. Bank issued another notice of an event of default to Water Station Management based on its failure to "make any interest payments when due under the Class A [and Class B] Notes."

274.   On July 1, 2024, the 352 Fund provided U.S. Bank written direction to declare the principal and all unpaid and accrued interest under the notes immediately due and payable. And on July 2, 2024, U.S. Bank provided Water Station Management a default notice under the indenture which caused all principal and unpaid and accrued interest under the notes immediately due and payable.

275.    As of the filing of this complaint, the unpaid principal and interest has not been paid, and the events of default have not been waived or cured.

276.   Water Station Management breached Section 7.1 of the indenture both by allowing the balance of the Interest Reserve Account to fall below the Interest Reserve Required Balance and by failing to provide punctual payments of the interest in the ordinary course and accelerated principal of and interest on the Class A and Class B bonds.

277.    As a result of Water Station Management's material breach of Section 7.1 the

indenture, the 352 Fund suffered damages in an amount to be proven at trial.

**Count IX:  Declaration that the Release of the 352 Fund's Security Interest Is Void**
**(Against Water Station Management)**

278.    The foregoing paragraphs are incorporated as if expressly set forth herein.

279.    Pursuant to the Granting Clauses of the indenture, Water Station Management

granted to the Trustee, for the benefit and security of the bondholders, a first priority security

interest in all of its right, title, and interest, in all assets of Water Station Management, as

follows:

(a) all of the Issuer's rights, remedies, powers, privileges and claims under or
with respect to the Assets, including, without limitation, and all payments,
proceeds, earnings, interest, dividends (whether of cash, securities, instruments
or other property) thereon or with respect thereto, (b) all property delivered
herewith or in the future that may be delivered to the Trustee pursuant to the
terms hereof and all payments thereon or with respect thereto and any sums held
by any agent to make payments in respect of the Notes, (c) the Issuer's rights,
remedies, powers, privileges and claims under or with respect to the Asset
Agreements (other than the Excluded Asset Agreements), (d) the Collection
Account and all investment property, money, instruments and other property
from time to time credited to or carried in such account, (e) the Acquisition
Account and all investment property, money, instruments and other property
from time to time credited to or carried in such account, (f) the Interest Reserve
Account and all investment property, money, instruments and other property
from time to time credited to or carried in such account, (g) the Servicer Account
and all investment property, money, instruments and other property from time to
time credited to or carried in such account, (h) all accounts, chattel paper, deposit
accounts, securities accounts, documents, general intangibles, payment
intangibles, goods, instruments, investment property, letter-of-credit rights,
letters of credit, money, consisting of, arising from, or relating to any of the
foregoing, (i) all proceeds, profits, rents, products, earnings, interest, dividends
(whether in the form of cash, securities, instruments or other property),
distributions (whether of rights, options, stock, warrants, securities or other
property) of any of the foregoing (the property described clauses (a) through (i),
the "Primary Collateral"), (j) the Limited Guaranty and (k) other than Excluded
Asset Agreements, all other assets and property of the Issuer including, without
limitation, all accounts, chattel paper, deposit accounts, securities accounts,

documents, general intangibles, payment intangibles, goods, instruments, investment property, letter of credit rights, letters of credit, money, goods, and all proceeds, profits, rents, products, earnings, interest, dividends (whether in the form of cash, securities, instruments or other property), distributions (whether of rights, options, stock, warrants, securities or other property) of any of the foregoing (the property described clauses (j) and (k), the "Other Collateral" and together with the Primary Collateral, the "Collateral").

280.    The security interest granted under the indenture was perfected by the filing of a UCC-1 financing statement on April 29, 2022, and/or by possession and control of the deposit and security accounts described therein (in the case of such accounts at U.S. Bank), and/or by account control agreements (in the case of deposit or security accounts at other financial institutions).

281.    On February 20, 2024, as part of the fraudulent scheme described herein, Chirico and Wear entered into an agreement that purported to release all of the Water Machines from the 352 Fund's liens, including the revenue those machines generated.

282.    Water Station Management has taken the position that because of this agreement, the 352 Fund has released any lien it may have over the Water Machines.

283.    The 352 Fund contends that the agreement between Chirico and Wear was procured by the fraud of Wear and Water Station Management, and Chirico's complete abandonment of the interests of the 352 Fund.  The 352 Fund received no benefit whatsoever by the purported release of collateral.   Any such purported release of a security interest should be rendered void as a part of the fraudulent scheme.

284.    The 352 Fund is therefore entitled to a judgment declaring that the agreement purporting to release the 352 Fund's lien over the Water Machines is null and void.

**Count X:  Gross Negligence**
**(Against REVL and REVL Securities)**

285.    The foregoing paragraphs are incorporated as if expressly set forth herein.

286.    By virtue of their role as Collateral Manager and their agreement to act for the 352 Fund, REVL was in a position of trust, for the benefit of the Trustee and the bondholders, and had fiduciary duties and other obligations to fulfill its role in good faith and without conflict of interest.  The Trustee, and the 352 Fund as a bondholder, were entitled to rely on the reports and other information provided by REVL with respect to the collateral, and REVL had an obligation to disclose material facts concerning the status or integrity of the collateral, including facts concerning the fraud perpetrated by Water Station Management.

287.    By at least August 2023, REVL knew that nearly half of the Water Machines that were supposedly purchased with bond proceeds could not be located, and likely did not exist. It therefore knew that the documentation and information provided by Water Station Management to justify its prior withdrawals of the bond proceeds were false and misleading. REVL failed to inform the Trustee of this critical information.

288.    Even after REVL was aware of the fraud, REVL continued to approve additional withdrawal requests from Water Station Management, again (on information and belief) without performing any diligence to confirm that the bond proceeds would be used to purchase Water Machines.

289.    Further, on information and belief, REVL continued to provide reports to the Trustee and bondholders that purported to identify Water Machines as collateral, and that such

machines were generating revenue, even when it knew full well that nearly half of those Water Machines did not exist.

290.    REVL further knew that Water Station Management was in breach of the terms of the indenture, which triggered REVL's notice to Water Station Management that it had 90 days to "cure" the fact that over half of the collateral securing the indenture was missing.  Yet even after the expiration of the 90 day period, REVL did nothing.

291.    At no point did REVL inform the Trustee that it was aware of an ongoing fraud, that nearly half of the collateral that REVL was entrusted to monitor and manage was missing, that REVL's prior and ongoing reports concerning the collateral were false and misleading, or that Water Station Management breached the terms of the indenture.  On information and belief, REVL did not provide such information to the Trustee because doing so would reveal that REVL had failed to perform the necessary diligence and monitoring activities with respect to the collateral in the first instance.

292.    REVL's conduct, which knowingly assisted in the cover up of Water Station Management's fraud, constituted gross negligence and willful misconduct and reflected a conscious and reckless indifference to the rights of the bondholders that REVL had been entrusted to protect.

293.    At the same time, REVL Securities purportedly acted as an "independent" third party to mark the value of the bonds to market, for purposes of reporting the value of the bonds to investors.  The employees of REVL Securities responsible for valuing the bonds were the same individuals at REVL who knew that the collateral was missing, that Water Station Management had been committing fraud, and that an event of default had occurred.  REVL

Securities nonetheless continued to mark the value of the bonds at or within 99% of par value throughout the fall of 2023, further helping to conceal these crucial facts. REVL Securities later marked the Series A bonds to 82% of par to reflect the price at which Heartland Financial sold its bonds to the 352 Fund, but continued to mark the Series B bonds within 99% of par value until May 2024. If the bonds had been valued correctly to reflect the obvious risks associated with the missing collateral and ongoing fraud, U.S. Bank would have been immediately alerted to the serious problems underlying this investment.

294. REVL Securities knowingly assisted in the cover up of Water Station Management's fraud by their conscious indifference in failing to value the bonds correctly, which constituted gross negligence or willful misconduct and reflected a reckless indifference to the rights of the bondholders.

295. As a result of the failures of REVL and REVL Securities as described herein, the Trustee was prevented from taking action to protect the interests of the bondholders, including (among other things) declaring an event of default and foreclosing on the collateral securing the bonds.

296. As a direct and proximate result of REVL's and REVL Securities' gross negligence or willful misconduct, the 352 Fund has suffered damages in an amount to be determined at trial.

**Count XI: Actual Fraudulent Transfer under DCL § 273(a)(1)**
**(Against Wear, the Wear Entities, Chirico,**
**C3 Capital, and Does 1-1000)**

297. The foregoing paragraphs are incorporated as if expressly set forth herein.

298.    As described above, Wear and the companies he controlled made numerous transfers of cash, equipment and other assets to himself, the Wear Entities, Chirico and C3 Capital, and, on information and belief, Does 1-1000 with the intent to hinder, delay or defraud the noteholders as creditors of Water Station Management.

299.    Among other things, Wear and Water Station Management fraudulently procured withdrawals of the bond proceeds with falsified documentation that purported to demonstrate that the bond proceeds would be used to purchase Water Machines that would secure the bonds. Instead, Wear directed those proceeds: (i) to franchisees to facilitate his ongoing Ponzi scheme; (ii) to or for the benefit of the Wear Entities for the purchase of vending machines or other property; (iii) to fund the Wear Entities' operations or pay other creditors of the Wear Entities; (iv) to Chirico and C3 Capital for the repayment or return on their "investment"; and/or (v)  to or for the benefit of Does 1-1000.  By misappropriating the bond proceeds and diverting them for those improper purposes, Wear removed the proceeds from the bank accounts over which the Trustee maintained a security interest pursuant to the indenture, and transferred them to persons or entities outside the scope of that security interest.  In so doing, Wear defrauded the noteholders, and substantially hindered their ability to locate or foreclose on collateral and recover amounts owed under the indenture.

300.    On information and belief, after fraudulently procuring the purported release of the Water Machines from the security interest of the noteholders, Wear and Water Station Management entered into agreements to sell, pledge, or to otherwise generate revenue or other funds using the Water Machines that were required to be the primary collateral for the bonds. Those funds were either retained by Wear and Water Station Management, or transferred to or

for the benefit of the Wear Entities and Does 1-1000 for the same improper purposes described above.  As a result of the purported release of the Water Machines from the security interest and diversion of such equipment and funds, Wear defrauded the noteholders, and substantially hindered their ability to locate or foreclose on collateral and recover amounts owed under the indenture.

301.    These transfers and transactions are all surrounded by the badges of fraud.

302.    *First*, the transfers were made to or for the benefit of Wear and the Wear Entities, Chirico, or to franchisees and "investors" in his ongoing fraudulent scheme.

303.    *Second*, Wear effectively retained control of the majority of funds transferred to the Wear Entities, of which he is sole or part owner, and a senior executive or principal, as well as the vending machines or other equipment purchased by those entities using those funds.

304.    *Third*, the improper transfers and use of the bond proceeds were concealed from the Trustee and from the 352 Fund.  The proceeds were procured through fraudulent statements, the actual use of the proceeds was never disclosed, and when it was discovered that the Water Machines were not purchased with the proceeds, Wear and Water Station Management arranged for revenue generated by other vending machines to be directed and reported to the Trustee to conceal that fact.

305.    *Fourth*, before many of the transfers were made, Water Station Management had been sued or threatened with suit by numerous franchisees, vendors, third party creditors and its

own CFO, Sadek.  Water Station Management had further incurred numerous events of default under the indenture.

306.   *Fifth*, the transfer of over $100 million of bond proceeds, and transfer or incurrence of obligations as to the $41 million of Water Machines and related agreements that did exist, involved substantially all of Water Station Management's assets.  As a result, upon information and belief, there is nothing left of value at Water Station Management.

307.   *Sixth*, Water Station Management did not receive reasonably equivalent value for these transfers or obligations.  The funds were used to purchase equipment, to pay creditors or otherwise benefit the Wear Entities, with Water Station Management receiving nothing in return.  Other funds were used to pay off franchisees and other members of the Ponzi scheme.  On information and belief, the Water Machines and related agreements were sold or pledged for the purpose of generating funds for the use of Wear or the Wear Entities.  Water Station Management did not receive anything of value in return.

308.   *Seventh*, Water Station Management was insolvent or became insolvent as a result of the transfers and obligations described herein.  Among other reasons, as a result of the fraudulent bond scheme, Water Station Management incurred over $100 million of debt and diverted the bond proceeds to other entities or persons as described herein, without obtaining assets in return.  Water Station Management was therefore balance sheet insolvent from the beginning of the scheme.  By the fall of 2023, Water Station Management was unable to meet

basic day-to-day funding obligations, such as making payroll, and was therefore insolvent by virtue of its inability to pay ordinary debts as they became due.

309. *Eighth*, for similar reasons, the diversion of bond proceeds and transfers or obligations with respect to the Water Machines occurred after Water Station Management incurred a substantial debt of approximately $75 million under the original indenture, which continued to increase with each upsizing of the indenture.

310. *Finally*, the Water Machines and related agreements were the essential assets of the business of Water Station Management, and on information and belief, those Water Machines and agreements were either pledged as collateral to third party lenders or creditors, or transferred to Wear, the Wear Entities, or other companies owned and controlled by Wear.

311. The transfers of bond proceeds and transfers of or obligations incurred with respect to the Water Machines and related agreements are actually fraudulent within the meaning of DCL § 273(a)(1). The 352 Fund is entitled to a judgment against Wear, the Wear Entities, Chirico, C3 Capital and Does 1-1000, that such transfers and obligations are voidable as to the 352 Fund.

### Count XII: Constructive Fraudulent Transfer under DCL § 273(a)(2) (Against Wear, the Wear Entities, Chirico, C3 Capital, and Does 1-1000)

312. The foregoing paragraphs are incorporated as if expressly set forth herein.

313. The above-described transfers of bond proceeds, and transfers of or obligations incurred with respect to the Water Machines and related agreements, are also voidable as constructive fraudulent transfers pursuant to DCL § 273(a)(2).

314. As described above, Water Station Management did not receive reasonably equivalent value in exchange for these transfers or for incurring these obligations. The funds were used to pay creditors or otherwise benefit the Wear Entities, or to pay off franchisees and other members of the Ponzi scheme, and, on information and belief, the Water Machines were sold or pledged for the purpose of generating funds for the use of Wear, the Wear Entities or other companies owned or controlled by Wear.

315. Each transfer and obligation was made or incurred when Water Station Management was insolvent. At the time of each transfer and incurrence of an obligation, Wear and Water Station Management knew and intended that Water Station Management was unable to pay its debts as they became due, including Water Station Management's obligation to pay principal and interest due under the bonds, or to meet its day-to-day funding obligations or timely pay third party vendors and creditors.

316. The transfers of bond proceeds, and transfers of or obligations incurred with respect to the Water Machines and related agreements, are therefore constructively fraudulent within the meaning of DCL § 273(a)(2). The 352 Fund is entitled to a judgment against Wear, the Wear Entities, Chirico, C3 Capital and Does 1-1000, that such transfers and obligations are voidable as to the 352 Fund.

## DEMAND FOR RELIEF

WHEREFORE, the 352 Fund respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

(a) On the First Cause of Action, a judgment in the 352 Fund's favor and against Wear, Sadek, Chirico, C3 Capital, and the Wear Entities, jointly and severally, for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, then trebled, plus interest, costs, and attorneys' fees;

(b)     On the Second Cause of Action, a judgment in the 352 Fund's favor and against Wear, Sadek, Chirico, C3 Capital, and the Wear Entities, jointly and severally, for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, then trebled, plus interest, costs, and attorneys' fees;

(c)     On the Third Cause of Action, a judgment in the 352 Fund's favor and against Wear, Sadek, Chirico, C3 Capital, the Wear Entities, REVL, and REVL Securities jointly and severally, for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, then trebled, plus interest, costs, and attorneys' fees;

(d)     On the Fourth Cause of Action, a judgment in the 352 Fund's favor and against Wear and Water Station Management, jointly and severally, for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, plus interest and punitive damages;

(e)     On the Fifth Cause of Action, a judgment in the 352 Fund's favor and against Wear, the Wear Entities, Chirico, C3 Capital, Sadek, REVL and REVL Securities, jointly and severally, for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, plus interest and punitive damages;

(f)     On the Sixth Cause of Action, a judgment in the 352 Fund's favor and against Chirico for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, plus interest and punitive damages;

(g)     On the Seventh Cause of Action, a judgment in the 352 Fund's favor and against Wear, Water Station Management, Creative Technologies, Refreshing USA, Sadek, REVL and REVL Securities, jointly and severally, for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, plus interest and punitive damages;

(h)     On the Eighth Cause of Action, a judgment in the 352 Fund's favor and against Water Station Management for damages in an amount to be proven at trial, representing the unpaid and immediately due and payable principal and interest under the bonds issued by Water Station Management, plus all reasonable compensation, costs, expenses, and disbursements in connection with enforcement or exercise of remedies under the indenture;

(i)     On the Ninth Cause of Action, a declaratory judgment in the 352 Fund's favor holding that the purported release of the 352 Fund's lien over the Water Machines is null and void;

(j)     On the Tenth Cause of Action, a judgment in the 352 Fund's favor and against REVL and REVL Securities, jointly and severally, for damages in an amount to be determined at trial, but believed to be not less than $106,925,000, plus interest;

(k)     On the Eleventh Cause of Action, a judgment in the 352 Fund's favor and against Wear, the Wear Entities, Chirico, C3 Capital, and Does 1-1000, that the transfers of bond proceeds and obligations are voidable as to the 352 Fund, and an order of turnover against the foregoing Defendants further transferring any of the monies they received as a result of such transfers back to the 352 Fund;

(l)     On the Twelfth Cause of Action, a judgment in the 352 Fund's favor and against Wear, the Wear Entities, Chirico, C3 Capital, and Does 1-1000, that the transfers of bond proceeds and obligations are voidable as to the 352 Fund, and an order of turnover against the foregoing Defendants further transferring any of the monies they received as a result of such transfers back to the 352 Fund;

(m)     On all equitable causes of action, including the Sixth, Seventh, Eleventh and Twelfth Causes of Action, an imposition of a constructive trust on all bond proceeds, any equipment or other property or assets purchased with such proceeds, or anything else of value acquired by Defendants in exchange for such proceeds;

(n)     An award of reasonable attorneys' fees and costs incurred by the 352 Fund in connection with this action; and

(o)     Such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
        July 3, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP

By: /s/ *Scott S. Balber*
    Scott S. Balber
    Peter Behmke
    Michael P. Jones
    Dmitriy Gelfand
200 Park Avenue
New York, New York 10166
Telephone:  (917) 542-7600
Facsimile:  (917) 542-7601
Email:      Scott.Balber@hsf.com
         Peter.Behmke@hsf.com
         Michael.Jones@hsf.com
         Dmitriy.Gelfand@hsf.com

*Attorneys for 3\5\2 Capital GP LLC,*
*On Behalf of 3\5\2 Capital ABS Master Fund LP*