**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 3\|5\|2 CAPITAL GP LLC, on behalf of 3\|5\|2 CAPITAL ABS MASTER FUND LP and LEUCADIA ASSET MANAGEMENT, LLC,<br><br>*Plaintiffs*,<br><br>-against-<br><br>RYAN WEAR, TYLER SADEK, JORDAN CHIRICO, JEREMY BRIGGS, WATER STATION MANAGEMENT LLC, REFRESHING USA, LLC, CREATIVE TECHNOLOGIES, LLC, C3 CAPITAL, INC., REVL CAPITAL MANAGEMENT LLC, REVL SECURITIES LLC, CREATIVE TECHNOLOGIES FLORIDA, LLC, WATERSTATION TECHNOLOGY II LLC, WATERSTATION FINANCE COMPANY, LLC, WATERSTATION TECHVENTURE LLC, WST FRANCHISE SYSTEMS LLC, WST AZ PROPERTIES, LLC, WSM CAPITAL FUNDING, INC., WS SPV 1, LLC, REFRESHING ARIZONA, LLC REFRESHING CALIFORNIA L.L.C., REFRESHING CAROLINAS LLC, REFRESHING COLORADO LLC, REFRESHING FLORIDA LLC, REFRESHING GEORGIA LLC, REFRESHING GREAT LAKES, LLC, REFRESHING GREAT PLAINS LLC, REFRESHING KENTUCKY LLC, REFRESHING LAS VEGAS, LLC, REFRESHING MID-ATLANTIC LLC, REFRESHING MIDWEST LLC, REFRESHING MIDWEST REAL ESTATE LLC, REFRESHING MONTANA, LLC, REFRESHING NEW ENGLAND, LLC, REFRESHING NEW MEXICO LLC, REFRESHING OHIO LLC, REFRESHING TEXAS, LLC, REFRESHING UTAH, LLC, REFRESHING USA MERGER SUB LLC, REFRESHING WASHINGTON LLC, VENDPRO LLC, BEVTECK TECHNOLOGIES LLC, SUMMIT MANAGEMENT SERVICES LLC, IDEAL PROPERTY INVESTMENTS LLC, IDEAL INDUSTRIAL PARK LLC, IDEAL AZ | Case No. 1:24-cv-05102 (VEC)<br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

PROPERTY INVESTMENTS, LLC, 2129
ANDREA LANE, LLC, 3209 VAN BUREN LLC,
ICE & WATER VENDORS LLC, K-2
ACQUISITION, LLC, K-2 MFG LLC, SMOKEY
POINT HOLDINGS LLC, PISTOL INC., EMERY
DEVELOPMENT LLC, ARIZONA WATER
VENDORS INCORPORATED, 1118 VIRGINIA
STREET LLC, 11519 SOUTH PETROPARK
LLC, TCR PLUMBING LLC, FLAGSTAFF
PLUMBING, LLC, 70 NORTH GARDEN
AVENUE LLC, 701 EDEN LLC, AURORA
BUILDING PRODUCTS LLC, 3422 W
CLARENDON AVE LLC, 1206 HEWITT AVE
LLC, GOLDEN STATE VENTURES, LLC,
GOLDEN STATE VENDING, LLC, VALLEY
VENDING, LLC, DRINK UP VENTURE LLC,
and JOHN DOES 1-1000,

*Defendants*.

Plaintiffs 3|5|2 Capital GP LLC ("352 GP"), on behalf of 3|5|2 Capital ABS Master Fund

LP (the "352 Fund"), and Leucadia Asset Management, LLC ("LAM"), by and through their

undersigned counsel, allege against defendants Ryan Wear ("Wear"), Tyler Sadek ("Sadek"),

Jordan Chirico ("Chirico"), Jeremy Briggs ("Briggs"), Water Station Management, LLC

("Water Station Management"), Refreshing USA, LLC ("Refreshing USA"), Creative

Technologies, LLC ("Creative Technologies"), C3 Capital, Inc. ("C3 Capital"), REVL Capital

Management LLC ("REVL"), REVL Securities LLC ("REVL Securities"), Creative

Technologies Florida, LLC ("Creative Technologies Florida"), Waterstation Technology II

LLC ("Waterstation Technology"), Waterstation Finance Company, LLC ("Waterstation

Finance"), Waterstation Techventure LLC ("Waterstation Techventure"), WST Franchise

Systems LLC ("WST Franchise"), WST AZ Properties LLC ("WST AZ Properties"), WSM

Capital Funding, Inc. ("WSM Capital Funding"), WS SPV 1, LLC ("WS SPV 1"), Refreshing

Arizona, LLC ("Refreshing Arizona"), Refreshing California L.L.C. ("Refreshing California"), Refreshing Carolinas LLC ("Refreshing Carolinas"), Refreshing Colorado LLC ("Refreshing Colorado"), Refreshing Florida LLC ("Refreshing Florida"), Refreshing Georgia LLC ("Refreshing Georgia"), Refreshing Great Lakes, LLC ("Refreshing Great Lakes"), Refreshing Great Plains LLC ("Refreshing Great Plains"), Refreshing Kentucky LLC ("Refreshing Kentucky"), Refreshing Las Vegas, LLC ("Refreshing Las Vegas"), Refreshing Mid-Atlantic LLC ("Refreshing Mid-Atlantic"), Refreshing Midwest LLC ("Refreshing Midwest"), Refreshing Midwest Real Estate LLC ("Refreshing Midwest Real Estate"), Refreshing Montana, LLC ("Refreshing Montana"), Refreshing New England, LLC ("Refreshing New England"), Refreshing New Mexico LLC ("Refreshing New Mexico"), Refreshing Ohio LLC ("Refreshing Ohio"), Refreshing Texas, LLC ("Refreshing Texas"), Refreshing Utah, LLC ("Refreshing Utah"), Refreshing USA Merger Sub LLC ("Refreshing USA Merger Sub"), Refreshing Washington LLC ("Refreshing Washington"), VendPro LLC ("VendPro"), BevTeck Technologies LLC ("BevTeck Technologies"), Summit Management Services LLC ("Summit Management"), Ideal Property Investments LLC ("Ideal Property Investments"), Ideal Industrial Park LLC ("Ideal Industrial Park"), Ideal AZ Property Investments, LLC ("Ideal AZ Property Investments"), 2129 Andrea Lane, LLC ("2129 Andrea Lane"), 3209 Van Buren LLC ("3029 Van Buren"), Ice & Water Vendors LLC ("Ice & Water Vendors"), K-2 Acquisition, LLC ("K-2 Acquisition"), K-2 MFG LLC ("K-2 MFG"), Smokey Point Holdings LLC ("Smokey Point Holdings"), Pistol Inc. ("Pistol"), Emery Development LLC ("Emery Development"), Arizona Water Vendors Incorporated ("Arizona Water Vendors"), 1118 Virginia Street LLC ("1118 Virginia Street"), 11519 South Petropark LLC ("11519 South

Petropark"), TCR Plumbing LLC ("TCR Plumbing"), Flagstaff Plumbing, LLC ("Flagstaff Plumbing"), 70 North Garden Avenue LLC ("70 North Garden Avenue"), 701 Eden LLC ("701 Eden"), Aurora Building Products LLC ("Aurora Building Products LLC"), 3422 W Clarendon Ave LLC ("3422 W Clarendon Ave"), 1206 Hewitt Ave LLC ("1206 Hewitt Ave"), Golden State Ventures, LLC ("Golden State Ventures"), Golden State Vending, LLC ("Golden State Vending"), Valley Vending, LLC ("Valley Vending"), Drink Up Venture LLC ("Drink Up Venture," collectively without Wear, Sadek, Chirico, REVL, and REVL Securities, the "Wear Entities") and John Does 1-1000 (collectively, "Defendants"[1]), as follows:

## **INTRODUCTION**

1.      This case arises out of a massive fraud perpetrated against the 352 Fund and its investors.  As described herein, Wear and Water Station Management have been operating a scheme to misappropriate hundreds of millions of dollars that were provided to them for the express purpose of acquiring self-service water station machines, known as WST-700s, which filter water from a local source for purchase by consumers (the "Water Machines").  Wear and Water Station Management were only able to accomplish the fraud by entering into a common enterprise with the Wear Entities, Chirico (a former 352 Fund portfolio manager and LAM employee), Water Station Management's then-Chief Financial Officer ("CFO"), Sadek, and its corporate controller, Briggs, as well as through the gross negligence and willful misconduct of REVL.  As a result of their collective misconduct, more than $100 million of funds provided to

---

[1]     After this case was initiated, involuntary bankruptcy petitions were filed against Water Station Management, LLC, Refreshing USA, LLC and Creative Technologies, LLC in the United States Bankruptcy Court in the Southern District of Texas.  Also after this case was initiated, Ideal Property Investments LLC filed a petition for bankruptcy in the United States Bankruptcy Court in the Eastern District of Washington.  An automatic stay of proceedings under 11 U.S.C. §362 applies to these entities.

Water Station Management to acquire Water Machines were misappropriated, siphoned to participants in the scheme (including Chirico and Sadek), or diverted to or for the benefit of Wear and other companies under his ownership and control.

2.    Water Station Management and another Wear-owned company, Creative Technologies, held themselves out as the manufacturer, operator and manager of thousands of Water Machines.  The purported business model of Water Station Management was twofold. Water Station Management allegedly owned and managed thousands of Water Machines, at a supposed value of $8,500 per machine, from which Water Station Management would collect revenue when customers purchased filtered water.  Water Station Management also entered into "franchise," or "joint venture," agreements with third parties, pursuant to which third parties could purportedly purchase Water Machines from Creative Technologies that would then be placed at retail locations and serviced by Water Station Management for a fee.  The remaining revenue generated by the machines was supposed to belong to the franchisees.  Wear and Water Station Management also agreed to guarantee to some franchisees a "too good to be true" fixed return of as much as 28% on their franchises in lieu of payments tied to fluctuating revenues.

3.    On April 29, 2022, Chirico, as the portfolio manager for the 352 Fund, directed the 352 Fund and an affiliate to purchase $15 million of Class B bonds issued by Water Station Management.  Subsequently, the 352 Fund acquired ownership of all the affiliate's Class B bonds.  Another investor, non-party Heartland Financial USA, Inc. ("Heartland Financial"), purchased $60 million of Class A bonds.  Under the bond indenture, proceeds from the bonds could only be used by Water Station Management to purchase Water Machines, which would then collateralize the bonds and generate revenue to enable principal and interest payments.

5

4.      The bond proceeds were administered by U.S. Bank as the Trustee appointed under the bond indenture, and REVL as the appointed Collateral Manager for the bond offering. REVL was responsible for reviewing documentation to ensure that the bond proceeds were only released for the purpose of purchasing Water Machines. REVL was also responsible for providing information about the performance of the Water Machines on a monthly basis, and reporting to the bondholders and U.S. Bank any failure by Water Station Management to comply with its obligations under the indenture.

5.      Throughout the entire period of his employment, Chirico made investment decisions for the 352 Fund unilaterally. However, Chirico's decision to invest in Water Station Management was hopelessly conflicted. At the same time Chirico was directing the 352 Fund and its affiliate to invest in Water Station Management's bonds, he had also invested $7 million in Water Station Management franchises through a company, C3 Capital, that he owned jointly with his wife. The franchise investment was made with a cash down payment coupled with a loan obtained from the Small Business Administration. Chirico also arranged for his brother, his parents, and various friends and neighbors to acquire Water Station Management franchises.

6.      In or around September 2022, months after Chirico had directed the 352 Fund's first purchase of the Series B bonds, Wear bribed Chirico by paying off the bulk of the personal cash down payment that Chirico had made for his franchise investments.

7.      Then, in November 2022, Chirico "sold" his interest in C3 Capital to Wear's company, Creative Technologies, for $7.259 million. The funds used by Creative Technologies to buy out Chirico's personal investment constituted a commercial bribe made with bond proceeds.

6

8.      While Wear and his co-conspirators were improperly transferring bond proceeds to Chirico, franchisees and others associated with the enterprise, they were not using them to purchase Water Machines as required under the indenture.  By no later than August 2023, REVL knew that thousands of Water Machines allegedly purchased with the bond proceeds did not exist and that millions of dollars of bond proceeds had not been used by Water Station Management for their intended purpose.  REVL attempted to perform a physical inspection of the machines that Water Station Management claimed both to own and to use as collateral for the bonds.  REVL determined that 163 of the 164 machines in its sample set for inspection did not exist.  REVL then discovered that more than 3,000 machines that were supposed to be operating in Family Dollar stores, and in other locations, were "actually missing."  It was eventually discovered that revenue that Water Station Management had been reporting as having been generated by Water Machines was instead being generated by other food and beverage vending machines owned by a separate Wear-affiliated company, Refreshing USA.  Wear, or those acting under his direction, had installed modems associated with the Water Machines onto the Refreshing USA vending machines to conceal the fact that Water Station Management had not used the bond proceeds to purchase Water Machines, and that the vast majority of those machines did not exist.

9.      There was no doubt, by at least August 2023, that Water Station Management was perpetrating a fraud.  To this point, Water Station Management had been submitting to REVL purchase orders and invoices for the purchase of Water Machines, all to convince REVL to authorize the release of bond proceeds for those purchases—but those machines did not exist.  The purchase orders and invoices were falsified.  The collateral and revenue reports that

purported to show the machines were installed and generating revenue were likewise fabricated. On information and belief, instead of purchasing and operating Water Machines, Water Station Management used the bond proceeds primarily to pay "franchisees" their guaranteed returns, or to buy out franchisees who had raised complaints about the business. REVL knew that Chirico—with whom REVL had a longstanding personal and professional relationship—had invested in the scheme, and that he stood to directly, personally benefit from the misappropriation of bond proceeds.

10. Upon its discovery of the fraud, REVL had a choice to make. It could report what it discovered to those who could take action to protect investors, such as to U.S. Bank, as Trustee, or it could try to conceal the fraud to preserve its own reputation and business relationship with Wear and Chirico. REVL chose the latter. REVL served notice to Wear that Water Station Management had 90 days to "cure" this incurable situation. REVL then took absolutely no action after the expiration of the 90 days. More egregiously, on information and belief, REVL never reported to U.S. Bank, as Trustee, that most of the machines that were supposed to collateralize the bonds did not exist, nor did it provide U.S. Bank with any opportunity to take the necessary actions to preserve the value of the bonds. And throughout this entire period, REVL Securities—an entity that was controlled by the same REVL team acting as collateral manager—provided the 352 Fund with monthly mark-to-market valuations representing that the bonds continued to be worth their full purchase price, even though it affirmatively knew that the majority of the collateral backing the bonds did not exist.

11. Then, in December 2023, despite being fully aware of the ongoing fraud at Water Station Management, Chirico made the unilateral decision to direct the 352 Fund and its affiliate

to buy out the Class A bondholder at a purchase price of $57.6 million. Chirico acted solely in his own interest—and against the interest of the 352 Fund and LAM—in unilaterally directing the 352 Fund to purchase the Class A bond. There was no legitimate business or investment rationale for quadrupling the exposure of the 352 Fund to Water Station Management when Chirico *knew* that Water Station Management was committing a fraud, and that the bonds were undercollateralized by tens of millions of dollars (if not more). Chirico directed the 352 Fund to purchase the Class A bond to remove any oversight by the Class A bondholder, which would allow him to loosen the indenture's restrictions and requirements for the benefit of Water Station Management, and direct further funds from the 352 Fund to Water Station Management to prop up the failing company and the ongoing scheme. All these actions came directly at the expense of the 352 Fund. Neither the 352 Fund nor LAM stood to benefit from the purchase of the Class A bonds, whose collateral had already been pilfered.

12.    By no later than January 2024, because its assets had been plundered, Water Station Management was insolvent and unable to meet basic day-to-day funding obligations, including making payroll. REVL had confirmed that thousands of Water Machines that were supposed to have been purchased with bond proceeds were "missing." In January 2024, Wear, his CFO—Sadek—and Chirico participated in a telephone call, which Chirico recorded. During that call, Chirico acknowledged that the 352 Fund's $87.9 million bond investment was undercollateralized by at least $46 million. On that call, Sadek admitted this was "***the largest franchise fraud in the history of the United States***" and told Wear that he "***was going to jail***." Nevertheless, Chirico directed the 352 Fund to authorize an amendment to the indenture to remove any restrictions on Water Station Management's use of bond proceeds, and

purportedly waived numerous events of default caused by Water Station Management's fraud and insolvency. Wear claims that he then sent $900,000 of bond proceeds to Chirico. As is evident, Chirico's conduct was for his sole personal benefit—so that he could receive proceeds to pay off his SBA loans, line his own pockets and ensure that friends and family would recoup their Water Station Management Investments.

13.    On or around February 16, 2024, Chirico colluded with Wear to further damage the 352 Fund, all for the benefit of the fraudulent enterprise. U.S. Bank, on behalf of the bondholders (including the 352 Fund), held a lien over all the assets of Water Station Management. On February 20, 2024, Chirico caused the 352 Fund to instruct the U.S. Bank to release all liens over the Water Machines, vainly attempting to extinguish the security interest over the remaining approximately $41 million of collateral securing the bonds. U.S. Bank followed Chirico's instruction and, on February 21, 2024, filed a UCC-3 financing statement that announced that the Water Machines were no longer subject to the bondholder's security interest. Chirico's and Wear's conspiracy was designed to render the 352 Fund's $106.9 million investment in these "asset-backed securities" effectively unsecured, and to prevent the 352 Fund from exercising any remedies with respect to the collateral. There was no benefit to the 352 Fund from releasing all liens over the Water Machines, and Chirico acted outside of the scope of his employment and entirely in his own self-interest in doing so.

14.    Throughout this period, Chirico never disclosed to LAM, his employer and the manager of the 352 Fund: (i) his personal conflicts of interest; (ii) that Water Station Management was committing fraud; (iii) that the Water Machines securing the bonds largely did not exist; or (iv) that he was directing the 352 Fund to substantially increase its exposure

10

while it was already undercollateralized by tens of millions of dollars. As of April 5, 2024, the balance of funds in Water Station Management's interest reserve account at U.S. Bank remained below the "Interest Reserve Required Balance" for fifteen days, thereby triggering an event of default under the indenture. U.S. Bank issued a notice of event of default on May 28, 2024. On June 20, 2024, Water Station Management failed to make a required interest payment, and U.S. Bank issued an additional notice of event of default that day. On July 2, 2024, U.S. Bank issued default notices to Water Station Management after receipt of written direction to do the same from the 352 Fund, thereby accelerating the unpaid principal and interest under the bonds. As of the filing of this complaint, the events of default have not been waived or cured, and all rights and remedies of the 352 Fund under the indenture have been accelerated.

15.    Defendants' scheme continues to this very day. Indeed, throughout October 2024, Wear, Sadek and Briggs have all attempted to sell off assets that they have misappropriated, alter corporate records to cover up their misconduct, and transfer the ownership of Water Station Management's assets to retain control over them.

16.    By this complaint, the 352 Fund and LAM seek compensation and other relief for the injury that they and the 352 Fund's investors have sustained due to the conspiracy, fraud, breaches of fiduciary duty, gross negligence, negligent misrepresentation and breaches of contract described herein.

## PARTIES

17.    3|5|2 Capital GP LLC is a Cayman Islands limited liability company that acts as the general partner of the 352 Fund and, under Cayman Islands law, is authorized to bring this action on behalf of the 352 Fund.

18.    Leucadia Asset Management LLC, or "LAM" (formerly known as Jefferies Investment Advisers, LLC) is a Delaware limited liability company that is the manager of the 352 Fund.  It is also Chirico's prior employer.  Through his role as an employee of LAM, Chirico acted as the 352 Fund's portfolio manager.

19.    On information and belief, defendant Wear is an adult individual and citizen of the State of Washington, with an address of 14717 27th Avenue NW, Marysville, WA 98271.  Wear was the original owner and/or control person of all of the Wear Entities and at various times has acted as the Chief Executive Officer and owner of Water Station Management, Creative Technologies, and Refreshing USA.

20.    Defendant Sadek is an adult individual and citizen of the State of Indiana, with an address of 1636 Central Avenue, Indianapolis, Indiana, 46202.  Sadek was the Chief Financial Officer of Water Station Management.  On information and belief, Sadek was also a franchisee or joint venture partner of Water Station Management.  He currently claims to be the owner of all of the Wear Entities.

21.    Defendant Chirico is an adult individual and citizen of the State of Indiana, with an address of 1121 Laurelwood Street, Carmel, Indiana, 64032.  Chirico was the former portfolio manager of the 352 Fund and an employee of LAM beginning on May 28, 2020, until he was terminated on June 5, 2024.  Chirico was also a franchisee of Water Station Management.

22.    Defendant Briggs is an adult individual and citizen of the State of Washington, with an address of 8100 242nd Street Southwest, Edmonds, Washington, 98026.  Briggs was the Director of Finance and Corporate Controller of Water Station Technology and the Corporate Controller of Refreshing USA.

23.     On information and belief, defendant Water Station Management is a limited liability company organized and existing under the laws of Washington, with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Water Station Management is majority owned and controlled by Wear.

24.     On information and belief, defendant Refreshing USA is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing USA is majority owned and controlled by Wear.

25.     On information and belief, defendant Creative Technologies is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, Creative Technologies is majority owned and controlled by Wear.

26.     On information and belief, defendant C3 Capital is a corporation organized and existing under the laws of Indiana with its principal place of business located at 1121 Laurelwood, Carmel, Indiana, 64032.

27.     On information and belief, defendant REVL is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1921 Walnut Street, 2nd Floor, Philadelphia, Pennsylvania, 19103.

28.     On information and belief, defendant REVL Securities is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1921 Walnut Street, 2nd Floor, Philadelphia, Pennsylvania, 19103.

29.     On information and belief, defendant Creative Technologies Florida is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2129 Andrea Lane, Fort Myers, Florida 33912.  On further information and belief, Creative Technologies Florida is majority owned and controlled by Wear.

30.     On information and belief, defendant Waterstation Technology is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Waterstation Technology is majority owned and controlled by Wear.

31.     On information and belief, defendant Waterstation Finance Company is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Waterstation Finance is majority owned and controlled by Wear.

32.     On information and belief, defendant Waterstation Techventure is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Waterstation Techventure is majority owned and controlled by Wear.

33.     On information and belief, defendant WST Franchise is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, WST Franchise is majority owned and controlled by Wear.

34.     On information and belief, defendant WST AZ Properties is a limited liability company organized and existing under the laws of Arizona with its principal place of business

14

located at 2581 W Erie Street, Chandler, Arizona, 85224.  On further information and belief, WST AZ Properties is majority owned and controlled by Wear.

35.    On information and belief, defendant WSM Capital Funding is a corporation organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Wear is the Chief Executive Officer and Director of WSM Capital Funding.

36.    On information and belief, defendant WS SPV 1 is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, WS SPV 1 is majority owned and controlled by Wear.

37.    On information and belief, defendant Refreshing Arizona is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 4237 E Magnolia Street, Phoenix, Arizona, 85034.  On further information and belief, Refreshing Arizona is majority owned and controlled by Wear.

38.    On information and belief, defendant Refreshing California is a limited liability company organized and existing under the laws of California with its principal place of business located at 83750 Citrus Ave, Suite 1, Indio, California, 92201.  On further information and belief, Refreshing California is majority owned and controlled by Wear.

39.    On information and belief, defendant Refreshing Carolinas is a limited liability company organized and existing under the laws of North Carolina with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Carolinas is majority owned and controlled by Wear.

15

40.     On information and belief, defendant Refreshing Colorado is a limited liability company organized and existing under the laws of Colorado with its principal place of business located at 1120 Elkton Drive, Suites J, Colorado Spring, Colorado, 80907.   On further information and belief, Refreshing Colorado is majority owned and controlled by Wear.

41.     On information and belief, defendant Refreshing Florida is a limited liability company organized and existing under the laws of Florida with its principal place of business located at 2129 Andrea Lane, Fort Myers, Florida, 33912.  On further information and belief, Refreshing Florida is majority owned and controlled by Wear.

42.     On information and belief, defendant Refreshing Georgia is a limited liability company organized and existing under the laws of Georgia with its principal place of business located at 131 Bells Ferry Lane, Marietta, Georgia, 30066.  On further information and belief, Refreshing Georgia is majority owned and controlled by Wear.

43.     On information and belief, defendant Refreshing Great Lakes is a limited liability company organized and existing under the laws of Illinois with its principal place of business located at 1400 Greenleaf Ave, Elk Grove Village, Illinois, 60007.  On further information and belief, Refreshing Great Lakes is majority owned and controlled by Wear.

44.     On information and belief, defendant Refreshing Great Plains is a limited liability company organized and existing under the laws of Oklahoma with its principal place of business located at 2915 N. Classen Suite 120-F, Oklahoma City, Oklahoma, 73106.  On further information and belief, Refreshing Great Plains is majority owned and controlled by Wear.

45.     On information and belief, defendant Refreshing Kentucky is a limited liability company organized and existing under the laws of Kentucky with its principal place of business

16

located at 2732 Grand Ave Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Kentucky is majority owned and controlled by Wear.

46.    On information and belief, defendant Refreshing Las Vegas is a limited liability company organized and existing under the laws of Nevada with its principal place of business located at 1810 E Sahara Ave Suite 212 #1579, Las Vegas, Nevada, 89104.  On further information and belief, Refreshing Las Vegas is majority owned and controlled by Wear.

47.    On information and belief, defendant Refreshing Mid-Atlantic is a limited liability company organized and existing under the laws of Pennsylvania with its principal place of business located at 1505 Branagan Drive, Tulleytown, Pennsylvania, 19007.  On further information and belief, Refreshing Mid-Atlantic is majority owned and controlled by Wear.

48.    On information and belief, defendant Refreshing Midwest is a limited liability company organized and existing under the laws of Indiana with its principal place of business located at 230 E 16th Street, Indianapolis, Indiana, 46202.  On further information and belief, Refreshing Midwest is majority owned and controlled by Wear.

49.    On information and belief, defendant Refreshing Midwest Real Estate is a limited liability company organized and existing under the laws of Indiana with its principal place of business located at 230 E 16th Street, Indianapolis, Indiana, 46202.  On further information and belief, Refreshing Midwest is majority owned and controlled by Wear.

50.    On information and belief, defendant Refreshing Montana is a limited liability company organized and existing under the laws of Montana with its principal place of business located at 1924 North Avenue West, Missoula, Montana, 59801.  On further information and belief, Refreshing Montana is majority owned and controlled by Wear.

17

51.    On information and belief, defendant Refreshing New England is a limited liability company organized and existing under the laws of New Hampshire with its principal place of business located at 2626 Brown Avenue, Unit D, Manchester, New Hampshire, 03103. On further information and belief, Refreshing New England is majority owned and controlled by Wear.

52.    On information and belief, defendant Refreshing New Mexico is a limited liability company organized and existing under the laws of New Mexico with its principal place of business located at 3101 Yale Boulevard, Albuquerque, New Mexico, 87106.  On further information and belief, Refreshing New Mexico is majority owned and controlled by Wear.

53.    On information and belief, defendant Refreshing Ohio is a limited liability company organized and existing under the laws of Ohio with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Ohio is majority owned and controlled by Wear.

54.    On information and belief, defendant Refreshing Texas is a limited liability company organized and existing under the laws of Texas with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Texas is majority owned and controlled by Wear.

55.    On information and belief, defendant Refreshing Utah is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at 586 W 9320 S, Sandy, Utah, 84070.  On further information and belief, Refreshing Utah is majority owned and controlled by Wear.

56.    On information and belief, defendant Refreshing USA Merger Sub is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing USA Merger Sub is majority owned and controlled by Wear.

57.    On information and belief, defendant Refreshing Washington is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Refreshing Florida is majority owned and controlled by Wear.

58.    On information and belief, defendant VendPro is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, VendPro is majority owned and controlled by Wear.

59.    On information and belief, defendant BevTeck Technologies is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, BevTeck Technologies is majority owned and controlled by Wear.

60.    On information and belief, defendant Summit Management Services is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Summit Management Services is majority owned and controlled by Wear's father, Richard Wear.

61.     On information and belief, defendant Ideal Property Investments is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Ideal Property Investments is majority owned and controlled by Wear.

62.     On information and belief, defendant Ideal Industrial Park is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, Ideal Industrial Park is majority owned and controlled by Wear.

63.     On information and belief, defendant Ideal AZ Property Investments is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 4237 E Magnolia Street, Phoenix, Arizona, 85034.  On further information and belief, Ideal Industrial Park is majority owned and controlled by Wear.

64.     On information and belief, defendant 2129 Andrea Lane is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at 2129 Andrea Lane, Fort Myers, Florida, 33912.  On further information and belief, 2129 Andrea Lane is majority owned and controlled by Wear.

65.     On information and belief, defendant 3209 Van Buren is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, 3239 Van Buren is majority owned and controlled by Wear.

66.     On information and belief, defendant Ice & Water Vendors is a limited liability company organized and existing under the laws of Arizona with its principal place of business

20

located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119.  On further information and belief, Ice & Water Vendors is majority owned and controlled by Wear.

67.    On information and belief, defendant K-2 Acquisition is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, K-2 Acquisition is majority owned and controlled by Wear.

68.    On information and belief, defendant K-2 MFG is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119.  On further information and belief, K-2 MFG is majority owned and controlled by Wear.

69.    On information and belief, defendant Smokey Point Holdings is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, Smokey Point Holdings is majority owned and controlled by Wear.

70.    On information and belief, defendant Pistol is a corporation organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, Wear is the Chief Executive Officer and Director of Pistol.

71.    On information and belief, defendant Emery Development is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Emery Development is majority owned and controlled by Wear.

21

72. On information and belief, defendant Arizona Water Vendors is a corporation organized and existing under the laws of Arizona with its principal place of business located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119. On further information and belief, Wear is the Chief Executive Officer and Director of Arizona Water Vendors.

73. On information and belief, defendant 1118 Virginia Street is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201. On further information and belief, 1118 Virginia Street is majority owned and controlled by Wear.

74. On information and belief, defendant 11519 South Petropark is a limited liability company organized and existing under the laws of Texas with its principal place of business located at 602 S Meadow Avenue, Odessa, Texas, 79761. On further information and belief, 11519 South Petropark is majority owned and controlled by Wear.

75. On information and belief, defendant TCR Plumbing is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201. On further information and belief, TCR Plumbing is majority owned and controlled by Wear.

76. On information and belief, defendant Flagstaff Plumbing is a limited liability company organized and existing under the laws of Arizona with its principal place of business located at 1612 N West Street, Suite 122, Flagstaff, Arizona, 86004. On further information and belief, Flagstaff Plumbing is majority owned and controlled by Wear.

77. On information and belief, defendant 70 North Garden Avenue is a limited liability company organized and existing under the laws of Illinois with its principal place of

22

business located at 70 North Garden Avenue, Roselle, Illinois, 60172.  On further information and belief, 70 North Garden Avenue is majority owned and controlled by Wear.

78.    On information and belief, defendant 701 Eden is a limited liability company organized and existing under the laws of North Carolina with its principal place of business located at 125 S King Street, Suite 2A, Jackson, Wyoming, 83001.  On further information and belief, 701 Eden is majority owned and controlled by Wear.

79.    On information and belief, defendant Aurora Building Products is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Aurora Building Products is majority owned and controlled by Wear.

80.    On information and belief, defendant 3422 W Clarendon Ave is a limited liability company organized and existing under the laws of Wyoming with its principal place of business located at PO Box 1045, Jackson, Wyoming, 83001.  On further information and belief, 3422 W Clarendon Ave is majority owned and controlled by Wear.

81.    On information and belief, defendant 1206 Hewitt Ave is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 1206 Hewitt Avenue, Everett, Washington, 98201.  On further information and belief, 1206 Hewitt Ave is majority owned and controlled by Wear.

82.    On information and belief, defendant Golden State Ventures is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201.  On further information and belief, Golden State Ventures is majority owned and controlled by Wear.

83. On information and belief, defendant Golden State Vending is a limited liability company organized and existing under the laws of Washington with its principal place of business located at 2732 Grand Avenue, Suite 122, Everett, Washington, 98201. On further information and belief, Golden State Vending is majority owned and controlled by Wear.

84. On information and belief, defendant Valley Vending is a limited liability company organized and existing under the laws of Montana with its principal place of business located at 1924 North Avenue W, Missoula, Montana, 59801. On further information and belief, Valley Vending is majority owned and controlled by Wear.

85. On information and belief, defendant Drink Up Venture is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 770 E 39th Avenue, Unit 1, Apache Junction, Arizona, 85119. On further information and belief, Drink Up Venture is majority owned and controlled by Wear.

86. On information and belief, John Does 1-1000, are believed to be individuals and entities who received payments from the bond proceeds.

## JURISDICTION AND VENUE

87. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the 352 Fund asserts civil causes of action arising under the laws of the United States and, in particular, the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), as codified at 18 U.S.C. §§ 1962 and 1964(c), *et seq*.

88. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining state and common law claims as those claims are so related to the 352 Fund's federal claims that they form part of the same case or controversy.

24

89.    This Court may exercise personal jurisdiction over Wear, Water Station Management, REVL, and REVL Securities because they purposefully availed themselves of the New York forum, and transacted business in New York pursuant to C.P.L.R. § 302(a)(1), by entering into an indenture and related transactions, including the Water Station Management LLC Management Agreement dated as of April 29, 2022 between REVL and Water Station Management.  Under Section 12.9 of the indenture, Wear, Water Station Management, REVL, and REVL Securities all agreed to "SUBMIT[] TO THE EXCLUSIVE PERSONAL JURISDICTION OF, AND . . . AGREE[] THAT ALL PROCEEDINGS RELATING HERETO SHALL BE BROUGHT ONLY IN ANY COURT OF THE STATE OF NEW YORK SITTING IN THE COUNTY OF NEW YORK, AND APPELLATE COURTS THEREFROM."  This Court may exercise personal jurisdiction over Chirico because he consented, in his employment agreement, "to the personal jurisdiction of the state and federal courts sitting in the City and State of New York with respect to matters related to [his] employment . . . ."

90.    This Court may exercise jurisdiction over the remaining Defendants, and venue properly lies in the Southern District of New York, pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that any Defendants residing in any other district be brought before this Court.  As noted above, this Court has personal jurisdiction over, at least, defendants Wear, Chirico, Water Station Management, REVL, and REVL Securities because they purposefully availed themselves of the New York forum by entering into the indenture and related agreements.  There is no other district in which a court would have personal jurisdiction over all of the alleged co-conspirators, because:  (i)  there appears to be no basis to subject defendants Chirico and Sadek (who are subject to general personal jurisdiction in Indiana) to personal

jurisdiction in the State of Washington, where Wear, Briggs, and the majority of the Wear Entities are subject to general personal jurisdiction; and (ii) there appears to be no basis to subject Wear, Briggs, and the Wear Entities to personal jurisdiction in the State of Indiana, where Chirico and Sadek are subject to general personal jurisdiction. Moreover, as is set forth in detail below, the facts alleged demonstrate a single nationwide RICO conspiracy exists.

91. Venue is also proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the 352 Fund's and LAM's claims, including the execution of the indenture and the related transactions, occurred in New York.

## I.    Chirico's "Investment" with Water Station Management

92. Chirico and Sadek are longstanding, close personal friends who live in Indianapolis, Indiana. Both have worked in financial services for the majority of their careers and, as is now becoming apparent, also have a penchant for misconduct. For example, Sadek has admitted to distributing false and misleading newsletters to investors and, in turn, was subjected to a Cease and Desist Order issued by the United States Securities and Exchange Commission.

93. At some point in or around 2018, Chirico and Sadek decided to invest their own personal capital in Water Station Management.

94. For his part, in or around April 2018, Chirico created a closely held company called C3 Capital, which he then used to enter into a common business arrangement with Wear and Water Station Management.

95. Specifically, Chirico caused C3 Capital to invest approximately $7 million in the

acquisition of Water Station Management franchises under a franchise agreement, funded in large part by Small Business Administration ("SBA") loans. C3 Capital purportedly acquired approximately 700 Water Machines pursuant to this arrangement, all of which were to be placed, operated and managed by Water Station Management for a fee. Chirico then subsequently agreed with Wear, on behalf of Water Station Management, that in lieu of being paid based on a percentage of revenue generated by these machines, C3 Capital would be paid a flat rate of return of 15% per annum. Notwithstanding that Chirico represented to the SBA that he had used personal funds as a deposit for the purchase of the Water Machine franchises, Chirico has subsequently admitted that the bulk of the down payment was rebated to him by Wear.

96. As early as November 2018, Chirico was actively working to market and sell Water Machine franchises on behalf of Water Station Management. To that end, Chirico actively modelled joint venture proposals in consultation with Wear that would provide investors with a fixed rate of annual return of 12%.

97. Chirico also persuaded his friends and family to become "franchisees" of Water Station Management, such that each invested capital for the "purchase" of Water Machines in return for guaranteed fixed rates of return.

98. Wear and Water Station Management entered into numerous such agreements with other "franchisees" around the country, under which the franchisee paid for Water Machines that would be installed and managed by Water Station Management, in return for a guaranteed flat rate of return for as much as 28% per annum. A number of those investors have since filed lawsuits across the United States, accusing Wear and Water Station Management of running a scheme in which the machines never existed, or the same machines with unique serial

numbers were fraudulently "sold" numerous times to different investors. These investors have claimed that the returns paid by Water Station Management were not paid out of revenue generated by Water Machines, but by funds raised by new franchisees, loans, or other sources.

## II.     <u>Chirico Is Employed by LAM and Creates the 352 Fund as Portfolio Manager</u>

99.     On May 28, 2020, Chirico joined LAM to establish a new investment strategy and to manage investment funds (i.e., the 352 Fund and other managed accounts). Chirico had previously sought employment with LAM but was not hired at the time because he lacked a sufficient investment track record. Several years later, after developing a track record, Chirico reached out to LAM and stated that his strategy would be to acquire a portfolio of asset-backed securities, loans, and other financial instruments on behalf of the 352 Fund to obtain long term returns on investments secured by collateral.

100.     Following Chirico's hiring, LAM established the 352 Fund, via the execution of a Limited Liability Company Agreement (as amended from time to time, the "Operating Agreement"). Under the Operating Agreement, LAM was appointed the "Manager" of the 352 Fund and, in turn, could "exercise full, complete, and exclusive right, power and authority to conduct the business and affairs of the [352] Fund." LAM also has the power to "delegate to any other Person or entity, duties and obligations vested by this Agreement with the Manager except as prohibited by law."

101.     LAM's rights, powers, and authority, as Manager, are enumerated under section 3.1(b) of the Operating Agreement and include the rights:

> to take such action for and on behalf of the Fund and in the name of the Fund as the Manager shall reasonably determine to be necessary, appropriate, advisable or convenient to . . . to carry on the businesses, purposes and activities for which the Fund was formed, including, directly and indirectly through its interest in the Master Fund,

buying, selling, selling short, holding and trading, on margin or otherwise, in a broad range of Financial Instruments that may be exchange-traded or traded over-the-counter, and may be purchased in the primary or secondary market. . . .

102.    Under his Employment Agreement dated May 28, 2020, Chirico was "authorized to make appropriate investment decisions (subject to any agreed-to risk limits or guidelines)." Accordingly, LAM delegated its power to make investment decision under the Operating Agreement to Chirico as portfolio manager of the 352 Fund.

103.    In his role, Chirico was the senior-most person in a three-person (later four-person) team.  As portfolio manager, Chirico owed fiduciary duties of good faith and loyalty to both LAM (his employer), as well as to the 352 Fund and its investors (whose capital Chirico was vested with the discretion to manage).

104.    Pursuant to his Employment Agreement, Chirico's employment with LAM was subject to LAM's employment policies, including those contained in the "Handbook, Code of Ethics and General Compliance Policies and Procedures."  As a condition of his employment, Chirico was required to "comply with all applicable policies of [LAM] and its parent companies." (*Id*.)

105.    Under his Employment Agreement, Chirico was entitled to a salary of $400,000 payable in accordance with LAM's policies, and a bonus for services in his first year of employment in the minimum amount of $866,666.67.  Over the course of his employment between May 2020 and his termination in 2024, Chirico was paid a total of $5,346,914.67.

106.    Upon joining LAM, Chirico was required to disclose any outside business interests.  While Chirico disclosed that he owned C3 Capital, his disclosures were riddled with several falsehoods and material omissions.  In particular, Chirico:

a. claimed that C3 Capital was *not* "investment related," even though Chirico treated C3 Capital and its franchise agreement with Water Station Management as an investment;

b. claimed that C3 Capital was *not* in his "coverage sector industry," even though he later invested the 352 Fund's capital into Water Station Management, just as C3 Capital had done; and

c. claimed that to the best of his knowledge, there were not "***any conflicts of potential conflicts with the entity and the Firm or with an affiliate of the Firm***," even though Chirico later caused the 352 Fund to invest its own capital in order to facilitate the sale of C3.

107. Chirico also did not disclose that he had actively marketed Water Station Management franchises to potential franchisees, or that he had such close connections to Water Station Management's business.

108. In response to subsequent inquiries about his C3 Capital investment, Chirico continued to conceal his ownership of Water Station Management franchises.

**III.    Chirico Directs the 352 Fund to Invest in Water Station Management**

109. After being hired by LAM, Chirico began the process of identifying potential deals into which he could invest the 352 Fund's capital.

110. As part of his due diligence, Chirico consulted with REVL and REVL Securities, an Indiana based "boutique investment bank" that, according to its website, provides "financial advisory, capital markets, and private credit solutions to clients worldwide." Chirico had known the principals of REVL and REVL Securities since at least 2010, and he often directed business

to them even prior to his employment at LAM.

111.    Chirico's relationship with REVL and REVL Securities was not strictly professional.  For example, on or around October 2, 2020, Chirico sought out REVL's advice regarding his personal investment in Water Station Management, and the effects that his personal SBA loans might have.  In turn, REVL knew that Chirico had a personal investment in Water Station Management, which also created a conflict of interest should Chirico invest others' funds into Water Station Management.

112.    Ultimately, REVL Securities acted as a broker dealer for Water Station Management, and arranged for a bond offering to assist Water Station Management in raising funds to assist it in acquiring Water Machines.

113.    In or around April 2022, Chirico arranged for the 352 Fund and its affiliate to invest in Water Station Management through that bond offering.  Pursuant to an indenture dated April 29, 2022, Water Station Management issued Class A notes in the aggregate principal amount of $56,250,000, and Class B notes in the aggregate principal amount of $15,000,000.  Non-party Heartland Financial purchased the Class A notes, and Chirico directed the 352 Fund and its affiliate to purchase the Class B notes.

114.    Chirico did not disclose that through C3 Capital, he had a $7 million investment with Wear and Water Station Management.  Chirico also did not disclose that his friends and family members had invested in Water Station Management franchises.  Nor did he disclose that he had been acting as a de facto officer of Water Station Management, assisting it in identifying potential franchisees and investors.

115.    The purported business rationale for Water Station Management's issuance of

the bonds was to obtain capital to purchase and deploy Water Machines. Those Water Machines were supposed to be either: (i) new machines manufactured by Water Station Management's affiliate, Creative Technologies; or (ii) machines that had previously been sold to franchisees, which would be repurchased and then operated for the exclusive benefit of Water Station Management. The Water Machines and the revenue they generated were supposed to secure Water Station Management's payment obligations under the bonds, such that the obligations would be at least 100% secured by collateral at all times.

116. In directing subsequent purchases of the Water Station Management bonds, Chirico acted with the full authority vested in LAM to manage the 352 Fund, but without the knowledge or acquiescence of either the 352 Fund or LAM. When directing each subsequent purchase of the bonds, Chirico acted with full knowledge of the fraudulent scheme and the facts underlying each purchase.

## IV.    Chirico Actively Concealed his Conflicts of Interest and Received Commercial Bribes

117. Shortly following the sale of the Class A and Class B bonds, Wear began to bribe Chirico, in order to implement a scheme to misappropriate the proceeds of the bonds.

118. For example, on September 30, 2022, Wear agreed to pay a $1,900,000 commercial bribe to Chirico to induce him to participate in the scheme to misappropriate bond proceeds. Specifically, on that day, Wear issued to C3 Capital a promissory note in the amount of $1,900,000, with an interest rate of 15% per annum. There is no other explanation for Wear's issuance of this promissory note. And upon information and belief, over the next three years, Wear would cause Water Station Management to misappropriate bond proceeds, and transfer those proceeds to Chirico and/or C3 Capital to pay off the promissory note.

119.    On that same day, Wear caused Water Station Management to wire $3.6 million to pay off Chirico's SBA loan.  On information and belief, Wear used misappropriated bond proceeds to pay off Chirico's loan obligations.

120.    Similarly, on November 15, 2022, seven months after the bond transaction closed, Chirico and his wife caused C3 Capital to sell 100 of its Class A shares to Wear's other company, Creative Technologies, with a stated purchase price of $7,259,000.  This arrangement with Creative Technologies constituted another commercial bribe intended to induce Chirico to continue to participate in the scheme to misappropriate bond proceeds, to the benefit of himself and the enterprise, and to the detriment of the 352 Fund.

121.    Finally, over the course of the past two years, Wear also bribed Chirico by transferring more than $300,000 to him which, in turn, was used to pay off loans taken out by Chirico's friends and family members.  These friends and family members were owners of Water Station Management franchises, which they had financed through personally guaranteed SBA loans.  Water Station Management failed to make payments on returns owed to these Chirico-related franchise holdings.  As a result, these franchisees were at risk of defaulting on their SBA loan obligations.  Chirico personally paid them a total of $300,000 to service their debts and to discourage them from commencing litigation against Water Station Management and Wear.  Wear, in turn, agreed to refund to Chirico the $300,000 he paid to his friends and family.  This payment constituted another commercial bribe paid to induce Chirico to continue to participate in the scheme to misappropriate bond proceeds, to the benefit of himself and the enterprise, and to the detriment of the 352 Fund.

122.    Indeed, in exchange for these bribes, Chirico took personal responsibility for

managing some of Water Station Management's communications with disaffected franchisees. For example, in January 2024, Chirico liaised with a franchisee about Water Station Management's plan to provide "catch up payments."

123.   This work was not disclosed to LAM, nor was it consistent with Chirico's employment obligations.  To the contrary, all of Chirico's work on behalf of Water Station Management's and Wear's fraudulent enterprise came at the direct expense of LAM and the 352 Fund.

## V.   The Administration of Bond Proceeds

### A.   Responsibilities of U.S. Bank as Trustee

124.   U.S. Bank was the Trustee under the indenture.

125.   Section 10.2 of the indenture required that the proceeds of the bonds were to be maintained in a segregated account at U.S. Bank (the "Acquisition Account"), which was pledged as additional security for the bonds.  Funds on deposit in the Acquisition Account could only be withdrawn by Water Station Management upon receipt by the "Trustee" (U.S. Bank) of a "Withdrawal Certificate" executed by Water Station Management and approved by the "Collateral Manager" (REVL) for the purpose of acquiring Water Machines, defined as "Eligible Assets."  Section 7.6 of the indenture expressly prohibited Water Station Management from using the bond proceeds for any purpose other than making a one-time prepayment on certain warehouse leases (not at issue here) or for purchasing Water Machines.

126.   Pursuant to the Granting Clauses of the indenture, U.S. Bank, as Trustee, was granted a first priority security interest in all assets of Water Station Management (with limited, irrelevant exceptions), including all existing Water Machines and all such machines purchased by Water Station Management in the future, for the benefit of the holders of the bonds.  On April

34

29, 2022, U.S. Bank filed a UCC-1 financing statement, number 2022-119-1619-8, perfecting the security interest granted under the indenture.

### B. Responsibilities of REVL and REVL Securities

127.    REVL was appointed as the Collateral Manager under the indenture. As the Collateral Manager, REVL agreed, *inter alia*, "to provide certain kinds of asset management, reporting and administrative services" in respect of the collateral and the Notes under the indenture "for the benefit of the holders of the Notes," as described more fully therein.

128.    REVL's responsibilities included, *inter alia*, the obligation to "review and approve in writing to the Trustee . . . each acquisition" of a Water Machine to the extent purchased with the bond proceeds, based on proper documentation provided by Water Station Management demonstrating such purchase. The documentation and information were required to include, *inter alia*, invoices or purchase orders, model and serial numbers, locations, retailers, purchase prices, and a withdrawal certificate. REVL was required to review that information, verify good title to each Water Machine to be acquired, and confirm in writing to U.S. Bank that any assets purchased using bond proceeds was an "Eligible Asset"—i.e., a Water Machine.

129.    REVL also had numerous reporting obligations related to the financial condition of Water Station Management and the integrity of the collateral securing the bonds. For example, REVL was required to provide to U.S. Bank monthly Excel files containing information about the Water Machines owned by Water Station Management, monthly balance sheet and cash activity as related to the bond facilities, quarterly performance reports, and monthly ad hoc analytics as requested by the noteholders for all pledged and non-pledged assets.

130.    REVL Securities and the 352 Fund had an understanding and agreement that

REVL Securities would provide monthly bond pricing reports for the bonds. REVL Securities knew that the 352 Fund trusted that REVL Securities' reporting was truthful, and that the 352 Fund relied on the monthly bond pricing report to facilitate the 352 Fund's valuation of its own portfolio. REVL Securities was also aware that the 352 Fund relied upon the bond pricing reports to evaluate the quality of the assets in its portfolio.

131. Both REVL and REVL Securities are subsidiaries of REVL Capital Group and were managed by the same personnel, who, on information and belief, shared knowledge regarding their dealings with Water Station Management.

## VI. Wear, Sadek and Briggs Execute Fraudulent Withdrawal Certificates in Furtherance of the Scheme and Misappropriate Bond Proceeds

132. Following the issuance of the bonds in April 2022, and during the months that followed, Water Station Management regularly provided REVL with documentation, including purported Purchase and Sale Agreements between Water Station Management and Creative Technologies, that purported to show that Water Station Management was purchasing Water Machines. REVL reviewed these documents and authorized the release of bond proceeds. Water Station Management also provided monthly operational, financial, and collateral reports intended to demonstrate that the Water Machines were installed and generating revenue.

133. To convince U.S. Bank to release the bond proceeds in accordance with the indenture, Wear, Sadek, and Briggs prepared and transmitted fraudulent withdrawal certificates to U.S. Bank representing that those proceeds would be used to purchase Water Machines.

134. Although Water Station Management and the Wear Entities have obscured the roles that each of Wear, Sadek, and Briggs played, on information and belief, they were all actively involved in managing the finances and operations of the Wear Entities. Indeed, on

information and belief, the "finance department" of the Wear Entities consisted only of Sadek and Briggs. Moreover, documents show that Briggs would regularly communicate with REVL about the collateral that Water Station Management intended to purchase and would provide fabricated Purchase and Sale Agreements in support of his representations. He would also provide purported "New Collateral" spreadsheets to the 352 Fund.

135. In each withdrawal certificate prepared by Wear, Sadek, and Briggs, Water Station Management confirmed that "the funds so withdrawn will be solely used to fund the purchase of Eligible Assets pursuant to the indenture and Purchase and Sale Agreement."

136. Upon receipt of the each of the withdrawal certificates, U.S. Bank released the bond proceeds from the Acquisition Account into Water Station Management's Bank of America account in accordance with the indenture.

137. The instances in which Wear, Sadek, and Briggs transmitted fraudulent withdrawal certificates and misappropriated the bond proceeds include, but are not necessarily limited to, the following.

138. **Withdrawal No. 1**. On May 19, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate on behalf of Water Station Management purporting to authorize U.S. Bank to release $468,350 of bond proceeds, which was supposed to be used to purchase 58 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. On information and belief, instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, Wear siphoned the proceeds to other members of the conspiracy, including Sadek, Chirico, C3 Capital, and the

Wear Entities, and to franchisees.

139.    **Withdrawal No. 2**.  On May 27, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $290,700 of bond proceeds, which was supposed to be used to purchase Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  On information and belief, instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, Wear siphoned the proceeds to other members of the conspiracy, including Sadek, Chirico, C3 Capital, and the Wear Entities, and to franchisees.

140.    **Withdrawal No. 3**.  On June 24, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $161,500 of bond proceeds, which was supposed to be used to purchase Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Ideal Property Investments LLC and other Wear Entities.

141.    **Withdrawal No. 4**.  On July 1, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $306,850 of bond proceeds, which was supposed to be used to purchase 38 Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead

of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Summit Management Services LLC, Refreshing USA LLC and Ideal Property Investments LLC and other Wear Entities.

142.    **Withdrawal No. 5**.  On August 1, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $218,025 of bond proceeds, which was supposed to be used to purchase 27 Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

143.    **Withdrawal No. 6**.  On August 10, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $2,132,750 of bond proceeds, which was supposed to be used to purchase 226 Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

144.    **Withdrawal No. 7**.  On August 15, 2022, Wear, Sadek, and Briggs prepared and

transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $3,262,300 of bond proceeds, which was supposed to be used to purchase 404 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

145.    **Withdrawal No. 8**. On August 23, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $3,883,125 of bond proceeds, which was supposed to be used to purchase 444 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. On information and belief, instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, Wear siphoned the proceeds to other members of the conspiracy, including Sadek, Chirico, C3 Capital, and the Wear Entities, and to franchisees.

146.    **Withdrawal No. 9**. On August 26, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $2,236,775 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water

Station Management transferred the bond proceeds to other members of the conspiracy, including Ideal Property Investments LLC and other Wear Entities.

147.    **Withdrawal No. 10**.  On September 6, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $2,414,425 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Ideal Property Investments LLC and other Wear Entities.

148.    **Withdrawal No. 11**.  On September 15, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $3,569,150 of bond proceeds, which was supposed to be used to purchase 442 Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  The 442 Water Machines that were supposed to have been purchased by Water Station Management with the September 15, 2022, bond proceeds did not exist.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred approximately $2.3 million of the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.  On September 19, 2022, Water Station Management transferred bond proceeds

41

to a franchisee named Todd Gerig. This payment reflected a "12% fixed return" that Water Station Management had guaranteed to Mr. Gerig in a July 19, 2019 service and management agreement. Mr. Gerig had no right or entitlement to receive any bond proceeds.

149. **Withdrawal No. 12**. On September 20, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $3,294,600 of bond proceeds, which was supposed to be used to purchase 408 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities. On September 21, 2022, Water Station Management transferred bond proceeds to another franchisee named Lou Wittenberg. The Water Machines that corresponded to serial numbers provided to U.S. Bank to induce it to release the bond proceeds did not exist.

150. **Withdrawal No. 13**. On September 29, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $7,630,875 of bond proceeds, which was supposed to be used to purchase 171 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC, Ideal Property

42

Investments LLC, and other Wear Entities.  Wear and Water Station Management made at least three transfers to pay off the loans of C3 Capital, which had been personally guaranteed by Chirico, including two loan payments to Newtek Small Business Finance LLC ("Newtek") and one loan payment to First Fed Bank accounts.  Bank records show the following transfers to pay off C3 Capital's loans.

   a. **SBA Transfer No. 1**:  a payoff of $1,746,032.64 for a loan with the loan number ending 278.

   b. **SBA Transfer No. 2**:  a payoff of $1,076,152.17 for a loan with the loan number ending 385.

   c. **SBA Transfer No. 3**:  a payoff of $1,852,793.69 for a loan with the loan number ending 407.

All of these transfers directly and personally benefited Chirico, at the expense of the 352 Fund. Indeed, to the best of the 352 Fund's knowledge, C3 Capital was a worthless entity which owned non-existent Water Machines and no other assets.

151.    **Withdrawal No. 14**.  On October 6, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $1,057,825 of bond proceeds, which was supposed to be used to purchase 131 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear

43

Entities.

152.    **Withdrawal No. 15**.  On October 12, 2022, Wear, Sadek, and Briggs prepared and transmitted to U.S. Bank a withdrawal certificate purporting to authorize U.S. Bank to release $3,956,750 of bond proceeds, which was supposed to be used to purchase 490 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

153.    **Withdrawal No. 16**.  On October 18, 2022, Water Station Management at the direction of Wear, Sadek, and Briggs executed a withdrawal certificate purporting to authorize U.S. Bank to release $2,907,000 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

154.    **Withdrawal No. 17**.  On November 2, 2022, Water Station Management at the direction of Wear, Sadek, and Briggs executed a withdrawal certificate purporting to authorize U.S. Bank to release $1,049,750 of bond proceeds, which was supposed to be used to purchase

130 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

155. **Withdrawal No. 18**. On November 11, 2022, Water Station Management at the direction of Wear, Sadek, and Briggs executed a withdrawal certificate purporting to authorize U.S. Bank to release $177,650 of bond proceeds, which was supposed to be used to purchase 22 Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

156. **Withdrawal No. 19**. On November 28, 2022, Water Station Management at the direction of Wear, Sadek, and Briggs executed a withdrawal certificate purporting to authorize U.S. Bank to release $549,100 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale. Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water

Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC, Ideal Property Investments LLC and other Wear Entities.

157.   **Withdrawal No. 20**.  On February 1, 2023, Water Station Management at the direction of Wear, Sadek, and Briggs executed a withdrawal certificate purporting to authorize U.S. Bank to release $484,500 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC, Ideal Property Investments LLC and other Wear Entities.

158.   **Withdrawal No. 21**.  On February 9, 2023, Water Station Management at the direction of Wear, Sadek, and Briggs, executed a withdrawal certificate purporting to authorize U.S. Bank to release $9,544,650 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC, Ideal Property Investments LLC, Water Station Finance Company LLC and other Wear Entities.

159.   **Withdrawal No. 22**.  On February 28, 2023, Water Station Management at the

direction of Wear, Sadek, and Briggs, executed a withdrawal certificate purporting to authorize U.S. Bank to release $4,513,925 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

160.    **Withdrawal No. 23**.  On March 21, 2023, Water Station Management at the direction of Wear, Sadek, and Briggs, executed a withdrawal certificate purporting to authorize U.S. Bank to release $4,602,750.00 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC and other Wear Entities.

161.    **Withdrawal No. 24**.  On March 29, 2023, Water Station Management at the direction of Wear, Sadek, and Briggs, executed a withdrawal certificate purporting to authorize U.S. Bank to release $3,867,925 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative

Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC, Ideal Property Investments LLC, and other Wear Entities.

162.    **Withdrawal No. 25**.  On April 25, 2023, Water Station Management at the direction of Wear, Sadek, and Briggs, executed a withdrawal certificate purporting to authorize U.S. Bank to release $1,041,675.00 of bond proceeds, which was supposed to be used to purchase an as yet undetermined number of Water Machines, each of which was identified by a specific serial number on an associated bill of sale.  Instead of using the bond proceeds to pay Creative Technologies in accordance with the terms of the Purchase and Sales Agreement provided to U.S. Bank to induce the release of the proceeds, bank statements show that Wear and Water Station Management transferred the bond proceeds to other members of the conspiracy, including Refreshing USA LLC, Ideal Property Investments LLC and other Wear Entities.

163.    Records also demonstrate that between on May 30, 2023 and June 2, 2023, Sadek received at least $1.5 million in payments from Water Station Management's Bank of America Bank which, on information and belief, were made from bond proceeds to provide guaranteed returns for the Water Station franchises owned by Sadek.

164.    Although the Purchase and Sale Agreements that Wear, Sadek and Briggs provided to U.S. Bank show that more than 10,000 Water Machines were purchased by Water Station Management with bond proceeds, Water Station Management's own internal records show that the business had actually purchased only about 2,600 Water Machines.  Moreover, a

comparison of collateral schedules created and disseminated by Water Station Management demonstrates that hundreds of devices that were purportedly collateral for the bonds were also owned by third parties. Accordingly, many of the Purchase and Sale Agreements provided to REVL to evidence the purchase of Water Machines as collateral for the bonds were indeed fraudulent.

## VII.    The First and Second Indenture Supplements and Waivers

165.    On or about January 23, 2023, Chirico unilaterally directed the 352 Fund to authorize the First Indenture Supplement and Waiver, pursuant to which Water Station Management issued $19,875,000 of additional Class A notes, purchased by non-party Heartland Financial, and $5,300,000 of additional Class B notes, purchased by the 352 Fund and its affiliate. The 352 Fund later acquired all the Class B notes purchased by its affiliate.

166.    On or about June 5, 2023, Chirico unilaterally directed the 352 Fund to authorize the Second Indenture Supplement and Waiver, which, at Wear's request, provided a more favorable servicing fee of 20% to Water Station Management and permitted Water Station Management to direct U.S. Bank to withdraw up to $1,552,200 from the Acquisition Account. Chirico agreed to provide the higher servicing fee and withdrawal limit despite there being no benefit to the 352 Fund of doing so.

## VIII.    REVL Discovers the Fraud and Facilitates the Conspiracy

167.    In June 2023, if not earlier, REVL began to suspect that there were inaccuracies in the information reported by Wear and Water Station Management concerning the Water Machines. REVL hired an outside firm to perform on-site inspections where the Water Machines were supposedly located. As reported by REVL in an email dated August 11, 2023, sent to Wear and Chirico (but not to U.S. Bank or Heartland Financial), the outside firm visited

164 locations identified by Water Station Management as having operating Water Machines. Of the 164 locations visited, 163 "had **NO** WST-700 machines located on site." (Emphasis in original).

168.    In response, Wear provided a number of false excuses and explanations, such as that the machines had been "re-routed" because of unavailable utilities, lack of space or competition from other machines.  None of these excuses or explanations were believable, or caused REVL to believe that the bond proceeds had been properly utilized.

169.    On August 16, 2023, REVL reported to Wear and Chirico that further investigation revealed that "3000+" Water Machines that were intended to be installed at Family Dollar stores and other locations "are actually missing."

170.    On September 12, 2023, REVL reported to Chirico that REVL had performed further on-site inspections at warehouses that Wear had represented contained Water Machines. During that inspection, REVL reported that it was unable to locate any of the "3,500 machines we're not seeing any revenue on."  That is nearly *half* of the machines that Water Station Management claimed that it had purchased and put into operation, and that secured the bonds.

171.    In a subsequent email on September 12, 2023, REVL informed Wear, with a copy to Chirico, that, "since this remains unresolved, the *90 day cure period has started and you have until 11/29/2023* to either demonstrate the collateral is in good working condition collecting revenue or deposit the cash used to buy those machines back into the collection account.  If neither of these is complete, 100% of available cash flow will be used to pay down the debt, and there will be no cash released for servicing." (Emphasis in original).

172.    REVL's email apparently referred to Section 7.4(f) of the indenture, which

provides that if a Water Machine "is in need of maintenance or repairs, the Issuer shall have ninety (90) days from the date the Issuer becomes aware of such Asset's need for maintenance or repair to make such repairs and maintenance," or to return the bond proceeds associated with the purchase of that machine to the Acquisition Account at U.S. Bank. However, on information and belief, REVL never informed U.S. Bank, as Trustee, that it discovered a substantial number of Water Machines did not exist, that Wear and Water Station Management had lied about their existence and location, or even that REVL had purported to invoke a 90-day cure period under the indenture.

173.    Based on REVL's discoveries, REVL knew that the documents and information provided by Water Station Management to demonstrate that bond proceeds would be used to purchase Water Machines were fabricated, and that Water Station Management's reports concerning the location, operations and revenue of those machines were false and misleading. Any one of those facts constituted a breach of the indenture and demonstrated that Water Station Management was engaged in an ongoing fraud as to the bondholders.

174.    Nonetheless, on information and belief, REVL never informed U.S. Bank of these discoveries. REVL instead decided to join the ongoing conspiracy by concealing the fraud, in order to cover up its own mismanagement and breaches of its duties to ensure the integrity of the bond collateral, to continue to collect fees, and maintain its relationship with Chirico in the hopes of doing further and other business with him.

175.    During this period, Water Station Management was not using the bond proceeds to purchase Water Machines. It was instead using those funds to pay franchisees that were complaining about Water Station Management's failure to pay amounts purportedly due on their

51

"investments." Wear and Water Station Management also diverted bond proceeds to pay other creditors of Water Station Management and Wear's other companies, and/or to Wear himself, all in violation of the indenture.

176.    On November 29, 2023, the purported 90-day "cure period" expired, without Water Station Management doing anything to identify or provide operating Water Machines, to explain why they were missing, or otherwise address the major problems identified by REVL. That same day, Wear emailed non-party Cantaloupe, a payment processor, copying REVL and later Chirico, requesting that Cantaloupe redirect modems corresponding to separate food and beverage vending machines that he owned through the Wear Entities, including, but not limited to, Refreshing USA, Refreshing Mid-Atlantic, and Refreshing Midwest, to the Water Station Management Bank of America account. These modems were used to process payments made to the vending machines and to transfer those payments to the bank accounts of the respective Wear Entities that owned the machines. Wear, Sadek, Briggs, Chirico, and Water Station Management redirected modems belonging to food and beverage vending machines to make it appear that revenue was being generated by Water Machines, while obfuscating the fact that those Water Machines did not actually exist.

177.    Because REVL was copied on Wear's email, it was fully aware of this deception. REVL still did nothing. On information and belief, REVL failed to inform U.S. Bank about the missing collateral, the fraud, the use of other food and beverage machines to conceal the fraud, or that a 90-day cure period had expired, and an event of default had occurred.

178.    Throughout this period, REVL Securities continued to provide monthly marks to the 352 Fund for the purposes of valuing the Water Station Management Bonds on the 352

Fund's books. The employees of REVL Securities responsible for valuing the bonds were the same individuals at REVL who knew that the collateral was missing, that Water Station Management had been committing fraud, and that an event of default had occurred.

179. Despite being fully aware that the collateral was missing and that Wear and the Wear Entities were unable to identify or provide operating Water Machines, REVL Securities nonetheless continued to mark the value of the bonds at or within 99% of par value throughout the fall of 2023.

180. In December 2023, REVL Securities marked the Series A bonds to 82% of par to reflect the price at which Heartland Financial sold those bonds to the 352 Fund (as described below) but continued to mark the Series B bonds within 99% of par value up until the point when U.S. Bank finally declared an event of default in May 2024. If the bonds had been valued correctly to reflect the obvious risks associated with the missing collateral and ongoing fraud, U.S. Bank and the 352 Fund's investors would have been immediately alerted to the serious problems underlying the scheme. By providing inflated marks to conceal the fraud, REVL Securities knowingly joined the conspiracy and enabled the Wear Entities to continue their operations, thereby substantially assisting the ongoing scheme.

181. Because REVL Securities failed to value the bonds truthfully, and because REVL failed to inform U.S. Bank and LAM of the events of default and fraud of which it had actual knowledge, they prevented U.S. Bank from formally declaring an event of default, ceasing the further withdrawal of bonds proceeds, preserving and or attempting to foreclose against the collateral, or taking any other steps to preserve value for the bondholders.

## IX.    The Third Indenture Supplement and Purchase of the Class A Notes

182.    By December 2023, Water Station Management was insolvent and had defaulted on its interest payment obligations to the bondholders.  That default had been cured only by millions of dollars in personal loans made to Water Station Management by its own CFO, Sadek, on December 5, 2023.

183.    Chirico actively engaged in the fraudulent scheme with Wear, Sadek, Briggs and the Wear Entities, and knew that Water Station Management was unable to provide the collateral necessary to secure the bonds, having received the above reports and emails from REVL.  He was also aware that Water Station Management was in serious financial distress and unable to pay creditors in the ordinary course of its business, including required interest payments on the bonds, or even to make payroll.

184.    Instead of informing U.S. Bank of these critical facts or taking any action to protect the investors in the 352 Fund, Chirico, acting entirely in his own self-interest to perpetuate the scheme, unilaterally directed the 352 Fund *to more than quadruple its exposure to Water Station Management* by purchasing the vast majority of the Class A notes from Heartland Financial.  On or about December 20, 2023, Chirico negotiated and reached an agreement for the 352 Fund and its affiliate to purchase $70.125 million of Class A notes for 82 cents on the dollar, thereby increasing its investment in Water Station Management to $87.925 million.

185.    By taking Heartland Financial out of the deal, Chirico was able to ensure that Heartland Financial would not insist on declaring an event of default and putting Water Station Management out of business.  Chirico was motivated to remove any oversight by Heartland

Financial so that he could loosen the indenture's restrictions and requirements for the benefit of Water Station Management and the scheme, and direct funds from the 352 Fund to Water Station Management to prop up the failing company and the ongoing scheme. By doing so, Chirico was actively supporting the scheme for his own benefit and for the benefit of his co-conspirators, and to the detriment of the 352 Fund and LAM.

186.    Chirico was motivated purely by self-interest. If a default occurred, Chirico and his friends and family would likely never recover on their investments in Water Station Management. However, loosening the restrictions on Water Station Management's use of bond proceeds enabled Wear to continue to funnel money to franchisees and perpetuate the scheme. Indeed, in a September 2023 text message exchange with his wife, who was a co-owner of C3 Capital, Chirico expressed that he was "pissed at Ryan [Wear]" because "he's not going to be able to make our 300k payment on time either from selling C3 [Capital] so need to address that as well." When his wife asked, "Does that worry you about the bond deal," Chirico responded: "Yes for bond deal *but I care as much or more about the personal investors that are with him still* . . . ." (Emphasis added).

187.    Removing Heartland Financial also allowed Chirico to make changes to the terms of the indenture that would more readily enable Water Station Management to use the bond proceeds, to purportedly waive the numerous events of default of which Chirico was aware, and provide changes to the collateral provisions that would favor Water Station Management and help prop up the failing business while it continued to make payments to other creditors, franchisees, Chirico and to Chirico's family and friends.

188.    After Heartland Financial was taken out of the deal, on December 20, 2023,

55

Chirico directed the 352 Fund to authorize the Third Indenture Supplement and Waiver. That agreement loosened the restrictions on the Acquisition Account and allowed Water Station Management to withdraw bond proceeds up to $970,000 for *any* purpose. It also allowed Water Station Management to provide substitute collateral for the assets originally pledged under the indenture, which it never did.

189. At no point did Chirico disclose that he was removing the restrictions on Water Station Management's use of the bond proceeds because it otherwise could not meet basic day-to-day obligations, such as payroll, that Water Station Management was "no longer acquiring new assets" because, in fact, it had never used the bond proceeds to acquire Water Machines in the first place, or that the assets were "non-performing" because they were the subject of a fraudulent scheme and did not exist. Chirico knew that this course of action did not benefit the 352 Fund or LAM, but unilaterally directed the upsize the 352 Fund's investment to benefit himself and the scheme.

190. On or around December 21, 2023, with knowledge that Water Machines were missing or non-existent, Sadek and Chirico worked to find additional funding to prop up the scheme. To that end, they attempted to broker a deal with Itsinreach Vending Services, a division of Sodexo ("Itsinreach"). In emails regarding a potential deal, Chirico copied representatives from REVL, introducing REVL as an "underwriter and structuring agent for the deals . . . done thus far with waterstation." A representative from REVL, with full knowledge that documents and information provided by Water Station Management to demonstrate that bond proceeds would be used to purchase Water Machines were fabricated, and that Water Station Management's internal accounting records concerning the location, operations and

revenue of those machines were false and misleading, then used wires (i.e., email) to provide Itsinreach with: (1) financial statements of Water Station Management, Refreshing USA and Creative Technologies, and (2) a collateral file with "asset level details on ~10,800 machines provided by the company." At that time, Chirico, Sadek and REVL knew that those Water Machines did not exist, that the documents they were sending were false, and therefore were actively seeking to mislead third parties to perpetuate their fraudulent scheme.

### X.     The Fourth and Fifth Indenture Supplement, and Upsize of the Bonds

191.    On January 25, 2024, REVL confirmed to Chirico that, after further investigation, it could not find the majority of the 6,500 Water Machines that were supposedly purchased using the bond proceeds, and that were supposed to be the collateral securing the bonds.

192.    Around this time, Wear admitted to Chirico what had already been confirmed by REVL on December 2, 2023: that more than 80% of the modems that were supposed to be on Water Machines to direct and report revenue generated by those machines were not on Water Machines at all. Instead, Wear (or someone acting at his direction) had set up modems on food and beverage vending machines operated by some of the Wear Entities to falsely report revenue generated by those vending machines as revenue generated by the Water Machines. The purpose of that deception was to help cover up the fact that Wear and Water Station Management had not been purchasing Water Machines with the bond proceeds but had instead been diverting those funds for their own purposes, including to facilitate the ongoing scheme with the Water Station Management franchisees.

193.    In a telephone call on January 29, 2024, between Wear, Sadek, and Chirico (and

recorded by Chirico), Chirico admitted that he believed, *in the best case*, there were only $41 million of Water Machines that existed and collateralized the Water Station Management bonds. Sadek admitted that Water Station Management was "*the largest franchise fraud in the history of the United States,*" and told Wear that he was "*going to jail*." (Emphasis added). At no point did Chirico inform any of his superiors at LAM about the missing collateral.

194.    Moreover, in January 2024, a work colleague of Chirico's—who also happened to be a Water Station Management franchisee—learned that the specific Water Station Machines that he had purchased as part of his franchise investment had also been "sold" to other franchisees.  This colleague promptly advised Chirico that Water Station Management had sold identical assets to multiple parties.  But Chirico did not alert anyone in response to this information.

195.    On February 2, 2024, Chirico directed the 352 Fund to enter into the Fourth Indenture Supplement and Waiver, pursuant to which he purported to waive, as events of default under the indenture, Water Station Management's misuse of the proceeds of the bonds, fraudulent misrepresentations about the existence of the collateral, the failure to provide financial statements since at least November 2023, and numerous other serious breaches of the indenture.

196.    Two weeks later, on February 14, 2024, Chirico authorized the Fifth Indenture Supplement and Waiver, which purported to authorize Water Station Management to withdraw bond proceeds from the Acquisition Account at U.S. Bank for any purpose whatsoever, without receiving authorization from REVL as Collateral Manager.

197.    On information and belief, the reason that Chirico directed the 352 Fund to waive

material events of default, and enable easier withdrawals of the bond proceeds, was to continue to prop up the failing company until such time as it could pay its obligations to Chirico, his friends and family.  Chirico did so in breach of his fiduciary duties to the fund and LAM, and to benefit himself and the scheme.

## XI.    The Purported Release of Collateral

198.    After directing the 352 Fund to provide more funds to Water Station Management, Chirico and Wear then agreed on a plan that would allow Water Station Management to take back full control of the Water Machines that did exist and the revenue they generated.  On information and belief, Wear and Chirico intended to use those Water Machines to generate further funds (either through sales of the machines, by pledging the machines as collateral to obtain loans, or collecting the revenue they generated) to keep the scheme going until it could find a new counterparty to refinance the Wear Entities' outstanding obligations.

199.    On February 20, 2024, Chirico and Wear entered into an agreement that purported to direct U.S. Bank to release all the Water Machines, including the revenue they generated, from the lien under the indenture that secured the bonds.

200.    The purported release of the security interest was induced by the fraud of Wear and Water Station Management, and Chirico's complete abandonment of the interest of the 352 Fund.  The 352 Fund received no benefit whatsoever by the purported release of collateral.  Any such purported release of the security interest should be voided as a product of the fraudulent scheme.

201.    Although the 352 Fund held a lien over all of Water Station Management's assets, the Water Machines were the only collateral of any value at the time.

202.    On February 29, 2024, unaware of the ongoing fraudulent scheme, U.S. Bank followed Chirico's direction and authorized the filing of a UCC-3 statement to amend the existing UCC-1 statement that perfected the original lien in the indenture as to all assets of Water Station Management.  The UCC-3 statement reported that the Water Machines were now purportedly excluded from the lien.  Chirico was aware that this release of collateral would not benefit the 352 Fund.

203.    Wear has claimed that the release rendered the 352 Fund's $106.9 million exposure to Water Station Management completely unsecured.

204.    Accordingly, as a direct result of Chirico's and Wear's scheme, the 352 Fund was left as a purportedly unsecured creditor.

## XII.    U.S. Bank Declares Two Events of Default

205.    On or about March 20, 2024, the balance of Water Station Management's "Interest Reserve Account" fell below the balance required to be maintained in such account, pursuant to Sections 1.1 and 5.1 of the indenture.

206.    On March 20, 2024, U.S. Bank notified Water Station Management that it had a fifteen-day grace period, or until the close of April 4, 2024, to remedy the shortfall before an event of default would be triggered under Section 5.1(a)(iii) of the indenture.  By April 5, 2024, Water Station Management had failed to provide the required funds or remedy the shortfall, thereby triggering an event of default.

207.    On May 28, 2024, U.S. Bank issued a notice of default to Water Station Management based on the shortfall in the Interest Reserve Account.

208.    Chirico was terminated by LAM and therefore from his role as portfolio manager

of the 352 Fund effective June 5, 2024.

209.    On June 20, 2024, Water Station Management was required to make interest payments on the Class A and B notes under Sections 5.1(a)(i) and (ii) under the indenture. Water Station Management failed to make the interest payments, and that day, U.S. Bank issued another notice of an event of default to Water Station Management based on Water Station Management's failure to "make any interest payments when due under the Class A Notes" and failure to "make any interest payments when due under the Class B Notes."

210.    Pursuant to Section 5.2 of the indenture, on July 1, 2024, the 352 Fund sent U.S. Bank written direction causing U.S. Bank to issue default notices to Water Station Management, declaring the principal of the notes and all accrued and unpaid interest thereon to be immediately due and payable.

211.    Although U.S. Bank issued a default notice, at the time of the filing of this complaint, Water Station Management has failed to remedy the default or repay outstanding principal and interest, as required under the indenture.

212.    Pursuant to Section 5.10 of the indenture, the 352 Fund, as the noteholder, has the absolute and unconditional right to "receive payment of the principal of and interest of" the Water Station Management bonds and "to institute suit for the enforcement of any such payment . . . ."

213.    Moreover, pursuant to an agreement dated July 1, 2024, the Trustee has agreed that the 352 Fund has the right to institute these proceedings and take all other necessary steps to enforce rights under the indenture as to Water Station Management.

**XIII.** **Chirico, Wear, Sadek and Briggs Continue the Scheme**

**A.** **Chirico Destroys Evidence in Order to Perpetuate the Enterprise**

214.    On April 29, 2024, Chirico received a copy of a draft complaint which accused him of participating in a Ponzi scheme relating to Water Station Management.

215.    In response, on May 1, 2024, Chirico received a formal written, document preservation notice directing him to preserve all documents, communications, and any other evidence or electronic data in his possession, custody or control that related in any way to Wear or Water Station Management and its affiliated companies.

216.    After receiving the notice, Chirico deleted text messages that he had exchanged with Wear and Sadek, including text messages relating to Water Station Management and its affiliates.  Chirico also deleted substantial quantities of evidence in late 2023 and early 2024 after having actual knowledge of missing collateral and the misappropriation of bond proceeds, both of which he knew would certainly result in litigation.  Chirico admitted to this willful destruction of evidence.

217.    Upon information and belief, Chirico deleted this evidence to protect and perpetuate the fraudulent enterprise and conspiracy which continued to operate throughout 2024.

**B.  Sadek Becomes Purported "Owner" of Water Station Management in Order to Perpetuate the Enterprise**

218.    On information and belief, in his role as CFO, Sadek authorized the fabrication of various documents, including withdrawal certifications, that the members of the enterprise used to access and misappropriate bond proceeds.  He also provided personal funds to Water Station Management to ensure its survival in the face of possible defaults so that the enterprise

could continue to carry on its fraudulent purpose.

219.    As CFO, Sadek had knowledge of the financial operations and decision-making of all Wear Entities.  Sadek was intimately involved with the management of all the Wear Entities.  During his time as CFO of Water Station Management, Sadek used a Waterstation Technology email address, tyler.sadek@waterstationtechnology.com, to send and receive hundreds of emails relating to the scheme.

220.    In exchange for his services, between February 2022 and January 2024, Sadek received at least $1.5 million in payments from Water Station Management.  These payments were made from bond proceeds that were supposed to purchase Water Machines to serve as collateral for the bonds.

221.    As noted above, by December 2023, Water Station was insolvent as a result of the Defendants' looting of its assets.  However, to cover up their prior misappropriation of bond proceeds and other assets of Water Station Management, on December 5, 2023, Sadek provided Wear with a multi-million-dollar loan.  This transaction was characterized as a loan, which would accrue interest at 2% per month compounded monthly with a maturity date of November 1, 2024, as reflected in a Promissory Note executed by Wear.  Wear personally guaranteed that Promissory Note in favor of Sadek and identified certain of the Wear Entities as collateral for the loan.  Pursuant to the Note, Sadek was entitled to receive monthly interest payments from Wear.  On information and belief, those monthly interest payments would be, and in fact were, diverted from bond proceeds.

222.    In January 2024, under financial pressure and fully aware that their fraudulent scheme might unravel, Wear and Sadek attempted to perpetuate their criminal enterprise by

transferring ownership of Water Station Management to Sadek. To that end, on January 18 and 19, Wear, Sadek, Chirico, and their counsel circulated a purported Management Authority Transfer Agreement proposed to be entered between Ryan Wear, Water Station Management, and a company under Sadek's control. The Management Transfer Authority stated that the "Indenture Noteholders" (at this point, the 352 Fund under the direction of Chirico) had asked Sadek's business to assume management of Water Station Management, and to analyze potential restructurings. This, of course, was a ruse intended to continue the conspirators' shell game, as Wear, Sadek and Chirico knew full well that the indenture funds had been used for improper purposes. As someone with full oversight of, and involvement in, Water Station Management's operations and finances, Sadek was well-placed to take over the company and purport to restructure it at its creditors' expense.

223.    In furtherance of his bid to take over control of Water Station Management on behalf of and in support of the enterprise, in February 2024, Sadek filed a sham complaint in Hamilton County Superior Court in the State of Indiana (Cause No: 29D05-2402-CC-001521), alleging breach of the Promissory Note executed by Wear and seeking "compensation." As part of the conspiracy, Wear did not actively defend the lawsuit. In turn, Sadek's true motivation for filing this complaint was to conspire with Wear to divert ownership of the assets that had been misappropriated, and therefore protect the enterprise's control over those assets from other creditors.

224.    To protect its own interests, in July 2024, the 352 Fund filed an action in the Superior Court of the State of Washington County of Snohomish (Case No. 24-2-05545-31), seeking prejudgment attachment of assets belonging to Wear and the Wear Entities under the

Uniform Voidable Transfer Act, RCS 19.40.  The hearing on the 352 Fund's unopposed motion was scheduled to take place on August 1, 2024.

225.    Yet, in another desperate ploy to preserve the enterprise's control of assets that it had plundered from the 352 Fund, Sadek announced—on the day before the scheduled hearing—***that he had obtained a controlling interest in Water Station Management***.  He then instructed his counsel—without any basis at all—to remove the attachment proceedings to federal court.  The effect of this action was to delay any hearing on the 352 Fund's motion for pre-judgment attachment, and to provide Wear, Sadek, and other members of the enterprise with additional time to move assets in an effort to prevent the 352 Fund from recovering the funds that rightfully belong to it.

226.    The 352 Fund promptly moved to remand the attachment action that Sadek had removed to federal court in bad faith.  By order dated October 7, 2024, the Honorable Tana Lin of the United States District Court for the Eastern District of Washington agreed that attachment proceeding had been removed in bad faith and remanded the attachment action to Snohomish County.  (Case No. 24-cv-01172, Dkt. 12 (Order)).  Judge Lin recognized that the timing of removal was "suspect" because the notice of removal was filed the day before the hearing was to be held concerning the 352 Fund's motion for a prejudgment writ of attachment over Defendants' assets, and Defendants were able to delay that hearing by removing the matter to federal court.  (*Id.* at 9-10).  The Court further held that there was no good faith basis for removal and awarded attorney's fees to the 352 Fund as a sanction for the defendants' misconduct.

227.    The only conceivable purpose of removing the attachment proceeding was to prevent the 352 Fund from obtaining an order of attachment and allowing the defendants here

to continue to hide assets and perpetuate their fraudulent scheme.

### C. Wear and Briggs Interfere with a Receivership and Involuntary Bankruptcy to Perpetuate the Enterprise

228.    In May 2024, a Receiver was appointed over Creative Technologies in the Superior Court of Washington State.  (Case No. 24-2-10753-3 SEA; the "Receivership").  As of May 14, 2024, the Receiver had begun to unravel Wear and his accomplices' scheme.

229.    Wear and Briggs frequently obstructed the Receiver's attempted investigations. For instance, Wear and Briggs repeatedly refused to provide the Receiver with financial records of the Wear Entities by invoking fallacious corporate distinctions whenever it suited them.  It was only on July 29, 2024, in response to a court order compelling them to cooperate with the Receiver, that Wear provided a small subset of the documents and information sought by the Receiver.

230.    In another attempt to retain control over the Wear Entities and perpetuate the enterprise, in August 2024, months after the entity was placed in Receivership, Wear instructed a Creative Technologies salesperson to sell vending machines and to use the proceeds to further the scheme's operations.  Wear also improperly sold at least 57 vending machines through Refreshing USA's subsidiary in Georgia.

231.    Further, prior to the Receivership, Wear had engaged a consulting firm called AGRA Capital Advisors ("AGRA") to engage in a purported re-capitalization or re-financing of the Wear Entities, with Creative Technologies as the borrower.  On information and belief, Wear, Chirico, Sadek, and Briggs intended to use AGRA to re-capitalize or re-finance the Wear Entities that would help perpetuate the scheme.  Despite the jurisdiction of the Receivership, Wear continued to work with AGRA to dupe potential counterparties into re-capitalizing the

Wear Entities to keep the scheme afloat.

232.   Based upon a report prepared by AGRA on March 1, 2024, Wear materially misrepresented the financial condition and assets of the Wear Entities in his bid to obtain additional financing to perpetuate the enterprise.

233.   To that end, on August 13, 2024, Wear directed Cantaloupe to redirect revenue from 57 vending machines that were sold that month to a "new owner" of the machines called "National Vending." Upon information and belief, Wear attempted to redirect these revenues to retain control over them and to perpetuate the fraudulent scheme.

234.   Upon discovering the sales and other elements of the scheme, on August 19, 2024, the Receiver moved for an order to appoint itself as general receiver over Refreshing USA and Water Station Management and their assets (the "Receivership Entities"), and to divest Ryan Wear of management authority over Creative Technologies, Refreshing USA, and Water Station Management. The Receiver also sought authority to file voluntary bankruptcy petitions if it concluded that it would be in the best interests of creditors to do so ("Receiver's Motion").

235.   In his motion, the Receiver stated that Briggs, as an associate of Wear, "willfully interfered with [the] receivership, including the Receiver's efforts to marshal and liquidate estate property." The Receiver's Motion also noted that Briggs failed to provide the Receiver with records regarding Creative Technologies accounts, including information pertaining to six journal entries documenting the receipt and outflow of $108.7 million from Creative Technologies' bank accounts in September 2022. On information and belief, these inflows correspond to Water Station Management's receipt of bond proceeds from Withdrawal Certificate Nos. 14 and 15.

67

236.    Both Wear and Briggs filed declarations opposing the Receiver's Motion. However, on August 23, 2024, the Superior Court of the State of Washington (the "Washington Court"), granted the relief requested in Receiver's Motion.  The Court found that, Wear and Briggs "transferred money between the deposit accounts of Debtor Entities and their subsidiaries to pay entity specific obligations or evade creditors;"  Wear "engaged in unfair and deceptive acts and practices both before and after Receiver's appointment;" and "operated [Water Station Management, Creative Technologies, Refreshing USA] as a single enterprise whose assets and liabilities [could not] be reasonably separated."  The Washington Court also found that despite the Receiver's repeated warnings, Wear engaged in deceptive acts and "[disposed] of assets owned by Creative [Technologies] or traceable to Creative [Technologies] or its creditors . . . [sold] machines constituting or traceable to property of the receivership estate in violation of [temporary restraining order] . . . [did] not [account] for the proceeds of [the] unauthorized sales . . . continued to solicit new investors and new financing with offers to sell or encumber machines [which were] property of the receivership estate or traceable to property of the receivership estate . . . made and continue[d] to make material misrepresentation to potential lenders and investors."

237.    Upon receiving the authority from the Washington Court on August 23, 2024, the Receiver promptly removed Wear and Briggs from their roles in the Receivership Entities.

238.    Despite having been removed from their positions, Wear and Briggs continued to interfere with the assets of the Receivership Entities to shield them from the Receiver.  For example, in his declaration in opposition to the Receiver's motion, Wear claimed that the funds from defendant VendPro LLC should not be transferred to the Receiver or be treated as an asset

68

of the Receivership Entities.  Wear claimed that neither he nor the Receivership Entities had any connection with VendPro LLC.  However, the Annual Report for the business VendPro LLC obtained from the Washington Secretary of State website, dated May 8, 2023 lists Ryan Wear as an Authorized Person and Governor of VendPro LLC.  Moreover, records show that Briggs had, on an earlier occasion, instructed Cantaloupe (the Wear Entities' payment processor) to siphon funds from the Water Station Management bank account number ending with 5591 into VendPro LLC's account.

239.    Accordingly, on August 26, 2024, the Washington Court entered an order compelling Cantaloupe to turnover estate property held by Cantaloupe, including all funds collected by VendPro LLC, to the Receiver.On August 27, 2024, the very next day after the Washington Court granted the Receiver access to the funds collected by VendPro LLC, Wear and Briggs concocted another scheme to regain control of the misappropriated assets through a fraudulent Chapter 11 bankruptcy filing before the Southern District of Texas.

240.    While the 352 Fund's remand motion was still pending in federal court and therefore while the 352 Fund was frustrated in its ability to obtain an order of attachment, several individuals filed involuntary Petitions under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas in relation to Creative Technologies, Refreshing USA, and Water Station Management.  The individuals who commenced the proceedings were all employees of or otherwise associated with Water Station Management.  One of them, Annamarie Briggs, is the sister of Briggs, the defendant in this case. On information and belief, Wear and Briggs believed that these filings would have the effect of wresting power from the Receiver, buying time, and perpetuating their control of the pilfered

assets.

241.    Following the Chapter 11 filings, Wear and Briggs have taken numerous bad faith steps to interfere with these proceedings and the bankruptcy.  For example, in or around October 2024, Briggs broke into the Refreshing USA's offices that had been secured by the Receiver and improperly accessed laptops that belong to Refreshing USA.  Briggs had no good faith reason to access Refreshing USA's books and records.  On information and belief, Briggs did so for the purpose of seeking to manipulate Wear Entities' financial and accounting records.

## CAUSES OF ACTION

### Count I: Violations of 18 U.S.C. § 1962(c)
### (Against Wear, Sadek, Chirico,
### C3 Capital, REVL, REVL Securities, and the Wear Entities)

242.    The foregoing paragraphs are incorporated as if expressly set forth herein.

243.    The 352 Fund is a corporate entity, and therefore constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

244.    Wear, Sadek, Chirico, C3 Capital, Briggs, REVL, REVL Securities and the Wear Entities are natural persons and business entities, and therefore each constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

245.    The foregoing Defendants operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are a group of associated persons and legal entities which:  (i) share a common purpose to engage in a scheme to misappropriate bond proceeds paid by the 352 Fund and its investors; (ii) have ongoing relationships and work together as a common unit to achieve such purpose; and (iii) each of these persons and entities have worked together since at least April 2022, which is long enough to allow them to achieve their purpose.

70

246.    The enterprise exists separate and apart from Wear, as well as from the pattern of racketeering activity in which it engages.  On information and belief, the enterprise began with the legitimate acquisition of Water Machines, but has continued to grow through fraud. Each of the foregoing Defendants has a distinct role in the enterprise.

247.    **Wear and the Wear Entities' Role in the Enterprise:**  Wear established the Wear Entities, including Water Station Management, Creative Technologies, Refreshing USA and their subsidiaries and affiliates.  Wear was the managing member of at least 28 of the Wear Entities up until July 2024.

248.    Water Station Management's business model involved managing Water Machines placed in various retail locations throughout the United States and selling Water Machine franchises to individuals or entities.

249.    Wear promised multiple Water Machine franchisees, including Chirico, Chirico's relatives and friends, and Sadek, guaranteed returns on their franchise investments. As a result, Wear, in concert with Chirico, Sadek and Briggs, began to misappropriate bond proceeds to fund these guaranteed returns, as well as to enrich themselves.

250.    **Sadek's Role in the Enterprise**:  Sadek served as CFO of Water Station Management.   Indeed, in marketing materials prepared by Creative Technologies and Waterstation Technology, Sadek was specifically listed as the CFO of Water Station Management.  This fact was subsequently corroborated by Wear's sworn testimony to the State of Washington Department of Financial Institutions on November 14, 2023.

251.    As CFO, Sadek had knowledge of and involvement in the financial operations and decision-making of all Wear Entities.  Sadek was intimately involved with the management

of all the Wear Entities.

252. During his time as CFO of Water Station Management, Sadek used a Waterstation Technology email address, tyler.sadek@waterstationtechnology.com, to send and receive hundreds of emails relating to the scheme.

253. Sadek entered into Water Station franchise or joint venture agreements with the Wear Entities, in relation to which Wear guaranteed specific rates of return. In turn, Sadek was incentivized to misappropriate bond proceeds in order to help him recover the amounts to which he believed he was entitled.

254. Sadek assisted and participated in the enterprise by authorizing the fraudulent withdrawal certificates, bills of sale, invoices and reports, as well as by loaning Water Station Management monies to prevent an event of default, thereby allowing it to continue to operate the enterprise. On information and belief, Sadek also owned franchises and received payments for his franchises from the bond proceeds.

255. Sadek also assisted and participated in the enterprise by attempting to find alternative funding for Water Station Management using fabricated documentation in December 2023, when the co-conspirators were fully aware that Water Machines were missing or non-existent and Water Station Management was insolvent. For example, Sadek attempted to broker a deal with Itsinreach. To that end, Sadek, Chirico and REVL provided Itsinreach with fabricated documents including (1) financial statements for Water Station Management, Refreshing USA and Creative Technologies, and (2) a collateral file with "asset level details on ~10,800 machines provided by the company" to induce it to invest in Water Station Management. At that time, Sadek knew that those Water Machines did not exist, that the

documents being sent were false, and therefore that he was actively seeking to mislead third parties in order to perpetuate their fraudulent scheme.

256. In addition, Sadek assisted the enterprise by providing Water Station Management with a multi-million-dollar loan which was personally guaranteed by Wear in a Promissory Note in favor of Sadek. Pursuant to the Note, Sadek was entitled to receive monthly interest payments from Wear. On information and belief, those monthly interest payments were diverted from bond proceeds. On information and belief, Sadek's motivation in providing this loan was to keep Water Station Management afloat and perpetuate the scheme to misappropriate bond proceeds. Further, it gave Sadek a basis on which to assume control of the assets of Water Station Management. By transferring ownership of Water Station Management to Sadek, Wear, Sadek and his co-conspirators aimed to keep the assets of the company outside the reach of the creditors of Water Station Management.

257. To that end, on January 18 and 19, 2024, Wear, Sadek and Chirico circulated a purported Management Authority Transfer Agreement to be entered between Ryan Wear, Water Station Management, and a company managed by Tyler Sadek. Under the terms of the agreement, Sadek would analyze the potential for restructuring Water Station Management. This was, in effect, a ruse to ensure that Wear, Sadek and Chirico could retain control of Water Station Management and perpetuate the scheme.

258. However, instead of executing this agreement, Sadek and his co-conspirators found another way to transfer ownership of Water Station Management's assets to Sadek. In February 2024, Sadek filed a sham complaint in Hamilton County Superior Court in the State of Indiana (Cause No: 29D05-2402-CC-001521), alleging breach of the Promissory Note

executed by Wear.  Sadek was thereby able to obtain a controlling interest in Water Station Management.

259.    Sadek then acted to obstruct the 352 Fund's bid to seek prejudgment attachment of assets belonging to Wear and the Wear Entities by removing the state court attachment proceedings to federal court. Through this misconduct, Sadek was able to assist the enterprise in retaining control of Water Station Management's assets to perpetuate the scheme.

260.    **Chirico's Role in the Enterprise**: Chirico, as the 352 Fund's portfolio manager, assisted and participated in the enterprise by receiving commercial bribes to facilitate Water Station Management's misappropriation of bond proceeds, thereby ensuring that Wear and Water Station Management could continue to pay back franchisees, including himself and his friends, and family, and continue to attract new franchisees, joint venture partners and other investors.  After Chirico was aware that bond proceeds had been misappropriated, he continued to provide millions of dollars of the 352 Fund's money to Water Station Management, and also authorized the release of the 352 Fund's lien on its collateral.  Chirico acted outside the scope of his employment and only to benefit himself and the scheme.

261.    Chirico also marketed Water Station Management to potential investors and attempted to secure funding and deals on its behalf from 2018 and up until the present date.  For example, Chirico attempted to secure alternative funding for Water Station Management by distributing fraudulent documentation to Itsinreach, in December 2023.

262.    Further, Chirico owned franchises through C3 Capital and received payments for his franchises from bond proceeds.  In return for the above actions, Water Station Management transferred bond proceeds to Chirico as commercial bribes, either directly or to pay off SBA

loans that had been issued by C3 Capital.

263. C3 Capital assisted and participated in the enterprise by knowingly receiving bond proceeds in connection with its sale of shares to Creative Technologies, and by being the mechanism by which Chirico concealed his personal investment in the Water Machine franchises and his ongoing involvement in the fraud.

264. All of these actions were taken to benefit Chirico personally, and at the expense of the 352 Fund.

265. **Briggs' Role in the Enterprise:** Briggs was the Corporate Controller of Water Station Technology and Refreshing USA. In that capacity, and because the Wear Entities were managed as a single, financially indistinguishable enterprise, Briggs was in receipt of and managed bond proceeds.

266. As Corporate Controller, Briggs had knowledge of the financial status and decision-making of all the Wear Entities. Briggs aided and abetted Wear with the management of all the Wear Entities. Documents demonstrate that Briggs regularly communicated with REVL about the collateral that Water Station Management intended to purchase and provided fabricated Purchase and Sale Agreements. He would also provide purported "New Collateral" spreadsheets to the 352 Fund.

267. As recently as October 2024, Briggs actively attempted to keep the enterprise afloat by illicitly accessing the Wear Entities' Quickbooks, which enabled Briggs to falsify the Wear Entities' financial records and obscure his conspirators' past misconduct.

268. **The Other Wear Entities' Role in the Enterprise**: The remaining Wear Entities were either recipients of bond proceeds, recipients of assets purchased with bond

proceeds, transferees of collateral under the bonds, or otherwise aided and abetted the enterprise in its purpose to misappropriate bond proceeds as well as monies that belonged to franchisees.

269. Despite nominally being separately incorporated companies, Wear treated all the Wear Entities as a single, indistinguishable company. These companies did not maintain distinct books and records, and Wear routinely authorized the movement of funds between these companies for no consideration at all. Moreover, revenues that these companies have generated over the past several years have all flowed into bank accounts in the name of Refreshing USA.

270. **REVL's Role in the Enterprise**: REVL participated in the enterprise by authorizing the release of bond proceeds, even after it knew that the other defendants had misappropriated bond proceeds. REVL's participation allowed the other defendants continue to misappropriate bond proceeds.

271. REVL Securities participated in the enterprise by continuing to mark the value of the bonds at or within 99% of par value throughout the fall of 2023 despite its knowledge that the bonds were undercollateralized, further helping to conceal the misappropriation of the bonds' collateral. REVL Securities engaged in this conduct to perpetuate the conspiracy.

272. REVL also assisted the enterprise by helping it to solicit funding even though it knew that Water Station Management was insolvent, and the bonds were undercollateralized. For example, REVL provided Itsinreach with fabricated documents including (1) financial statements for Water Station Management, Refreshing USA and Creative Technologies, and (2) a collateral file with "asset level details on ~10,800 machines provided by the company" to induce it to invest in Water Station Management. At that time, REVL knew that those Water Machines did not exist, that the documents being sent were false, and therefore that it was

actively seeking to mislead third parties to perpetuate the fraudulent scheme.

273.    At all relevant times, the foregoing Defendants were employed by or associated with the enterprise and conducted and participated in its affairs through a pattern of racketeering activity under 18 U.S.C. § 1961(5) because the Defendants engaged in at least two predicate acts of racketeering activity within ten years of each other.

274.    At all relevant times, the foregoing Defendants were engaged in and had activities that affected interstate commerce, since the bond proceeds were transferred from the 352 Fund's accounts in New York to the Defendants, primarily located in Washington, which then further distributed the bond proceeds throughout the United States.

275.    The foregoing Defendants engaged in at least two acts of racketeering activity within ten years of each other and within the meaning of 18 U.S.C. § 1961(1), including:  (1) wire fraud under 18 U.S.C. § 1343; (2) commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08; (3) bank fraud under 18 U.S.C. § 1344; (4) engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957; (5) laundering of monetary instruments under 18 U.S.C. § 1956; (6) sale or receipt of stolen goods or moneys under 18 U.S.C. § 2315; and (7) concealment of assets under 18 U.S.C. § 152.

276.    **Predicate Acts Alleged Against Wear:**  *First*, Wear engaged in at least 25 acts of wire fraud under 18 U.S.C. § 1343 between May 19, 2022 and April 25, 2023 when, as part of a scheme to fraudulently misappropriate bond proceeds, he prepared and executed at least 25 fraudulent withdrawal certificates using fabricated purchase orders and revenue reports, which were transmitted by electronic mail and wires across various states to induce U.S. Bank as Trustee to release bond proceeds to Water Station Management and to execute the scheme.  For

example, on September 15, 2022, and separately, on September 20, 2022, Wear, Sadek and Briggs prepared fraudulent withdrawal certificates and corresponding invoices and bills of sale for the purported purchase of Water Machines (which was never intended to be performed), and which were sent to U.S. Bank and REVL via electronic mail to induce U.S. Bank to release bond proceeds. Those proceeds were then directed to the Wear Entities, who had knowledge of the scheme through their principal, Wear.

277. *Second*, Wear engaged in wire fraud by instructing Cantaloupe, the non-party payment processor, to redirect modems corresponding to the food and beverage vending machines to the account designated for Water Station Management. This falsely created the appearance that the revenue was being generated by Water Machines when it was actually being derived from other sources such as food and beverage machines or franchisees' investments. False reports indicating that the revenue was being generated by the Water Machines were transmitted by wires to the 352 Fund and U.S. Bank.

278. *Third*, Wear engaged in several acts of commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08 by transferring to Chirico and C3 Capital more than $7 million dollars, purportedly to acquire shares of C3 Capital, but in fact to influence Chirico's decision to invest the 352 Fund's capital in Water Station Management bonds as part of the fraudulent scheme. Wear also engaged in commercial bribery by giving Chirico a promissory note in the amount of $1,900,000 on or about September 30, 2022, under which Chirico would receive a guaranteed interest rate of 15% per annum, and wiring $3.6 million to pay off Chirico's SBA loan. These acts were all done to induce Chirico to perpetuate the scheme. These are acts of bribery that are chargeable under New York state law and are punishable by imprisonment for

more than one year.  They therefore constitute predicate acts under 18 U.S.C. § 1961(1)(A).

279.    *Fourth*, Wear engaged in at least 25 acts of bank fraud under 18 U.S.C. § 1344 between May 19, 2022 and April 25, 2023 when, as part of a scheme to fraudulently obtain bond proceeds, he prepared and executed at least 25 fraudulent withdrawal certificates, using fabricated purchase orders and revenue reports, to induce U.S. Bank (an insured depository institution as defined in section 3(c)(2) of the Federal Deposit Insurance Act) to release bond proceeds that it held in Acquisition Accounts to Water Station Management.

280.    *Fifth,* Wear engaged in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957 and laundering of monetary instruments under 18 U.S.C.A. § 1956 by receiving, transferring, and depositing fraudulently obtained bond proceeds with a value of over $10,000 into bank accounts belonging to Chirico, C3, Sadek, the Wear Entities and franchisees.

281.    *Sixth*, in August 2024, Wear engaged in the sale of stolen goods in violation of 18 U.S.C. § 2315 when, despite being removed from his position as the manager of the Wear Entities, and despite Creative Technologies being placed into receivership, Wear instructed a Creative Technologies salesperson to sell vending machines and to use the proceeds for payroll and to fund further operations.  Wear sold at least 57 vending machines through Refreshing USA's subsidiary in Georgia.

282.    *Seventh*, Wear engaged in several acts of knowingly and fraudulently transferring and concealing the assets of Water Station Management and other Wear Entities in contemplation of a case under Chapter 11 under 18 U.S.C. § 152(7).  In August 2024, in anticipation of the involuntary Chapter 11 proceedings that would be filed by his associates later

that month, Wear instructed a Creative Technologies salesperson to sell vending machines and to use the proceeds to further the scheme's operations. Wear also improperly sold at least 57 vending machines through Refreshing USA's subsidiary in Georgia. In addition, on August 13, 2024, Wear directed Cantaloupe to redirect revenue from 57 vending machines that were sold to a "new owner" of the machines called "National Vending." Upon information and belief, Wear attempted to redirect these revenues to retain control over them and to perpetuate the fraudulent scheme. Wear also tried to conceal the assets of VendPro LLC to shield those assets from the Receiver, and ultimately the involuntary bankruptcy.

283. **Predicate Acts Alleged Against Sadek:** *First*, Sadek engaged in at least 25 acts of wire fraud under 18 U.S.C. § 1343 between May 19, 2022 and April 25, 2023 when, as part of a scheme to fraudulently obtain funds, he assisted in the preparation and execution of at least 25 fraudulent withdrawal certificates using fabricated purchase orders and revenue reports, which were transmitted by electronic mail and wires across various states to induce U.S. Bank as Trustee to release bond proceeds to Water Station Management and to execute the scheme.

284. *Second*, Sadek engaged in wire fraud under 18 U.S.C. § 1343 on or around December 21, 2023 when, as part of a scheme to fraudulently obtain funds, he acted in concert with Chirico and REVL to provide false and misleading documents to Itsinreach. Sadek, along with Chirico, was copied into emails from REVL conveying (1) financial statements of Water Station Management, Refreshing USA and Creative Technologies, and (2) a collateral file with "asset level details on ~10,800 machines provided by the company." At the time of conveying those documents, Sadek knew they were false and misleading, and he intended to use those documents to fraudulently induce Itsinreach to provide additional funds to Water Station

80

Management, Refreshing USA and Creative Technologies.

285.    *Third*, Sadek engaged in at least 25 acts of bank fraud under 18 U.S.C. § 1344 between May 19, 2022 and April 25, 2023 when, as part of a scheme to fraudulently obtain bond proceeds, he prepared and executed at least 25 fraudulent withdrawal certificates, using fabricated purchase orders and revenue reports, to induce U.S. Bank (an insured depository institution as defined in section 3(c)(2) of the Federal Deposit Insurance Act) to release bond proceeds it held in Acquisition Accounts to the Bank of America Account with account number ending in 5591 belonging to Water Station Management.

286.    *Fourth*, Sadek engaged in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957 and laundering of monetary instruments under 18 U.S.C § 1956 by receiving, transferring and depositing fraudulently obtained bond proceeds with a value of at least $1.5 million.

287.    **Predicate Acts Alleged Against Chirico:** *First*, Chirico engaged in at least four acts of commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08 by receiving transfers of funds from Wear and the Wear Entities to his personal or C3 Capital accounts, including:

    a. more than $7 million dollars from Wear, purportedly on account of Creative's acquisition of the shares of C3 Capital, but in fact as part of a bribe to influence Chirico's decision to perpetuate the scheme;

    b. a promissory note from Wear in the amount of $1,900,000 on or about September 30, 2022, under which Chirico would receive a guaranteed interest rate of 15% per annum, and a wiring of $3.6 million to pay off an SBA loan owned by C3 Capital;

c.  more than $300,000 which was used to pay off SBA loans taken out by Chirico's friends and family members who were owners of Water Station Management franchisees;

d.  approximately $900,000 in funds in exchange for Chirico directing an additional $19 million in 352 Capital's funds to Water Station in January 2024.

288.  These are all acts of bribery that were conducted to induce Chirico to perpetuate the scheme, are chargeable under New York state law and are punishable by imprisonment for more than one year.  They therefore constitute predicate acts under 18 U.S.C. § 1961(1)(A).

289.  *Second*, Chirico engaged in wire fraud by encouraging Wear to instruct Cantaloupe, the non-party payment processor, to redirect modems corresponding to the food and beverage vending machines to the account designated for Water Station Management.  This falsely created the appearance that revenue was being generated by Water Machines when it was actually being derived from other sources such as food and beverage machines or franchisees' investments.

290.  *Third*, Chirico engaged in wire fraud under 18 U.S.C. § 1343 on or around December 21, 2023 when, as part of a scheme to fraudulently obtain funds, he acted in concert with Sadek and REVL to provide false and misleading documents to Itsinreach.  Chirico was copied into emails from REVL conveying (1) financial statements of Water Station Management, Refreshing USA and Creative Technologies, and (2) a collateral file with "asset level details on ~10,800 machines provided by the company."  At the time of conveying those documents, Chirico knew they were false and misleading, and he intended to use those documents to fraudulently induce Itsinreach to provide additional funding for Water Station

Management, Refreshing USA and Creative Technologies.

291.    *Fourth*, Chirico engaged in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957 and laundering of monetary instruments under 18 U.S.C.A. § 1956 by receiving fraudulently obtained bond proceeds with a value of at least $7 million.

292.    *Fifth*, Chirico engaged in bank fraud under 18 U.S.C. § 1344 when in 2018 he represented to the SBA as part of a scheme to obtain funds under the custody and control of financial institutions, that he had used personal funds as a deposit for the purchase of Water Machine franchises.  Chirico later admitted that the bulk of the down payment was in fact not personal funds but rather money rebated to him by Wear.

293.    **Predicate Acts Alleged Against C3 Capital:**  *First*, C3 Capital engaged in at least two acts of commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08 when it agreed that Wear and the Wear Entities would confer to Chirico and C3 Capital more than $7 million dollars, purportedly to acquire shares of C3 Capital, but which in fact were conferred in order to induce Chirico to participate in the misappropriation of bond proceeds.  Pursuant to a promissory note that he gave to Chirico, Wear also wired $3.6 million to pay off an SBA loan owned by C3 Capital.  These are acts of bribery that were done to induce Chirico to perpetuate the scheme and are chargeable under New York state law and are punishable by imprisonment for more than one year.  They therefore constitute predicate acts under 18 U.S.C. § 1961(1)(A).

294.    *Second*, C3 Capital engaged in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957 and laundering of monetary instruments under 18 U.S.C.A. § 1956 by receiving fraudulently obtained bond proceeds with a value of at

least $7 million from Water Station Management.

295.    **Predicate Acts Alleged Against Briggs:**  *First*, Briggs engaged in at least 25 acts of wire fraud under 18 U.S.C. § 1343 between May 19, 2022 and April 25, 2023 when, as part of a scheme to fraudulently obtain funds, he assisted in the preparation and execution of at least 25 fraudulent withdrawal certificates, using fabricated purchase orders and revenue reports, which were transmitted by electronic mail and wires across various states to induce U.S. Bank as Trustee to release bond proceeds to Water Station Management and to execute the scheme.

296.    *Second*, Briggs engaged in at least 25 acts of bank fraud under 18 U.S.C. § 1344 between May 19, 2022 and April 25, 2023 when, as part of a scheme to fraudulently obtain bond proceeds, he prepared and executed at least 25 fraudulent withdrawal certificates, using fabricated purchase orders and revenue reports, to induce U.S. Bank (an insured depository institution as defined in Section 3(c)(2) of the Federal Deposit Insurance Act) to release bond proceeds it held in Acquisition Accounts to Water Station Management.

297.    *Third*, Briggs engaged in several acts of knowingly and fraudulently transferring and concealing the assets of Water Station Management and other Wear Entities in contemplation of a case under Chapter 11 under 18 U.S.C. § 152(7).  Briggs failed to provide the Receiver with records regarding Creative Technologies accounts, including information pertaining to six journal entries documenting the receipt and outflow of $108.7 million from Creative Technologies' bank accounts in September 2022.

298.    *Fourth*, Briggs knowingly and fraudulently manipulated records in violation of 18 U.S.C. § 152(8) when he improperly accessed, and then manipulated, the Wear Entities' Quickbooks to falsify the Wear Entities' financial records and obscure the conspirators' past

84

misconduct.

299.    **Predicate Acts Alleged Against The Wear Entities:**    *First*, Creative Technologies and Water Station Management engaged in at least 25 acts of wire fraud under 18 U.S.C. § 1343 between May 19, 2022 and April 25, 2023, when as part of a scheme to fraudulently obtain funds Wear, Sadek, and Briggs, as controllers of the Wear Entities, prepared and executed at least 25 fraudulent withdrawal certificates, including fabricated Purchase and Sale Agreements between Creative Technologies and Water Station Management and falsified revenue reports, which were transmitted by electronic mail and wires across various states to induce U.S. Bank as Trustee to release bond proceeds to Water Station Management and to execute the scheme.

300.    *Second*, Water Station Management engaged in at least 25 acts of bank fraud under 18 U.S.C. § 1344 between May 19, 2022 and April 25, 2023 when, as part of a scheme to fraudulently obtain bond proceeds, Wear, Sadek, and Briggs, as controllers of the Wear Entities, prepared and executed at least 25 fraudulent withdrawal certificates, using fabricated purchase orders and revenue reports, to induce U.S. Bank (an insured depository institution as defined in Section 3(c)(2) of the Federal Deposit Insurance Act) to release bond proceeds it held in Acquisition Accounts to the Bank of America with account number ending in 5591 belonging to Water Station Management.

301.    *Third*, the Wear Entities including Refreshing USA, Ideal Property Investments LLC, and on information and belief, Ideal Industrial Park LLC, Ideal AZ Property Investments LLC, 2129 Andrea Lane, LLC, 3209 Van Buren LLC, 70 North Garden Avenue LLC, 701 Eden LLC, Aurora Building Products LLC, 3422 W Clarendon Ave LLC, and 1206 Hewitt Ave LLC

engaged in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957 and laundering of monetary instruments under 18 U.S.C. § 1956 by receiving and transferring fraudulently obtained bond proceeds with a value of over $10,000 from Water Station Management.  The Receiver appointed in by the Washington Court determined that the primary activity of the Wear Entities was channeling money that was invested or loaned by creditors between and among members of the conspiracy and third parties.

302.    **Predicate Acts Alleged Against REVL:**  *First*, REVL engaged in wire fraud under 18 U.S.C. § 1343 when, despite its knowledge that Wear and Water Station were not utilizing bond proceeds to acquire Water Machines, it authorized further disbursements of bond proceeds.  REVL also helped to conceal the ongoing fraud.

303.    *Second*, REVL engaged in wire fraud under 18 U.S.C. § 1343 on or around December 21, 2023, when, as part of a scheme to fraudulently obtain funds, it acted in concert with Chirico and Sadek to provide false and misleading documents to Itsinreach.  REVL sent emails to Itsinreach, copying Chirico and Sadek, conveying (1) financial statements of Water Station Management, Refreshing USA and Creative Technologies, and (2) a collateral file with "asset level details on ~10,800 machines provided by the company."  At the time of conveying those documents, REVL knew they were false and misleading, and it intended to use those documents to fraudulently induce Itsinreach to provide additional funding for Water Station Management, Refreshing USA, and Creative Technologies.

304.    At all relevant times, the foregoing Defendants were employed by or associated with the enterprise and conducted and participated in its affairs through a pattern of racketeering activity under 18 U.S.C. § 1961(5) because the Defendants engaged in at least two predicate

acts of racketeering activity within ten years of each other.

305. The foregoing Defendants directed and controlled the enterprise, and their participation in the enterprise was made possible, in whole or in part, by the pattern of racketeering.

306. The above-referenced acts were undertaken by the foregoing Defendants with the same or with similar intent, results, accomplices, victims or methods of commission, or are otherwise related by distinguishing characteristics and are not isolated instances. Such acts are in fact a regular method by which Defendants have conducted and continue to conduct the affairs of the enterprise.

307. The 352 Fund's right to repayment has been frustrated by the enterprise's misconduct, including by the enterprise's actions to waive the 352 Fund's claims for prior breaches of the indenture and the purported release of the 352 Fund's collateral. Accordingly, notwithstanding the 352 Fund's efforts to pursue all avenues to collect its debt, including via the acceleration of the debt, the 352 Fund has been unable to recover the amounts it is owed because of the waivers and releases discussed above.

308. As a direct and proximate result of the foregoing Defendants' pattern of racketeering, the 352 Fund has been injured and damaged in an amount to be determined at trial including treble and punitive damages.

**Count II: Violations of 18 U.S.C. § 1962(a)**
**(Against Wear, Sadek, Chirico, Briggs,**
**C3 Capital, REVl, REVL Securities, and the Wear Entities)**

309. The foregoing paragraphs are incorporated as if expressly set forth herein.

310. The 352 Fund is a corporate entity, and therefore constitutes a "person" within

87

the meaning of 18 U.S.C. § 1962(3).

311.   Wear, Sadek, Chirico, Briggs, C3 Capital, REVL, REVL Securities and the Wear Entities are natural persons and business entities, and therefore each constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

312.   The foregoing Defendants operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are a group of associated persons and legal entities that:  (i) share a common purpose to engage in a scheme to misappropriate bond proceeds paid by the 352 Fund and its investors; (ii) have ongoing relationships and work together as a common unit to achieve such purpose; and (iii) each of these persons and entities have worked together since at least April 2022 and continue to work together presently, committing acts in furtherance of the enterprise as recently as October 2024, which is long enough to allow them to achieve their purpose.

313.   The foregoing Defendants engaged in at least two acts of racketeering activity within ten years of each other and within the meaning of 18 U.S.C. § 1961(1):  including (1) wire fraud under 18 U.S.C. § 1343; (2) commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08; (3) bank fraud under 18 U.S.C. § 1344; (4) engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957; (5) laundering of monetary instruments under 18 U.S.C. § 1956; and (6) sale or receipt of stolen goods or moneys under 18 U.S.C. § 2315.  (*See supra,* ¶¶ 276-302).

314.   At all relevant times, the enterprise was engaged in and had activities that affected interstate commerce, since the bond proceeds were transferred from the 352 Fund's bank accounts in New York to the Defendants, primarily located in Washington, which then

further distributed the bond proceeds throughout the United States.

315.    The foregoing Defendants received income from the bond proceeds, which was derived, directly or indirectly, from a pattern of racketeering, that such Defendants used or invested to continue to operate the above-described enterprise in violation of 18 U.S.C. §§ 1962(a).

316.    The above-referenced acts were undertaken by the foregoing Defendants with the same or with similar intent, results, accomplices, victims or methods of commission, or are otherwise related by distinguishing characteristics and are not isolated instances.  Such acts are a regular method by which Defendants have conducted and continue to conduct the affairs of the enterprise.

317.    The 352 Fund's right to repayment has been frustrated by the enterprise's misconduct, including by the enterprise's actions to waive the 352 Fund's claims for prior breaches of the indenture and the purported release of the 352 Fund's collateral.  Accordingly, notwithstanding the 352 Fund's efforts to pursue all avenues to collect its debt, including via the acceleration of the debt, the 352 Fund has been unable to recover the amounts it is owed because of the waivers and releases discussed above.

318.    As a direct and proximate result of the foregoing Defendants' investment and use of the bond proceeds to establish and operate their commerce-affecting enterprise, the 352 Fund has been injured and damaged in an amount of not less than $106.9 million dollars, before trebling and not including punitive damages.

319.    The 352 Fund and LAM have also been damaged by Chirico's receipt of more than $7 million in commercial bribes, described above, and in turn may recover the monies that

were paid to its faithless agent.

**Count III:  Violations of 18 U.S.C. § 1962(d)**
**(Against Wear, Sadek, Briggs, Chirico,**
**C3 Capital, Wear Entities, REVL, and REVL Securities)**

320.    The foregoing paragraphs are incorporated as if expressly set forth herein.

321.    The 352 Fund is a corporate entity, and therefore constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

322.    Wear, Sadek, Briggs, Chirico, C3 Capital, the Wear Entities, REVL and REVL Securities are natural persons and business entities, and therefore each constitutes a "person" within the meaning of 18 U.S.C. § 1962(3).

323.    The foregoing Defendants operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are a group of associated persons and legal entities that:  (i) share a common purpose to engage in a scheme to misappropriate bond proceeds paid by the 352 Fund and its investors; (ii) have ongoing relationships and work together as a common unit to achieve such purpose; and (iii) each of these persons and entities have worked together since at least April 2022 and continue to work together presently, committing acts in furtherance of the enterprise as recently as October 2024, which is long enough to allow them to achieve their purpose.

324.    Defendants Wear, Sadek, Chirico, Briggs, C3 Capital, the Wear Entities, REVL and REVL Securities knowingly embraced the purposes and objectives of the above-reference enterprise, agreed to commit predicate acts in furtherance thereof, and conspired to violate the provisions of 18 U.S.C. §§ 1962(a) and (c).

325.    The foregoing Defendants engaged in at least two acts of racketeering activity

within ten years of each other and within the meaning of 18 U.S.C. § 1961(1): including (1) wire fraud under 18 U.S.C. § 1343; (2) commercial bribery under N.Y. Penal Law §§ 180.03 and 180.08; (3) bank fraud under 18 U.S.C. § 1344; (4) engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957; (5) laundering of monetary instruments under 18 U.S.C. § 1956; and (6) sale or receipt of stolen goods or moneys under 18 U.S.C. § 2315. (*See supra*, ¶¶ 276-302).

326. At all relevant times, the enterprise was engaged in and had activities that affected interstate commerce, since the bond proceeds were transferred from the 352 Fund's bank accounts in New York to the Defendants, primarily located in Washington, which then further distributed the bond proceeds throughout the United States.

327. The foregoing Defendants knew that they were engaged in a conspiracy to commit the predicate acts, including, but not limited to, the fabrication of Water Machine and Water Station Management documentation for the purpose of soliciting the release of bond proceeds by U.S. Bank, that such acts were part of the racketeering activity, and the participation and agreement of each was necessary to allow the commission of this pattern of racketeering activity.

328. On information and belief, each of the foregoing Defendants specifically knew about and agreed to facilitate the scheme described above because the volume and frequency of the fraudulent activity, and the continuance of this scheme could not have occurred without the consent and knowing collusion of the foregoing Defendants.

329. **Wear's Knowledge of the Conspiracy:** As the managing member of the Wear Entities, including Water Station Management, Creative Technologies, Refreshing USA and

their subsidiaries, Wear, along with Sadek and Briggs, controlled the financial and operational conduct of the Wear Entities. As such, he was aware of and in control of the issuance of Purchase and Sale Agreements between Water Station Management and Creative Technologies, was aware of the number of Water Machines in existence, was aware of whether there were Water Machines in locations identified to REVL and others and knew whether Water Machines were being double counted. Wear was also aware of and in control of the flows of bond proceeds from Water Station Management's bank account to others including Sadek, Chirico, C3 Capital, franchisees and other Wear Entities.

330. **Wear's Acts in Furtherance of the Conspiracy:** *First*, Wear, along with Sadek and Briggs, produced fraudulent Purchase and Sale Agreements between Water Station Management and Creative Technologies, and other documentation, which were included with the withdrawal certificates to be sent to U.S. Bank.

331. *Second*, Wear, along with Sadek and Briggs, prepared and transmitted fraudulent withdrawal certificates to U.S. Bank in order to induce U.S. bank to release bond proceeds.

332. *Third*, Wear marketed and perpetuated the Water Station franchises in order to perpetuate the scheme.

333. *Fourth*, Wear, aided by Sadek, Briggs and Chirico, directed Cantaloupe to direct its modems to report revenues generated by vending machines other than Water Machines as revenue generated by Water Machines in order to perpetuate the conspiracy so that it could keep accessing bond proceeds.

334. *Fifth,* Wear attempted to keep the conspiracy afloat by interfering with the receivership and bankruptcy proceedings, including by transferring ownership of the assets of

Water Station Management to Sadek, obstructing the receiver's investigation into the Wear Entities' assets, attempting to get additional funding for Water Station Management despite the jurisdiction of the receiver, and selling off assets of Water Station Management whilst it was in receivership, including to an entity that was, on information and belief, controlled by the enterprise.

335.    **Sadek's Knowledge of the Conspiracy**:   As the CFO of Water Station Management, Sadek, along with Wear and Briggs, controlled the financial and operational conduct of the Wear Entities.   As such, he was aware of and in control of the issuance of Purchase and Sale Agreements between Water Station Management and Creative Technologies, was aware of the number of Water Machines in existence, was aware of whether there were Water Machines in locations identified to REVL and others and knew whether Water Machines were being double counted.   Sadek was also aware of and in control of the flows of bond proceeds from Water Station Management's bank account to others including Chirico, C3 Capital, franchisees and other Wear Entities.

336.    **Sadek's Acts in Furtherance of the Conspiracy:**   *First,* Sadek, along with Wear and Briggs, produced fraudulent Purchase and Sale Agreements between Water Station Management and Creative Technologies, and other documentation, which were included with the withdrawal certificates to be sent to U.S. Bank.

337.    *Second*, Sadek, along with Wear and Briggs, prepared and transmitted fraudulent withdrawal certificates to U.S. Bank in order to induce U.S. bank to release bond proceeds.

338.    *Third*, Sadek aided Wear in instructing Cantaloupe to direct its modems to report revenues generated by vending machines other than Water Machines as revenue generated by

Water Machines in order to perpetuate the conspiracy so that it could keep accessing bond proceeds.

339.    *Fifth*, Sadek provided personal funds to Water Station Management to ensure its survival in the face of possible defaults so that the enterprise could continue to carry on its fraudulent purpose, in anticipation that he would receive bond proceeds in return.

340.    *Sixth*, in December 2023, Sadek attempted to obtain further funding for Water Station Management, Creative Technologies and Refreshing USA by providing fraudulent and fabricated financial documents and collateral records to Itsinreach, despite knowing that the documents were not accurate.  On information and belief, Sadek engaged in this conduct to keep Water Station Management out of bankruptcy and perpetuate the scheme to misappropriate bond proceeds.

341.    *Seventh,* in order to perpetuate and secure the conspiracy, and through interference in ongoing legal proceedings regarding the attachment of the Wear Entities' assets, in August 2024 Sadek became the owner of 100% of Water Station Management's membership interests.  On information and belief, Sadek was motivated to obtain control of Water Station Management's asset to shield them from bankruptcy and perpetuate the scheme.

342.    **Chirico's Knowledge of the Conspiracy:**  Chirico has had direct personal knowledge of his misappropriation of bond proceeds since at least August 2023, when he was informed by REVL of the missing collateral.  Further, it appears likely that Chirico had knowledge of the fraud as early as November 2022, when—following the 352 Fund's acquisition of Water Station Management bonds—he received millions of dollars of payments from those bond proceeds.

343.   **Chirico's Acts in Furtherance of the Conspiracy:**   *First,* Chirico caused C3 Capital to invest approximately $7 million in the acquisition of Water Station Management franchises under a franchise agreement, funded in part by SBA loans.   C3 Capital purportedly acquired approximately 700 Water Machines pursuant to this arrangement, all of which were to be placed, operated and managed by Water Station Management for a fee.   Chirico then subsequently agreed with Wear, on behalf of Water Station Management, that in lieu of being paid based on a percentage of revenue generated by these machines, C3 Capital would be paid a flat rate of return of 15% per annum.

344.   *Second,* Chirico directed his friends and family to become franchisees of Water Station Management and to thus invest capital in the purchase of Water Machines.

345.   *Third,* Chirico unilaterally directed the 352 Fund to execute five indenture supplements which released the collateral securing the bonds, and in return received transfers of bond proceeds from Water Station Management.

346.   *Fourth,* in December 2023, Chirico attempted to obtain further funding for Water Station Management, Creative Technologies and Refreshing USA by providing fraudulent and fabricated financial documents and collateral records to Itsinreach, despite knowing that the documents were not accurate.   On information and belief, Chirico engaged in this conduct to keep Water Station Management out of bankruptcy and perpetuate the scheme to misappropriate bond proceeds.

347.   **C3 Capital's Knowledge of the Conspiracy:**   C3 Capital was owned and operated by Chirico and his wife as a shell company that would invest in Water Station Management franchises.   Chirico's knowledge of the conspiracy is imputed to C3 Capital on the

95

basis that Chirico completely dominated and controlled C3 Capital and it had no real corporate identity separate and aside from Chirico.

348.    **C3 Capital's Acts in Furtherance of the Conspiracy:**  Chirico used C3 Capital as a vehicle through which he invested in Water Station Management franchises.  As a result, he used C3 Capital to obtain bond proceeds as commercial bribes on at least two occasions. *First*, Chirico "sold" his interest in C3 Capital to Wear's company, Creative Technologies, for $7.2 million.  On information and belief, the funds used by Creative Technologies to buy out Chirico's personal investment were the proceeds of the bonds that Chirico had caused the 352 Fund to purchase.  *Second*, on September 30, 2022, Water Station Management made at least three transfers to pay off the loans of C3, including two loan payments to Newtek Small Business Finance LLC ("Newtek") and one loan payment to First Fed Bank accounts.

349.    **Brigg's Knowledge of the Conspiracy:**  Briggs was the Corporate Controller of Water Station Technology and Refreshing USA.  In that capacity, and because the Wear Entities were managed as a single, financially indistinguishable enterprise, Briggs, along with Wear and Sadek controlled the financial and operational conduct of the Wear Entities.  As such, he was aware of and in control of the issuance of Purchase and Sale Agreements between Water Station Management and Creative Technologies, was aware of the number of Water Machines in existence, was aware of whether there were Water Machines in locations identified to REVL and others and knew whether Water Machines were being double counted.  Briggs was also aware of and in control of the flows of bond proceeds from Water Station Management's bank account to others including Sadek, Chirico, C3 Capital, franchisees and other Wear Entities.

350.    **Briggs' Acts in Furtherance of the Conspiracy:**  *First*, Briggs, along with

96

Sadek and Wear, produced fraudulent Purchase and Sale Agreements between Water Station Management and Creative Technologies, and other documentation, which were included with the withdrawal certificates to be sent to U.S. Bank.

351. *Second*, Briggs, along with Wear and Sadek, prepared and transmitted fraudulent withdrawal certificates to U.S. Bank in order to induce U.S. bank to release bond proceeds.

352. *Third*, Briggs transferred bond proceeds into the bank accounts of other Wear Entities including Refreshing USA.

353. *Fourth*, Briggs aided Wear's instruction to Cantaloupe to direct its modems to report revenues generated by vending machines other than Water Machines as revenue generated by Water Machines in order to perpetuate the conspiracy so that it could keep accessing bond proceeds.

354. *Fifth*, Briggs attempted to interfere with the Wear Entities' bankruptcy proceedings by manipulating the Wear Entities' Quickbooks account in order to falsify the Wear Entities financial records, all in an effort to keep the conspiracy afloat.

355. **The Wear Entities' Knowledge of the Conspiracy:** The Wear Entities were owned and operated by Wear as a single, financially indistinguishable enterprise. Wear's knowledge of the conspiracy is imputed to the Wear Entities on the basis that Wear completely dominated and controlled the Wear Entities and it had no separate corporate identity.

356. **The Wear Entities Acts in Furtherance of the Enterprise:** The Wear Entities were used to launder bank proceeds between the Wear Entities, and to transfer bond proceeds to other individuals and entities as bribes and unlawful payments in the furtherance of the conspiracy.

357. **REVL's Knowledge of the Conspiracy:**  As Collateral Manager under the indenture, REVL was responsible for monitoring and reporting on the collateral for the benefit of the bondholders.  As early as June 2023, REVL discovered that there were inaccuracies in the information reported by Wear and Water Station Management.  REVL knew in August 2023 that "3000+" Water Machines that were intended to be installed at Family Dollar stores and other locations were missing.  In September 2023, REVL became aware that nearly half of the machines that Water Station Management claimed that it had purchased and put into operation, and that secured the bonds.  REVL also knew that Wear arranged to have modems associated with the bond collateral deposit funds into approximately twenty-seven different bank accounts associated with Wear through the Wear Entities, instead of to the bank accounts that were pledged as security for the bonds, as required under the indenture.  Accordingly, REVL was aware that revenues reported by Water Station Management were falsified.

358. **REVL's Acts in Furtherance of the Conspiracy**: *First*, despite knowing that the bonds were undercollateralized, REVL only reported the missing Water Machines to Wear and Chirico and failed to alert U.S. Bank and LAM.  This allowed the co-conspirators to perpetuate the conspiracy and continue to mislead U.S. Bank into releasing bond proceeds and to continue to obfuscate the scheme to misappropriate bond proceeds from the 352 Fund and LAM.

359. *Second,* despite knowing the bonds were undercollateralized and that Water Station Management's revenues were falsified, because of its conflict of interest and relationship with Chirico, REVL Securities continued to mark the value of the Series B bonds at or within 99% of par value until May 2024, further helping to conceal the defects in the bonds.  If the

bonds had been valued correctly to reflect the obvious risks associated with the missing collateral and ongoing fraud, U.S. Bank would have been immediately alerted to the serious problems underlying this investment.  REVL Securities engaged in this conduct to perpetuate the conspiracy and continue to defraud U.S. Bank into releasing bond proceeds.

360.  *Third,* REVL assisted the co-conspirators with soliciting additional funding for Water Station Management, Creative Technologies and Refreshing USA in December 2023 by providing fraudulent and fabricated financial documents and collateral records to Itsinreach, despite knowing that the documents were not accurate.

361.  On information and belief, none of the Defendants have withdrawn or otherwise disassociated themselves from the above-referenced conspiracy or the other members of the conspiracy.

362.  As a direct and proximate result of the foregoing Defendants' conspiracy, their acts of racketeering activity, the overt acts taken in furtherance of that conspiracy, and their violations of 18 U.S.C. § 1962(d), the 352 Fund has been injured and damaged in an amount to be determined at trial, including treble and punitive damages.

### Count IV:  Common Law Fraud
### (Against Wear and Water Station Management)

363.  The foregoing paragraphs are incorporated as if expressly set forth herein.

364.  At all relevant times, Wear was the owner and chief executive officer of Water Station Management.

365.  After entering into the indenture in April 2022, Wear and Water Station Management provided false and misleading documentation to U.S. Bank to authorize the release of bond proceeds for the stated purpose of purchasing Water Machines.  In fact, that

documentation was fabricated, and the majority of purported purchases of Water Machines never occurred.

366.     Wear and Water Station Management continued to provide false and misleading reports concerning the operation of the business, source of revenues, and the installation and operations of the Water Machines that were supposedly purchased with the proceeds of the bonds.  These false and misleading reports were provided to cover up the fact that Wear and Water Station Management had fraudulently diverted the proceeds of the bonds, and to induce the bondholders to refrain from declaring an event of default or otherwise taking steps to protect their investments.

367.     Wear and Water Station Management furthered their deception by using modems attached to other food and beverage vending machines, owned by Refreshing USA, to falsely report revenue generated by those vending machines as revenue generated by Water Machines. The purpose of that deception was to further hide the fact that Water Station Management was improperly diverting the bond proceeds and had not used those proceeds to purchase Water Machines.

368.     U.S. Bank, on the 352 Fund's behalf, reasonably relied on the false representations and reports described herein when deciding to release the bond proceeds to Water Station Management, which were then misappropriated.

369.     As a result of these Defendants' misconduct, the 352 Fund has been unable to recover any of the bond proceeds that were misappropriated.

370.     As a direct and proximate result of these Defendants' fraud, the 352 Fund has been damaged in an amount to be determined at trial.

**Count V:  Aiding and Abetting and Conspiracy to Commit Fraud**
**(Against Wear, the Wear Entities, Chirico,**
**C3 Capital, Briggs, REVL, REVL Securities, and Sadek)**

371.   The foregoing paragraphs are incorporated as if expressly set forth herein.

372.   At all relevant times, Wear was the owner, in whole or in part, and/or a principal of the Wear Entities, specifically including, Water Station Management, Creative Technologies, and Refreshing USA.  On information and belief, Creative Technologies also acquired shares of C3 Capital from Chirico and his wife in November 2023.  Wear's knowledge and intent in committing the fraud described above is therefore imputed to these company defendants.  Each of these affiliated companies and Wear agreed to commit the fraud and participate in the fraudulent scheme described herein and provided substantial aid and assistance to each other through the commission of wrongful and overt acts in order to accomplish that goal.

373.   Wear and Water Station Management misrepresented that Water Station Management had purchased the Water Machines as required under the indenture, failed to disclose that the majority of purported purchases of Water Machines never occurred, and misrepresented that the Water Machines had been purchased and were installed in locations around the country and were generating revenue.

374.   Creative Technologies was the manufacturer of Water Machines that Water Station Management was supposed to purchase using the proceeds of the bonds.  To facilitate the fraud of Wear and Water Station Management, Creative Technologies submitted false and misleading purchase orders, invoices and other documentation, intended to fraudulently induce U.S. Bank to approve the release of bond proceeds for the purpose of purchasing the Water Machines.  In fact, that documentation was fabricated, and no such purchases took place.

375.    Refreshing USA was the recipient of bond proceeds to which it had no right, and allowed the use of modems attached to food and beverage vending machines that it owned to falsely report that revenue generated by those machines was being generated by Water Machines owned by Water Station Management in order to conceal the fact that Water Station Management had diverted the bonds proceeds and not used those proceeds to purchase Water Machines.

376.    On information and belief, C3 Capital received bond proceeds from the time the bond was issued until the sale of its shares to Creative Technologies.  Chirico also used C3 Capital as a mechanism to conceal from the 352 Fund both his personal investment in the Water Station Management franchises and his ongoing involvement in the fraud.

377.    By at least August 2023, Chirico knew that Wear and Water Station Management were perpetrating the fraudulent scheme described herein.  He agreed to help conceal and help perpetrate that fraud in order to prop up the failing Water Station Management business and scheme, thereby increasing the chances that he and his friends and family would be paid out on their "investments" with Water Station Management.

378.    By at least August 2023, REVL knew that Wear and Water Station Management were perpetrating the fraudulent scheme described herein.  REVL permitted the proceeds of bonds to be released for improper purposes, did not monitor the bonds' collateral, and did not report to U.S. Bank that it had reason to know Water Station Management failed to comply with its obligations under the indenture and was committing a massive fraud.

379.    By at least August 2023, REVL Securities knew that Wear and Water Station Management were perpetrating the fraudulent scheme described herein.  After the 352 Fund and

its affiliate purchased the Series A bonds from Heartland Financial in December 2023, REVL Securities continued to mark the Series A bonds at 82% of par to reflect the price at which Heartland Financial sold those bonds. However, REVL Securities continued to mark the Series B bonds within 99% of par value up until the point when U.S. Bank declared an event of default in May 2024.

380. Sadek served as CFO of Water Station Management. In his role as CFO, he was responsible for managing Water Station Management's finances, tracking its cash flows, and undertaking major financial decisions on its behalf. On information and belief, he authorized the fraudulent withdrawal certificates, bills of sale, invoices and reports. In addition, on December 5, 2023, Sadek personally loaned Water Station Management monies to prevent an event of default, thereby continuing to artificially prop up Water Station Management. Based on a phone conversation recorded by Chirico in January 2024, Sadek was expressly aware that Water Station Management was a fraud, yet continued to take actions to conceal and advance the fraudulent enterprise.

381. Briggs was the Corporate Controller of Water Station Technology and Refreshing USA. In that capacity, and because the Wear Entities were managed as a single, financially indistinguishable enterprise, Briggs, along with Wear and Sadek controlled the financial and operational conduct of the Wear Entities. As such, he was aware of and in control of the issuance of Purchase and Sale Agreements between Water Station Management and Creative Technologies, was aware of the number of Water Machines in existence, was aware of whether there were Water Machines in locations identified to REVL and others and knew whether Water Machines were being double counted. Briggs was also aware of and in control

of the flows of bond proceeds from Water Station Management's bank account to others including Sadek, Chirico, C3 Capital, franchisees and other Wear Entities.

382.    Briggs, along with Wear and Sadek, produced fraudulent Purchase and Sale Agreements between Water Station Management and Creative Technologies, and other documentation, which was approved by REVL and sent to U.S. Bank to induce U.S. Bank to release bond proceeds. Briggs, along with Wear and Sadek, prepared and transmitted fraudulent withdrawal certificates to U.S. Bank in order to induce U.S. bank to release bond proceeds. As revenues from all Wear Entities flowed into the bank accounts of Refreshing USA and Briggs engaged in preparing and executing transfers of those proceeds. Briggs also aided and abetted Wear and Sadek to instruct Cantaloupe to direct its modems to report revenues generated by vending machines other than Water Machines as revenue generated by Water Machines in order to perpetuate the conspiracy so that it could keep accessing bond proceeds. Further, Briggs attempted to interfere with the Wear Entities bankruptcy proceedings by illicitly accessing and manipulating the Wear Entities' Quickbooks accounts, all in an effort to keep the conspiracy afloat.

383.    On information and belief, the remaining Wear Entities were either recipients of bond proceeds, transferees of the Water Machines, or entities that otherwise aided and abetted the fraudulent scheme by, inter alia, misdirecting and concealing the bond proceeds.

384.    U.S. Bank, on the 352 Fund's behalf, reasonably relied on the false representations and reports described herein when deciding to release the bond proceeds to Water Station Management, which were then misappropriated.

385.    As a result of these Defendants' misconduct, the 352 Fund has been unable to

recover any of the bond proceeds that were misappropriated.

386.    The 352 Fund also waived numerous events of default, and purportedly released the limited collateral securing its bonds to its own detriment based on the material misrepresentations and omissions by these Defendants.

387.    The wrongful misconduct of Wear, the Wear Entities, Chirico, C3 Capital, REVL, REVL Securities, and Sadek concealed the fraud, the conspiracy to commit fraud, and their aiding and abetting of the fraud.

388.    As a result of the aiding and abetting of the fraud, the 352 Fund suffered damages in an amount to be determined at trial.

## Count VI:  Breach of Fiduciary Duty
### (Against Chirico)

389.    The foregoing paragraphs are incorporated as if expressly set forth herein.

390.    Chirico served as the 352 Fund's portfolio manager and was an employee of LAM, and as a result, owed both LAM and the 352 Fund fiduciary duties, including, but not limited to, the duties of good faith and loyalty.

391.    Chirico breached those fiduciary duties by, *inter alia*:  (i) failing to disclose to the 352 Fund and LAM that Wear owed him substantial sums; (ii) failing to disclose to the 352 Fund and LAM that his friends and family owned franchises with Water Station Management; (iii) failing to disclose to the 352 Fund and LAM that Wear and Water Station Management were engaging in the fraudulent misappropriation of the bond proceeds; (iv) failing to disclose to the 352 Fund and LAM that he knew that Water Machines were missing from the locations at which Water Station Management had represented them to be; (v) failing to disclose to the 352 Fund and LAM that revenue was being generated by the Water Machines that did exist was

being diverted to over 20 different bank accounts associated with Wear and his companies; and (vi) failing to disclose that REVL had invoked a 90-day cure period under the indenture that Wear and Water Station Management failed to cure.

392.    In addition, Chirico breached his fiduciary duties by, *inter alia*:  (i) not disclosing to the 352 Fund and LAM that he learned that 80% of the modems that were supposed to be on Water Machines to direct and report revenue by those machines were not on those machines; (ii) not disclosing that he believed, as of January 29, 2024, there was only $41 million worth of collateral securing the 352 Fund's bonds; (iii) causing the 352 Fund to waive any events of default under the indenture; (iv) authorizing an amendment to the indenture which allowed Water Station Management to withdraw bonds proceeds for any purpose whatsoever without authorization from the collateral manager; (v) purporting to release the 352 Fund's primary security for the bonds. As a result of Chirico's breaches of his fiduciary duties, the 352 Fund and LAM have been damaged in an amount to be determined at trial.

### Count VII:  Aiding and Abetting Breach of Fiduciary Duty
### (Against Wear, Water Station Management, Creative Technologies, Refreshing USA, Sadek, Briggs, REVL, and REVL Securities)

393.    The foregoing paragraphs are incorporated as if expressly set forth herein.

394.    During the relevant period, Wear, Water Station Management, Creative Technologies, Refreshing USA, Sadek, REVL, and REVL Securities knew that Chirico was a portfolio manager at the 352 Fund and was trading on its behalf.  As set forth above, each of them knowingly participated in Chirico's breach of his fiduciary duty and provided substantial assistance through the commission of wrongful and overt acts.

395.    Wear and Water Station Management knowingly participated in and provided

substantial assistance to Chirico's breaches of fiduciary duty by misrepresenting that Water Station Management was a legitimate business and that it owned the Water Machines identified in Exhibit D to the indenture, failing to disclose that the majority of purported purchases of Water Machines never occurred, and failing to disclose that Water Machines were missing from the locations in which they were represented to be.

396.    Creative Technologies knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by submitting false and misleading purchase orders, invoices, and other documentation, in order to induce U.S. Bank to release bonds proceeds for the purpose of purchasing Water Machines.

397.    Refreshing USA was the recipient of bond proceeds to which it had no right, and knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by allowing the use of modems attached to food and beverage vending machines that it owned to falsely report that revenue generated by those machines was being generated by Water Machines owned by Water Station Management, in order to conceal the fact that Water Station Management had diverted the bonds proceeds and not used those proceeds to purchase Water Machines.

398.    Sadek knowingly participated and provided substantial assistance in his capacity as CFO of Water Station Management, by authorizing the creation and release of fraudulent documentation which was used to authorize the release of bond proceeds, including, but not limited to, withdrawal certificates, bills of sale, invoices, and reports.

399.    Briggs knowingly participated and provided substantial assistance in his capacity as Director of Finance and Corporate Controller of Water Station Technology and Corporate

107

Controller of Refreshing USA, by authorizing the creation and release of fraudulent documentation which was used to authorize the release of bond proceeds, including, but not limited to, withdrawal certificates, bills of sale, invoices, and reports.

400.    REVL, despite being aware of Chirico's conflict of interest due to his personal investment in Water Station Management, knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by failing to ensure that proceeds of the bonds were only released and used to purchase Water Machines, failing to monitor the bonds' collateral, and actively concealing from the 352 Fund and U.S. Bank that it knew that Water Station Management had failed to comply with its obligations under the indenture and was committing fraud.

401.    REVL Securities knowingly participated in and provided substantial assistance to Chirico's breaches of fiduciary duty by continuing to mark the Series A bonds at 82% of par (reflecting the price at which Chirico had caused the 352 Fund to purchase the bonds), and continuing to mark the Series B bonds at 99% of par value up until the point when U.S. Bank declared an event of default in May 2024, despite knowing that collateral was missing, that Water Station Management had been committing fraud, and that an event of default had occurred.

402.    Both REVL and Sadek also aided Chirico's breach of his fiduciary duty of loyalty by assisting him with obtaining additional funding for Water Station Management with fraudulent and false documents in December 2023.

403.    Sadek, Briggs and REVL were aware that Chirico was an employee of LAM and, as such, that he owed LAM fiduciary duties.

404.    As a result of the aiding and abetting of Chirico's breaches of his fiduciary duties, the 352 Fund has been damaged in an amount to be determined at trial.

**Count VIII:**
**Breach of Indenture – Failure to Pay Principal and Interest**
**(Against Water Station Management and the Wear Entities)**

405.    The foregoing paragraphs are incorporated as if expressly set forth herein.

406.    The indenture is a valid and enforceable agreement.  Water Station Management is a party to the indenture, and the 352 Fund, as noteholder, is an express, intended third-party beneficiary to the indenture entitled to enforce its terms.

407.    Pursuant to Section 2.7 of the indenture, "[p]rincipal and interest in the Notes shall be payable on each Payment Date . . . ."

408.    Under Section 7.1 of the indenture, Water Station Management is required to "duly and punctually pay the principal of, interest on and all other amounts payable on or in respect of the Class A Notes and Class B Notes, each in accordance with the terms of the Class A Notes or Class B Notes, as applicable, and this Indenture."

409.    Under Section 5.10 of the indenture, the 352 Fund, as the noteholder, has the absolute and unconditional right to "receive payment of the principal of and interest of" the Water Station Management bonds and "to institute suit for the enforcement of any such payment . . . ."

410.    Water Station Management has failed to duly and punctually pay the principal and interest owing under the Class A and B notes held by the 352 Fund.

411.    Specifically, on March 20, 2024, the balance of funds in Water Station Management's interest reserve account at U.S. Bank fell below the "Interest Reserve Required

Balance" and it was provided notice of the same by U.S. Bank. As of April 5, 2024, the shortfall in the interest reserve account was not remedied, thereby constituting an event of default pursuant to Section 5.1(a)(iii).

412. On May 28, 2024, U.S. Bank provided notice of an event of default to Water Station Management relating to its failure to maintain the Interest Reserve Required Balance.

413. Subsequently, on June 20, 2024, Water Station Management was required to make payments of principal and interest on the notes under Section 2.7 of the indenture. Water Station Management did not make interest payments on the Class A and Class B notes, thereby constituting another event of default pursuant to Sections 5.1(a)(i) and (ii).

414. On June 20, 2024, U.S. Bank issued another notice of an event of default to Water Station Management based on its failure to "make any interest payments when due under the Class A [and Class B] Notes."

415. On July 1, 2024, the 352 Fund provided U.S. Bank written direction to declare the principal and all unpaid and accrued interest under the notes immediately due and payable. And on July 2, 2024, U.S. Bank provided Water Station Management a default notice under the indenture which caused all principal and unpaid and accrued interest under the notes immediately due and payable.

416. As of the filing of this complaint, the unpaid principal and interest has not been paid, and the events of default have not been waived or cured.

417. Water Station Management breached Section 7.1 of the indenture both by allowing the balance of the Interest Reserve Account to fall below the Interest Reserve Required Balance and by failing to provide punctual payments of the interest in the ordinary course and

accelerated principal of and interest on the Class A and Class B bonds.

418. Despite nominally being separately incorporated companies, Wear treated all of the Wear Entities as a single, indistinguishable company. These companies did not maintain distinct books and records, and Wear routinely authorized the movement of funds between these companies for no consideration at all. Moreover, revenues that these companies have generated over the past several years have all flowed into bank accounts in the name of Refreshing USA. In turn, all of the Wear Entities should be held responsible for Water Station Management's obligations under the indenture.

419. As a result of Water Station Management's material breach of Section 7.1 of the indenture, the 352 Fund suffered damages in an amount to be proven at trial.

**Count IX:  Declaration that the Release of the 352 Fund's Security Interest Is Void
(Against Water Station Management)**

420. The foregoing paragraphs are incorporated as if expressly set forth herein.

421. Pursuant to the Granting Clauses of the indenture, Water Station Management granted to the Trustee, for the benefit and security of the bondholders, a first priority security interest in all of its right, title, and interest, in all assets of Water Station Manage, as follows:

> (a)(a) all of the Issuer's rights, remedies, powers, privileges and claims under or with respect to the Assets, including, without limitation, and all payments, proceeds, earnings, interest, dividends (whether of cash, securities, instruments or other property) thereon or with respect thereto, (b) all property delivered herewith or in the future that may be delivered to the Trustee pursuant to the terms hereof and all payments thereon or with respect thereto and any sums held by any agent to make payments in respect of the Notes, (c) the Issuer's rights, remedies, powers, privileges and claims under or with respect to the Asset Agreements (other than the Excluded Asset Agreements), (d) the Collection Account and all investment property, money, instruments and other property from time to

time credited to or carried in such account, (e) the Acquisition Account and all investment property, money, instruments and other property from time to time credited to or carried in such account, (f) the Interest Reserve Account and all investment property, money, instruments and other property from time to time credited to or carried in such account, (g) the Servicer Account and all investment property, money, instruments and other property from time to time credited to or carried in such account, (h) all accounts, chattel paper, deposit accounts, securities accounts, documents, general intangibles, payment intangibles, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, consisting of, arising from, or relating to any of the foregoing, (i) all proceeds, profits, rents, products, earnings, interest, dividends (whether in the form of cash, securities, instruments or other property), distributions (whether of rights, options, stock, warrants, securities or other property) of any of the foregoing (the property described clauses (a) through (i), the "Primary Collateral"), (j) the Limited Guaranty and (k) other than Excluded Asset Agreements, all other assets and property of the Issuer including, without limitation, all accounts, chattel paper, deposit accounts, securities accounts, documents, general intangibles, payment intangibles, goods, instruments, investment property, letter of credit rights, letters of credit, money, goods, and all proceeds, profits, rents, products, earnings, interest, dividends (whether in the form of cash, securities, instruments or other property), distributions (whether of rights, options, stock, warrants, securities or other property) of any of the foregoing (the property described clauses (j) and (k), the "Other Collateral" and together with the Primary Collateral, the "Collateral").

422. The security interest granted under the indenture was perfected by the filing of a UCC-1 financing statement on April 29, 2022, and/or by possession and control of the deposit and security accounts described therein (in the case of such accounts at U.S. Bank), and/or by account control agreements (in the case of deposit or security accounts at other financial institutions).

423. On February 20, 2024, as part of the fraudulent scheme described herein, Chirico

and Wear entered into an agreement that purported to release all of the Water Machines from the 352 Fund's liens, including the revenue those machines generated.

424.    Water Station Management has taken the position that because of this agreement, the 352 Fund has released any lien it may have over the Water Machines.

425.    The agreement between Chirico and Wear was procured by the fraud of Wear and Water Station Management, and Chirico's complete abandonment of the interests of the 352 Fund.  The 352 Fund received no benefit whatsoever by the purported release of collateral.  Any such purported release of a security interest should be rendered void as a part of the fraudulent scheme.

426.    The 352 Fund is therefore entitled to a judgment declaring that the agreement purporting to release the 352 Fund's lien over the Water Machines is null and void.

### Count X:  Gross Negligence
### (Against REVL and REVL Securities)

427.    The foregoing paragraphs are incorporated as if expressly set forth herein.

428.    By virtue of their role as Collateral Manager and their agreement to act for the 352 Fund, REVL and REVL Securities were in a position of trust, for the benefit of the Trustee and the bondholders, and had fiduciary duties and other obligations to fulfill its role in good faith and without conflict of interest.  U.S. Bank, and the 352 Fund as a bondholder, were entitled to rely on the reports and other information provided by REVL with respect to the collateral, and REVL had an obligation to disclose material facts concerning the status or integrity of the collateral, including facts concerning the fraud perpetrated by Water Station Management.

429.    By at least August 2023, REVL knew that nearly half of the Water Machines that were supposedly purchased with bond proceeds could not be located, and likely did not exist.

113

It therefore knew that the documentation and information provided by Water Station Management to justify its prior withdrawals of the bond proceeds were false and misleading. REVL failed to inform U.S. Bank, as Trustee, of this critical information.

430.    REVL continued to provide reports to U.S. Bank and bondholders that purported to identify Water Machines as collateral, and that such machines were generating revenue, even when it knew full well that nearly half of those Water Machines did not exist.

431.    REVL further knew that Water Station Management was in breach of the terms of the indenture, which triggered REVL's notice to Water Station Management that it had 90 days to "cure" the fact that over half of the collateral securing the indenture was missing.  Yet even after the expiration of the 90-day period, REVL did nothing.

432.    At no point did REVL inform U.S. Bank or LAM that it was aware of an ongoing fraud, that nearly half of the collateral that REVL was entrusted to monitor and manage was missing, that REVL's prior and ongoing reports concerning the collateral were false and misleading, or that Water Station Management breached the terms of the indenture.  On information and belief, REVL did not provide such information to U.S. Bank or LAM  because doing so would reveal that REVL had failed to perform the necessary diligence and monitoring activities with respect to the collateral in the first instance.

433.    REVL's conduct, which knowingly assisted in the cover up of Water Station Management's fraud, constituted gross negligence and willful misconduct and reflected a conscious and reckless indifference to the rights of the bondholders that REVL had been entrusted to protect.

434.    At the same time, REVL Securities purportedly acted as an "independent" third

party to mark the value of the bonds to market, for purposes of reporting the value of the bonds directly to investors.  The employees of REVL Securities responsible for valuing the bonds were the same individuals at REVL who knew that the collateral was missing, that Water Station Management had been committing fraud, and that an event of default had occurred.  REVL Securities nonetheless continued to mark the value of the bonds at or within 99% of par value throughout the fall of 2023, further helping to conceal these crucial facts.  REVL Securities later marked the Series A bonds to 82% of par to reflect the price at which Heartland Financial sold its bonds to the 352 Fund, but continued to mark the Series B bonds within 99% of par value until May 2024.  If the bonds had been valued correctly to reflect the obvious risks associated with the missing collateral and ongoing fraud, U.S. Bank would have been immediately alerted to the serious problems underlying this investment.

435.   REVL Securities knowingly assisted in the cover up of Water Station Management's fraud by their conscious indifference in negligently misrepresenting the value of the bonds correctly, which constituted gross negligence or willful misconduct and reflected a reckless indifference to the rights of the bondholders.

436.   As a result of the failures of REVL and REVL Securities as described herein, U.S. Bank was prevented from taking action to protect the interests of the bondholders, including (among other things) declaring an event of default and foreclosing on the collateral securing the bonds.

437.   As a direct and proximate result of REVL's and REVL Securities' gross negligence or willful misconduct, the 352 Fund has suffered damages in an amount to be determined at trial, plus punitive damages.

**Count XI:  Actual Fraudulent Transfer under DCL § 273(a)(1)**
**(Against Wear, the Wear Entities, Chirico,**
**C3 Capital, and Does 1-1000)**

438.    The foregoing paragraphs are incorporated as if expressly set forth herein.

439.    As described above, Wear and the companies he controlled made numerous transfers of cash, equipment and other assets to himself, the Wear Entities, Chirico and C3 Capital, and, on information and belief, Does 1-1000 with the intent to hinder, delay or defraud the noteholders as creditors of Water Station Management.

440.    Among other things, Wear and Water Station Management fraudulently procured withdrawals of the bond proceeds with falsified documentation that purported to demonstrate that the bond proceeds would be used to purchase Water Machines that would secure the bonds. Instead, Wear directed those proceeds:  (i) to franchisees to facilitate his ongoing scheme; (ii) to or for the benefit of the Wear Entities for the purchase of vending machines or other property; (iii) to fund the Wear Entities' operations or pay other creditors of the Wear Entities; (iv) to Chirico and C3 Capital for the repayment or return on their "investment"; and/or (v) to or for the benefit of Does 1-1000.  By misappropriating the bond proceeds and diverting them for those improper purposes, Wear removed the proceeds from the bank accounts over which U.S. Bank maintained a security interest pursuant to the indenture, and transferred them to persons or entities outside the scope of that security interest.  In so doing, Wear defrauded the noteholders, and substantially hindered their ability to locate or foreclose on collateral and recover amounts owed under the indenture.

441.    On information and belief, after fraudulently procuring the purported release of the Water Machines from the security interest of the noteholders, Wear and Water Station

116

Management entered into agreements to sell, pledge, or to otherwise generate revenue or other funds using the Water Machines that were required to be the primary collateral for the bonds. Those funds were either retained by Wear and Water Station Management, or transferred to or for the benefit of the Wear Entities and Does 1-1000 for the same improper purposes described above. As a result of the purported release of the Water Machines from the security interest and diversion of such equipment and funds, Wear defrauded the noteholders, and substantially hindered their ability to locate or foreclose on collateral and recover amounts owed under the indenture.

442. These transfers and transactions are all surrounded by the badges of fraud.

443. *First*, the transfers were made to or for the benefit of Wear and the Wear Entities, Chirico, or to franchisees and "investors" in his ongoing fraudulent scheme.

444. *Second*, Wear effectively retained control of the majority of funds transferred to the Wear Entities, of which he is sole or part owner, and a senior executive or principal, as well as the vending machines or other equipment purchased by those entities using those funds.

445. *Third*, the improper transfers and use of the bond proceeds were concealed from U.S. Bank and from the 352 Fund. The proceeds were procured through fraudulent statements, the actual use of the proceeds was never disclosed, and when it was discovered that the Water Machines were not purchased with the proceeds, Wear and Water Station Management arranged for revenue generated by other vending machines to be directed and reported to U.S. Bank to conceal that fact.

446. *Fourth*, before many of the transfers were made, Water Station Management had been sued or threatened with suit by numerous franchisees, vendors, third party creditors and its

own CFO, Sadek. Water Station Management had further incurred numerous events of default under the indenture.

447. *Fifth*, the transfer of over $100 million of bond proceeds, and transfer or incurrence of obligations as to the $41 million of Water Machines and related agreements that did exist, involved substantially all of Water Station Management's assets. As a result, upon information and belief, there is nothing left of value at Water Station Management.

448. *Sixth*, Water Station Management did not receive reasonably equivalent value for these transfers or obligations. The funds were used to purchase equipment, to pay creditors or otherwise benefit the Wear Entities, with Water Station Management receiving nothing in return. Other funds were used to pay off franchisees and other members of the scheme. On information and belief, the Water Machines and related agreements were sold or pledged for the purpose of generating funds for the use of Wear or the Wear Entities. Water Station Management did not receive anything of value in return.

449. *Seventh*, Water Station Management was insolvent or became insolvent as a result of the transfers and obligations described herein. Among other reasons, as a result of the fraudulent bond scheme, Water Station Management incurred over $100 million of debt and diverted the bond proceeds to other entities or persons as described herein, without obtaining assets in return. Water Station Management was therefore balance sheet insolvent from the beginning of the scheme. By the fall of 2023, Water Station Management was unable to meet basic day-to-day funding obligations, such as making payroll, and was therefore insolvent by virtue of its inability to pay ordinary debts as they became due.

450. *Eighth*, for similar reasons, the diversion of bond proceeds and transfers or

obligations with respect to the Water Machines occurred after Water Station Management incurred a substantial debt of approximately $75 million under the original indenture, which continued to increase with each upsizing of the indenture.

451. *Finally*, the Water Machines and related agreements were the essential assets of the business of Water Station Management, and on information and belief, those Water Machines and agreements were either pledged as collateral to third party lenders or creditors, or transferred to Wear, the Wear Entities, or other companies owned and controlled by Wear.

452. The transfers of bond proceeds and transfers of or obligations incurred with respect to the Water Machines and related agreements are actually fraudulent within the meaning of DCL § 273(a)(1). The 352 Fund is entitled to a judgment against Wear, the Wear Entities, Chirico, C3 Capital and Does 1-1000, that such transfers and obligations are voidable as to the 352 Fund.

**Count XII: Constructive Fraudulent Transfer under DCL § 273(a)(2)**
**(Against Wear, the Wear Entities, Chirico,**
**C3 Capital, and Does 1-1000)**

453. The foregoing paragraphs are incorporated as if expressly set forth herein.

454. The above-described transfers of bond proceeds, and transfers of or obligations incurred with respect to the Water Machines and related agreements, are also voidable as constructive fraudulent transfers pursuant to DCL § 273(a)(2).

455. As described above, Water Station Management did not receive reasonably equivalent value in exchange for these transfers or for incurring these obligations. The funds were used to pay creditors or otherwise benefit the Wear Entities, or to pay off franchisees and other members of the scheme, and, on information and belief, the Water Machines were sold or

pledged for the purpose of generating funds for the use of Wear, the Wear Entities or other companies owned or controlled by Wear.

456. Each transfer and obligation was made or incurred when Water Station Management was insolvent. At the time of each transfer and incurrence of an obligation, Wear and Water Station Management knew and intended that Water Station Management was unable to pay its debts as they became due, including Water Station Management's obligation to pay principal and interest due under the bonds, or to meet its day-to-day funding obligations or timely pay third party vendors and creditors.

457. The transfers of bond proceeds, and transfers of or obligations incurred with respect to the Water Machines and related agreements, are therefore constructively fraudulent within the meaning of DCL § 273(a)(2). The 352 Fund is entitled to a judgment against Wear, the Wear Entities, Chirico, C3 Capital and Does 1-1000, that such transfers and obligations are voidable as to the 352 Fund.

**Count XIII: Negligent Misrepresentation**
**(Against REVL and REVL Securities)**

458. The foregoing paragraphs are incorporated as if expressly set forth herein.

459. By virtue of its role as Collateral Manager and its agreement to act for the 352 Fund, REVL was in a position of trust, for the benefit of U.S. Bank and the bondholders, and had fiduciary duties and other obligations to fulfill its role in good faith and without conflict of interest.

460. REVL Securities and the 352 Fund had an understanding and agreement that REVL Securities would provide monthly bond pricing reports for the bonds. REVL Securities knew that the 352 Fund trusted that REVL Securities' reporting was accurate and relied on the

120

monthly bond pricing report to facilitate the 352 Fund's end of day processing and settlement deadline. REVL Securities was aware that its reporting assisted the 352 Fund with evaluating the quality of the assets in portfolio, and that the pricing was the basis on which the 352 Fund would adjust its investments.

461. U.S. Bank, and the 352 Fund as a bondholder, were entitled to rely on the reports and other information provided by REVL Securities with respect to the collateral, and REVL and REVL Securities had an obligation to disclose material facts concerning the status or integrity of the collateral, including facts concerning the fraud perpetrated by Water Station Management.

462. By at least August 2023, REVL knew that nearly half of the Water Machines that were supposedly purchased with bond proceeds could not be located, and likely did not exist. It therefore knew that the documentation and information provided by Water Station Management to justify its prior withdrawals of the bond proceeds were false and misleading. REVL failed to inform U.S. Bank of this critical information.

463. Further, on information and belief, REVL continued to provide reports to U.S. Bank and bondholders that purported to identify Water Machines as collateral, and that such machines were generating revenue, even when it knew full well that nearly half of those Water Machines did not exist.

464. REVL knew that Water Station Management was in breach of the terms of the indenture, which triggered REVL's notice to Water Station Management that it had 90 days to "cure" the fact that over half of the collateral securing the indenture was missing. Yet even after the expiration of the 90-day period, REVL did nothing.

465.    At no point did REVL or REVL Securities inform the Trustee that it was aware of an ongoing fraud, that nearly half of the collateral that REVL was entrusted to monitor and manage was missing, that REVL's prior and ongoing reports concerning the collateral were false and misleading, or that Water Station Management breached the terms of the indenture. On information and belief, REVL did not provide such information to U.S. Bank because doing so would reveal that REVL had failed to perform the necessary diligence and monitoring activities with respect to the collateral in the first instance.

466.    REVL's conduct, which knowingly assisted in the cover up of Water Station Management's fraud, constituted gross negligence and willful misconduct and reflected a conscious and reckless indifference to the rights of the bondholders that REVL had been entrusted to protect.

467.    At the same time, REVL Securities purportedly acted as an "independent" third party to mark the value of the bonds to market, for purposes of reporting the value of the bonds directly to investors.  The employees of REVL Securities responsible for valuing the bonds were the same individuals at REVL who knew that the collateral was missing, that Water Station Management had been committing fraud, and that an event of default had occurred.  REVL Securities nonetheless continued to mark the value of the bonds at or within 99% of par value throughout the fall of 2023, further helping to conceal these crucial facts.  REVL Securities later marked the Series A bonds to 82% of par to reflect the price at which Heartland Financial sold its bonds to the 352 Fund, but continued to mark the Series B bonds within 99% of par value until May 2024.  If the bonds had been valued correctly to reflect the obvious risks associated with the missing collateral and ongoing fraud, U.S. Bank would have been immediately alerted

to the serious problems underlying this investment.

468.    REVL Securities knowingly assisted in the cover up of Water Station Management's fraud by their conscious indifference in negligently failing to mark the value of the bonds correctly,  which reflected a reckless indifference to the rights of the bondholders.

469.    As a result of the failures of REVL and REVL Securities as described herein, U.S. Bank was prevented from taking action to protect the interests of the bondholders, including (among other things) declaring an event of default and foreclosing on the collateral securing the bonds.

470.    As a direct and proximate result of REVL's and REVL Securities' negligent misrepresentation, the 352 Fund has suffered damages in an amount to be determined at trial.

**Count XIV:  Breach of Contract**
**(Against Chirico)**

471.    The foregoing paragraphs are incorporated as if expressly set forth herein.

472.    Chirico was employed by LAM on May 28, 2020 under the terms of an Employment Agreement.  As a condition of his employment, Chirico was required to "comply with all applicable policies of [LAM] and its parent companies" including those contained in the "Handbook, Code of Ethics and General Compliance Policies and Procedures."

473.    Chirico failed to comply with LAM's policies and procedures by failing disclose his investments in Water Station Management through C3 Capital, as well as by making misrepresentations regarding the nature of his interest in C3 Capital, all described herein.

474.    Chirico further failed to comply with LAM's policies and procedures in breach of the Employment Agreement by continuing to direct the 352 Fund to upsize its bond holdings when it was no longer beneficial or in the best interests of the 352 Fund to do so.

475.    Under his Employment Agreement, Chirico was entitled to a salary of $400,000 payable in accordance with LAM's policies, and a bonus for services in his first year of employment in the minimum amount of $866,666.67.  Over the course of his employment between May 2020 and his termination in 2024, and in accordance with LAM's obligations under the Employment Agreement, Chirico was paid a total of $5,346,914.67.

476.    As a direct and proximate result of Chirico's breaches of his Employment Agreement, the 352 Fund has been damaged in an amount to be determined at trial.

### Count XV:  Faithless Servant
### (Against Chirico)

477.    The foregoing paragraphs are incorporated as if expressly set forth herein.

478.    Chirico was employed by LAM on May 28, 2020 under the terms of an Employment Agreement.  As a condition of his employment, Chirico was required to "comply with all applicable policies of JIA and its parent companies" including those contained in the "Handbook, Code of Ethics and General Compliance Policies and Procedures."

479.    From the time that Chirico was employed by LAM, he was a highly compensated employee who owed LAM duties of loyalty and fidelity, was bound to exercise good faith and loyalty in the performance of his duties for LAM and was prohibited by the Employment Agreement from acting in a manner inconsistent with the conditions of his employment.

480.    Chirico failed to comply with his duties and LAM's policies and procedures by failing disclose his investments in Water Station Management through C3 Capital, as well as by making misrepresentations regarding the nature of his interest in C3 Capital, all described above.

481.    Chirico further failed to comply with his duties and LAM's policies and procedures in breach of the Employment Agreement by participating in an enterprise, the

purpose of which was to misappropriate bond proceeds that were the security for the 352 Fund's investment in Water Station Management bonds.

482.    Under his Employment Agreement, Chirico was entitled to a salary of $400,000 payable in accordance with LAM's policies, and a bonus for services in his first year of employment in the minimum amount of $866,666.67.  Over the course of his employment between May 2020 and his termination in 2024, and in accordance with LAM's obligations under the Employment Agreement, Chirico was paid a total of $5,346,914.67.

483.    Because Chirico acted as a faithless servant and violated his duties and contractual obligations to LAM from at least September 2022 until the termination of his employment in June 2024, Chirico must disgorge all sums paid to him as compensation during that period.

### Count XVI:  Gross Negligence
### (Against Chirico)

484.    The foregoing paragraphs are incorporated as if expressly set forth herein.

485.    Chirico served as the 352 Fund's portfolio manager and was an employee of LAM, and as a result, owed the 352 Fund and LAM a duty of care to exercise, in the performance of his tasks, the care that a reasonably prudent person would use under similar circumstances.

486.    The 352 Fund and LAM placed trust in Chirico to perform his duties as portfolio manager.  Chirico understood that the 352 Fund and LAM had placed their trust in Chirico to perform his duties as portfolio manager and that if he failed to do so, the 352 Fund and LAM would be injured.

487.    Chirico breached the duty of care that he owed to the 352 Fund and LAM by causing the 352 Fund to waive any events of default under the indenture, authorizing an

amendment to the indenture which allowed Water Station Management to withdraw bond proceeds for any purpose whatsoever without authorization from the collateral manager and purporting to release the 352 Fund's primary security for the bonds by entering into an agreement releasing any lien over the Water Machines which did exist.

488.    Chirico's conduct constitutes an extreme departure from the ordinary standard of care a reasonably prudent person would use under similar circumstances, not least because Chirico knowingly assisted in the cover up of the fraudulent misappropriation of bond proceeds by Wear and the Wear Entities.

489.    As a result of Chirico's reckless and willful misconduct as described herein, U.S. Bank was prevented from taking action to protect the interests of the bondholders, including (among other things) declaring an event of default and foreclosing on the collateral securing the bonds.

490.    As a direct and proximate result of Chirico's gross negligence and willful misconduct, the 352 Fund has suffered damages in an amount to be determined at trial, plus punitive damages.

### DEMAND FOR RELIEF

WHEREFORE, the 352 Fund and LAM respectfully request that the Court enter judgment in their favor and against Defendants as follows, but in an amount no less than $106,925,000:

(a)    On the First Cause of Action, a judgment in favor of the 352 Fund and against Wear, Sadek, Chirico, Briggs, C3 Capital, and the Wear Entities, jointly and severally, for damages in an amount to be determined at trial, then trebled, plus interest, costs, and attorneys' fees;

(b)    On the Second Cause of Action, a judgment in favor of the 352 Fund and against Wear, Sadek, Chirico, Briggs, C3 Capital, and the Wear Entities, jointly and

126

severally, for damages in an amount to be determined at trial, then trebled, plus interest, costs, and attorneys' fees;

(c)     On the Third Cause of Action, a judgment in favor of the 352 Fund and against Wear, Sadek, Chirico, Briggs, C3 Capital, the Wear Entities, REVL, and REVL Securities jointly and severally, for damages in an amount to be determined at trial, then trebled, plus interest, costs, and attorneys' fees;

(d)     On the Fourth Cause of Action, a judgment in in favor of the 352 Fund and against Wear and Water Station Management, jointly and severally, for damages in an amount to be determined at trial, plus interest and punitive damages;

(e)     On the Fifth Cause of Action, a judgment in favor of the 352 Fund and against Wear, the Wear Entities, Chirico, C3 Capital, Sadek, Briggs, REVL and REVL Securities, jointly and severally, for damages in an amount to be determined at trial, plus interest and punitive damages;

(f)     On the Sixth Cause of Action, a judgment in favor of the 352 Fund and LAM and against Chirico for damages in an amount to be determined at trial, plus interest and punitive damages;

(g)     On the Seventh Cause of Action, a judgment in favor of the 352 Fund and against Wear, Water Station Management, Creative Technologies, Refreshing USA, Sadek, REVL and REVL Securities, jointly and severally, for damages in an amount to be determined at trial, plus interest and punitive damages;

(h)     On the Eighth Cause of Action, a judgment in favor of the 352 Fund and LAM and against the Wear Entities for damages in an amount to be proven at trial, representing the unpaid and immediately due and payable principal and interest under the bonds issued by Water Station Management, plus all reasonable compensation, costs, expenses, and disbursements in connection with enforcement or exercise of remedies under the indenture;

(i)     On the Ninth Cause of Action, a declaratory judgment in favor of the 352 Fund holding that the purported release of the 352 Fund's lien over the Water Machines is null and void;

(j)     On the Tenth Cause of Action, a judgment in favor of the 352 Fund and against REVL and REVL Securities, jointly and severally, for damages in an amount to be determined at trial, plus interest and punitive damages in an amount to be determined at trial;

(k)     On the Eleventh Cause of Action, a judgment in favor of the 352 Fund and against Wear, the Wear Entities, Chirico, C3 Capital, and Does 1-1000, that the transfers of bond proceeds and obligations are voidable as to the 352 Fund, and

127

an order of turnover against the foregoing Defendants further transferring any of the monies they received as a result of such transfers back to the 352 Fund;

(l)    On the Twelfth Cause of Action, a judgment in favor of the 352 Fund and against Wear, the Wear Entities, Chirico, C3 Capital, and Does 1-1000, that the transfers of bond proceeds and obligations are voidable as to the 352 Fund, and an order of turnover against the foregoing Defendants further transferring any of the monies they received as a result of such transfers back to the 352 Fund;

(m)    On the Thirteenth Cause of Action, a judgment in favor of the 352 Fund and against REVL and REVL Securities, jointly and severally, for damages in an amount to be determined at trial, plus interest;

(n)    On the Fourteenth Cause of Action, a judgment in favor of the 352 Fund and LAM and against Chirico for damages in an amount to be determined at trial, plus interest;

(o)    On the Fifteenth Cause of Action a judgment in favor of LAM and against Chirico for damages in an amount to be determined at trial, plus interest, and punitive damages in an amount to be determined at trial;

(p)    On the Sixteenth Cause of Action a judgment in favor of the 352 Fund and LAM and against Chirico for damages in an amount to be determined at trial, plus interest and punitive damages in an amount to be determined at trial;

(q)    On all equitable causes of action, including the Sixth, Seventh, Eleventh and Twelfth Causes of Action, an imposition of a constructive trust on all bond proceeds, any equipment or other property or assets purchased with such proceeds, or anything else of value acquired by Defendants in exchange for such proceeds;

(r)    An award of reasonable attorneys' fees and costs incurred by the 352 Fund in connection with this action; and

(s)    Such other and further relief as this Court may deem just and proper.

128

Dated:  New York, New York
        October 28, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP
By: /s/ *Scott S. Balber*
   Scott S. Balber
   Peter Behmke
   Michael P. Jones
   Prishika Raj
200 Park Avenue
New York, New York 10166
Telephone:  (917) 542-7600
Facsimile:   (917) 542-7601
Email:    Scott.Balber@hsf.com
          Peter.Behmke@hsf.com
          Michael.Jones@hsf.com
          Prishika.Raj@hsf.com

*Attorneys for 3\5\2 Capital GP LLC,*
*On Behalf of 3\5\2 Capital ABS Master Fund LP*