UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
3|5|2 CAPITAL GP LLC, on behalf of 3|5|2 :
CAPITAL ABS MASTER FUND LP and :
LEUCADIA ASSET MANAGEMENT, LLC, :
 :
                              Plaintiff, :      24-CV-5102 (VEC)
 :
        -against- :      OPINION & ORDER
 :
RYAN WEAR *et seq.*, :
 :
 :
                         Defendants. :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

       Plaintiffs, an asset management firm and the general partner of a fund it managed, sued a former employee and others for misappropriating the proceeds of bonds issued by a sham company and purchased by Plaintiffs. Plaintiffs brought claims under the civil RICO statute, 18 U.S.C. § 1962, in addition to various state causes of action. Defendants REVL and REVL Securities, Tyler Sadek and certain corporate Defendants associated with him (collectively, the "Sadek Defendants"),[1] Jordan Chirico, and Jeremy Briggs moved to dismiss. The motions are GRANTED because the so-called "RICO Amendment" of the Private Securities Litigation Reform Act precludes the civil RICO claims. 18 U.S.C. § 1964(c). Diversity has not been alleged, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims. The case is DISMISSED.

---

[1] The corporate Sadek Defendants include WST AZ Properties, LLC, Ideal AZ Property Investments, LLC, 3209 Van Buren LLC, Ice & Water Vendors LLC, K-2 Acquisition, LLC, Arizona Water Vendors Incorporated, TCR Plumbing LLC, and 1206 Hewitt Ave LLC, Refreshing Midwest LLC, and Refreshing Midwest Real Estate LLC. *See* Sadek et al. Mot.; Refreshing Midwest Mot., Dkt. 160; Refreshing Midwest Real Estate Mot., Dkt. 162.

## BACKGROUND

**I.     Factual Background**[2]

Defendant Jordan Chirico has made his career in the financial services industry. Amended Complaint ("Am. Compl."), Dkt. 91, ¶ 92. In 2018, Chirico personally invested in Water Station Management ("WSM"), a company founded by Defendant Ryan Wear. *Id.* ¶¶ 1, 93. WSM purported to own, manage, and manufacture self-service water station machines. *Id.* ¶¶ 1–2. It claimed to make money in two ways: first, by setting up its own water station machines, which dispensed filtered water to consumers for a fee; and second, by entering into "franchise" or "joint venture" agreements with third parties, who could purchase water station machines from WSM for use at retail locations. *Id.* ¶ 2.

Around the time that he invested in WSM, Chirico created C3 Capital, a closely held company. *Id.* ¶ 94. C3 Capital made a large investment in WSM, pursuant to which it acquired hundreds of water machines to be placed, operated, and managed by WSM. *Id.* ¶ 95. Shortly after making the investment, Chirico also began marketing and selling water machines on behalf of WSM to potential investors and franchisees. *Id.* ¶¶ 96–97.

About two years after he invested in WSM and created C3 Capital, Chirico began working for Plaintiff Leucadia Asset Management ("LAM") as an investment strategist and fund manager. *Id.* ¶ 99. Shortly thereafter, LAM was appointed manager of the newly created 352 Fund, as to which Plaintiff 352 Capital GP LLC acted as a general partner. *Id.* ¶¶ 17–18, 100–01. LAM named Chirico as the portfolio manager for 352 Fund. *Id.* ¶ 102–03. As portfolio manager, Chirico owed the Fund and LAM fiduciary duties of loyalty and good faith. *Id.* ¶ 103.

---

[2]     The facts are taken from the Amended Complaint. At this stage, the Court assumes that all well-pled allegations in the Amended Complaint are true. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).

Claiming that it wished to purchase and deploy water machines, WSM sought to raise capital via a bond offering. *Id.* ¶ 115. It engaged Defendant REVL Securities (together with Defendant REVL Capital Management, "REVL") as a broker dealer in connection with the offering and as the collateral manager. *Id.* ¶ 112. The offering occurred in April 2022, with the 352 Fund purchasing $15 million of WSM's Class B notes at Chirico's direction. *Id.* ¶ 113.

Pursuant to the indenture that effectuated the bond offering, non-party U.S. Bank served as Trustee of the bond proceeds. *Id.* ¶ 124. U.S. Bank maintained a segregated account into which the proceeds were deposited, and WSM was authorized to withdraw funds from that account only if it produced to U.S. Bank a "Withdrawal Certificate" executed and approved by REVL, the collateral manager. *Id.* ¶ 125. The withdrawal certificates needed to show, among other things, that the requested funds would be used solely for acquiring water machines or covering certain related expenses. *Id*. U.S. Bank was granted a security interest in virtually all of WSM's assets, including any then-existing water machines and any machines that WSM would acquire in the future. *Id.* ¶ 126. The water machines and the revenue they generated also secured WSM's payment obligations under the bonds. *Id.* ¶ 115.

The April 2022 bond offering was rife with undisclosed problems and conflicts of interest. For example, many of the water machines identified as WSM assets in the indenture did not, in fact, belong to Wear or WSM, rendering both the bondholders and U.S. Bank's security interests largely illusory. *Id.* ¶ 395. Chirico also failed to disclose to Plaintiffs the extent of his ties to Wear and WSM, including that that he had invested $7 million in WSM through C3 Capital and that that he had helped WSM identify potential franchisees and investors. *Id.* ¶ 114. Chirico also engaged REVL to advise the 352 Fund on potential investment opportunities, notwithstanding the fact that REVL was acting as WSM's broker dealer and collateral manager for the very bond offering in which it advised 352 Fund to invest. *Id.* ¶¶ 110, 112. Chirico's

own history with REVL was also significant, as it had provided advice to him regarding his personal investments in WSM prior to the April 2022 bond offering. *Id.* ¶ 111.

In the months following WSM's initial bond offering, between May 2022 and April 2023, Wear, Defendant Tyler Sadek (a friend of Chirico's and WSM's Chief Financial Officer), and Defendant Jeremy Briggs (WSM's Corporate Controller) prepared and transmitted to U.S. Bank at least twenty-five fraudulent withdrawal certificates. *Id.* ¶¶ 20, 22, 133, 137–62. They did so by providing REVL with fabricated documents purporting to show that WSM had been purchasing, distributing, and generating revenue from water machines and that it intended to use bond proceeds to acquire additional machines. *Id.* ¶ 132. In reality, after the withdrawals were approved, Defendants diverted most of the funds for other uses. *Id.* ¶¶ 135–37. All told, the documents provided to U.S. Bank in support of Defendants' withdrawals showed that WSM had purchased more than 10,000 water machines with bond proceeds. *Id.* ¶ 164. WSM's internal records, however, indicate that it purchased only about 2,600 machines. *Id.* As a result, the collateral schedules that WSM disseminated to REVL listed as collateral hundreds of machines that WSM did not, in fact, own. *Id.*

Throughout the scheme, Wear, Sadek, and Briggs "were all actively involved in managing the finances and operations" of WSM and other companies created by Wear in furtherance of the fraud. *Id.* ¶ 134. Briggs communicated with REVL about the collateral WSM purportedly intended to purchase and provided fabricated purchase and sale agreements and spreadsheets to support his representations. *Id.* Sadek, meanwhile, received at least $1.5 million in payments from WSM so that he could pay guaranteed returns for the franchises he owned. *Id.* ¶ 163. And Chirico routinely accepted "bribe[s]" from Wear to "implement a scheme to misappropriate the proceeds of the bonds." *Id.* ¶ 117. In September 2022, for example, Wear

issued a $1.9 million promissory note to Chirico's company, C3 Capital, which Defendants later paid off with bond proceeds. *Id.* ¶ 118.

With full awareness of, and participation in, WSM's fraudulent operations, Chirico caused the 352 Fund to further invest in WSM after the initial bond offering. In January 2023, Chirico directed the Fund to purchase almost $20 million of WSM's Class A notes and $5.3 million of its Class B notes. *Id.* ¶ 165. In June 2023, he executed supplements to the indenture to make its terms more favorable to WSM, increasing both the servicing fee paid to WSM and the withdrawal limit for the account held at U.S. Bank. *Id.* ¶ 166.

In mid-2023, REVL hired an outside firm to inspect sites at which WSM had reported its water machines were located. *Id.* ¶ 167. Those inspections revealed that an enormous number of the machines WSM purported to own and operate did not exist. *Id.* ¶¶ 167–70. When REVL ordered Wear and Chirico either to confirm that the machines existed and were in operation or to re-deposit the cash WSM had withdrawn purportedly to buy the machines, Wear instead orchestrated a scheme falsely to attribute revenue from other businesses he owned to the non-existent water machines. *Id.* ¶¶ 171–72, 176. REVL, which was copied on the emails pursuant to which Wear arranged this redirection, neither informed anyone about its concerns regarding WSM nor reappraised the bonds it had sold and as to which it was collateral manager in light of the suspected fraud. *Id.* ¶¶ 176–80.

By the end of 2023, WSM was insolvent and had defaulted on its payments to bondholders. *Id.* ¶ 182. To cure the default, Sadek made personal loans to WSM and Chirico directed the 352 Fund to purchase $70 million of additional Class A notes. *Id*. ¶¶ 182, 184. Sadek and Chirico also attempted to broker a deal with another investor. REVL provided the potential investor fabricated financial statements and collateral files of WSM — without disclosing the evidence it had amassed that much of the collateral did not exist. *Id*. ¶ 190.

The following month, REVL once again raised concerns that it was unable to locate the majority of the water machines that WSM claimed it had purchased using bond proceeds. *Id.* ¶ 191. At that point, Chirico admitted the fraud to REVL, but he did not inform anyone at LAM. *Id.* ¶ 192. Instead, he directed the 352 Fund to enter into two supplemental indentures. The first supplement purported to waive any claims of default arising from many of WSM's breaches of the original indenture and its supplements, including WSM's misuse of bond proceeds, misrepresentations about the existence of collateral, and failure to provide financial statements. *Id.* ¶ 195. The second supplement purported to authorize WSM to withdraw bond proceeds from U.S. Bank for any reason and without authorization from REVL, the collateral manager. *Id.* ¶ 196.

Chirico and Wear then directed U.S. Bank to release all water machines, and the revenue they generated, from the securing lien set forth in the indenture. *Id.* ¶ 199. The effect of the release was that 352 Fund's exposure to WSM — which, by this point, exceeded $100 million — was entirely unsecured. *Id.* ¶ 203.

In May 2024, the scheme finally fell apart. Because WSM had failed to maintain the required minimum balance in its account, U.S. Bank issued a notice of default of the indenture to WSM. *Id.* ¶¶ 205–07. Shortly thereafter, LAM terminated Chirico. *Id.* ¶ 208. And shortly after that, WSM failed to make payments on its Class A and B notes, prompting U.S. Bank to issue another notice of default. *Id.* ¶ 209. To date, 352 Fund has not collected any interest on its notes. *Id.* ¶ 211. And, in the leadup to this and other actions, Defendants have engaged in a series of efforts to delete evidence, hide assets, and impede litigation. *Id.* ¶¶ 214–41.

## II. Procedural Background

Plaintiffs sued in July 2024 and filed an Amended Complaint in October 2024. *See* Compl., Dkt. 1; Am. Compl. The Amended Complaint names Wear, Sadek, Chirico, Briggs,

REVL, and dozens of corporate entities allegedly owned by Wear as Defendants.[3]  Plaintiffs bring three claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c)–(d); Am. Compl. ¶¶ 242–362, and various state law claims, Am. Compl. ¶¶ 363–490.

Defendants' responses to this action have varied.  The Court dismissed the Amended Complaint against C3 Capital for failure to prosecute after Plaintiffs failed timely to serve it.  *See* January 28, 2025, Order, Dkt. 182.  Several of the corporate Defendants, including WSM, have declared bankruptcy, prompting the Court to stay proceedings against them.[4]  *See* October 3, 2024, Order, Dkt. 50; October 17, 2024, Order, Dkt. 67; October 24, 2024, Order, Dkt. 84.  Some of the other corporate Defendants are subject to an equity receivership established by a Washington state court; the receiver answered the Amended Complaint on those defendants' behalf.[5]  *See* TurningPointe Answer, Dkt. 132.  Still other corporate Defendants failed to appear or to respond to the Amended Complaint at all, prompting Plaintiffs to seek, and the Court to grant, default judgments.[6]  *See* March 14, 2025, Order for Default Judgment, Dkt. 201.

---

[3]   The extent to which all of the corporate entities identified in the Amended Complaint as "Wear Entities" actually belong to Wear is in dispute.  According to Sadek, an Indiana state court "assigned the membership interests" of the corporate Sadek Defendants to Sadek in an action that Sadek filed against Wear.  Sadek *et al*. Mem., Dkt. 130, at at 1 n.1.

[4]   The Defendants in bankruptcy are Ideal Property Investments, LLC, 3422 W Clarendon Ave LLC, Creative Technologies LLC, WSM, and Refreshing USA LLC.

[5]   The Defendants in receivership are 1118 Virginia Street LLC, 11519 South Petropark LLC, 2129 Andrea Lane LLC, 701 Eden LLC, Ideal Industrial Park LLC, Refreshing Arizona LLC, Refreshing California LLC, Refreshing Carolinas LLC, Refreshing Colorado LLC, Refreshing Florida LLC, Refreshing Georgia LLC, Refreshing Great Lakes LLC, Refreshing Great Plains LLC, Refreshing Las Vegas LLC, Refreshing Mid-Atlantic LLC, Refreshing Montana LLC, Refreshing New England LLC, Refreshing New Mexico LLC, Refreshing Texas LLC, and Refreshing Washington LLC.

[6]   The Defendants against whom default judgment was entered are 70 North Garden Avenue LLC, Aurora Building Products LLC, BevTeck Technologies LLC, Creative Technologies Florida, LLC, Drink Up Venture LLC, Emery Development LLC, Flagstaff Plumbing, LLC, Golden State Vending, LLC, Pistol Inc., Refreshing Kentucky LLC, Refreshing Ohio LLC, Refreshing USA Merger Sub LLC, Refreshing Utah, LLC, Summit Management Services LLC, Valley Vending, LLC, Vendpro LLC, Waterstation Technology II LLC, Waterstation Techventure LLC, WS SPV 1 LLC, WSM Capital Funding, Inc. and WST Franchise Systems LLC.

7

Of the remaining Defendants, only Wear has answered. *See* Wear Answer, Dkt. 154. The others — REVL, the Sadek Defendants, Chirico, and Briggs (collectively, the "Moving Defendants") — moved to dismiss. *See* REVL Mot., Dkt. 125; Sadek et al. Mot., Dkt. 128;[7] Chirico Mot., Dkt. 133; Briggs Mot., Dkt. 193. Plaintiffs opposed the motions. *See* Pl. Opp. to REVL, Sadek et al., and Chirico Mots. ("Pl. Mem. I"), Dkt. 176; Pl. Opp. to Briggs Mot. ("Pl. Mem. II"), Dkt. 198.

## DISCUSSION

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Conclusory allegations or "legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Achtman v. Kirby, McInerney, & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (alteration in original) (citation omitted).

On a motion to dismiss, the Court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002) (cleaned up).

---

[7] Defendants Refreshing Midwest LLC and Refreshing Midwest Real Estate LLC joined the other Sadek Defendants' original motion after it was filed. *See* Refreshing Midwest LLC Mot.; Refreshing Midwest Real Estate LLC Mot.

I. **Plaintiffs' Claims Under the Civil RICO Statute are Barred by the so-called RICO Amendment**

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). To state a civil RICO claim, a plaintiff must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains [an] interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123–24 (2d Cir. 2018) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)).

The Moving Defendants argue that Plaintiffs' RICO claims are barred by the so-called "RICO Amendment" made by the Private Securities Litigation Reform Act ("PSLRA"); that statute provides that "no person may rely on conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [the RICO Act]." 18 U.S.C. § 1964(c); *see also MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273 (2d Cir. 2011) ("Section 107 of the PSLRA . . . was enacted as an amendment to the RICO statute and accordingly is often referred to as the 'RICO Amendment' . . . "). To determine whether the RICO Amendment bars a civil RICO claim, courts consider whether any of the predicate acts could have been brought under Section 10(b) of the Securities Exchange Act, which makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *Sec. & Exch. Comm'n v. Zandford*, 535 U.S. 813, 819 (2002) (quoting 15 U.S.C. § 78j). The RICO Amendment has been interpreted expansively

to "bar[] civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant." *MLSMK*, 651 F.3d at 277.

For purposes of the RICO Amendment, courts must construe Section 10(b) "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Sec. & Exch. Comm'n v. Dorozhko*, 574 F.3d 42, 47 (2d Cir. 2009) (quoting *Zandford*, 535 U.S. at 819). The question is one of timing: if "the securities transactions and breaches of fiduciary duty [alleged as predicate acts] coincide," then the breaches are considered "'in connection with' securities sales within the meaning of [Section] 10(b)." *Zandford*, 535 U.S. at 825.

Plaintiffs argue that the RICO Amendment does not bar their civil RICO claims because they "do[] not allege that the 352 Fund was defrauded in connection with the April 2022 (or any other) bond purchase—and the Moving Defendants do not identify any misrepresentation or omission that was purportedly made relating to the purchase or sale of a security." Pl. Mem. I at 11. In other words, Plaintiffs contend that because the alleged predicate acts do not concern the initial sale of bonds, but, instead, Defendants' subsequent misappropriation of bond *proceeds*, they have not alleged fraud "in connection with the purchase or sale of any security."[8] 15 U.S.C. § 78j(b); *see also D'Addario v. D'Addario*, 75 F.4th 86, 93 (2d Cir. 2023) (RICO Amendment is not triggered where the purchase or sale of securities is merely "an incidental feature of an overall scheme").

Plaintiffs, however, mischaracterize their own Amended Complaint, which describes numerous breaches of fiduciary duty that were part and parcel of the initial bond offering in April 2022. In fact, the Amended Complaint explicitly alleges that Defendants have "share[d] a common purpose to engage in a scheme to misappropriate bond proceeds paid by the 352 Fund

---

[8] There is no dispute that bonds are securities. *See* 15 U.S.C. § 78c(a)(10) (defining "security" to include bonds).

10

and its investors" since "at least April 2022." Am. Compl. ¶¶ 245, 312, 323. The Amended Complaint also contains detailed allegations about material omissions and misrepresentations by several Defendants in connection with the April 2022 bond offering. For example, Plaintiffs allege that Wear and WSM knowingly misrepresented that WSM owned the water stations identified in the Schedule of Assets accompanying the April 2022 indenture. *Id.* ¶ 395; Boller Decl. Ex. C (April 2022 Indenture), Dkt. 134-3, at Ex. D. Plaintiffs also allege that Chirico's disclosures to LAM about his business interests in WSM "were riddled with several falsehoods and material omissions," including that he failed to disclose that his company, C3 Capital, had invested in WSM and that he had "actively marketed [WSM] franchises to potential franchisees." Am. Compl. ¶¶ 106–07, 114. Concealing such obvious conflicts of interest is a quintessential breach of the fiduciary duty of loyalty, and Plaintiffs allege that Chirico's non-disclosure of conflicts was ongoing at the time the bonds were sold. *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 139 (2d Cir. 2011).

The Amended Complaint is even more explicit in its allegations of breaches of fiduciary duty after the April 2022 bond offering. Indeed, Plaintiffs allege that "[w]hen directing each subsequent purchase of the bonds [following 352 Fund's initial purchase in April 2022], Chirico acted with full knowledge of the fraudulent scheme and the facts underlying each purchase." Am. Compl. ¶ 116. Chirico was aware, therefore, of the fraudulent nature of WSM when, in January 2023, he "unilaterally directed" the Fund to purchase almost $25 million of WSM's notes. *Id.* ¶ 165. Six of the challenged withdrawals — each of which, Plaintiffs allege, constitute a predicate act within the meaning of the civil RICO statute — occurred *after* January 2023, meaning that Defendants made both the sale and the withdrawals "with full knowledge of the fraudulent scheme." *Id.* ¶¶ 116, 157–62.

11

In short, the Amended Complaint details many instances in which "securities transactions and breaches of fiduciary duty coincide[d]." *Zandford*, 535 U.S. at 825. As a result, this case is not one in which after a lawful securities transaction was consummated, Defendants stole the proceeds. *Id.* at 820. Instead, Plaintiffs accuse Defendants of knowing, *at the time they coordinated the bond sales*, that the sales were predicated on lies and misrepresentations. And, at the time of Plaintiff's purchase of bonds in January 2023, Defendants had already made at least nineteen fraudulent withdrawals and would go on to make at least six more. The unmistakable implication of those allegations is that Defendants coordinated that sale of WSM bonds "while secretly intending from the very beginning to keep the proceeds." *Id.* at 824. The fraudulent withdrawals, therefore, sound in securities fraud and are barred by the RICO Amendment. *Id.* at 820.

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634 (S.D.N.Y. 2017), is instructive. In that case, the defendants, a group of investment companies that "made virtually every single investment decision" for the plaintiffs, were accused, among other things, of misappropriating the plaintiffs' equity interests and distributions to enrich themselves. *Id.* at 638–41. The court dismissed the plaintiffs' civil RICO claims, finding that the allegations relating to the defendants' alleged theft of plaintiffs' equity interests and distributions were barred by the RICO Amendment. *Id.* at 648. Rejecting the plaintiffs' argument that the case presented a "classic example of . . . post-investment looting and the concealment thereof," the court concluded that defendants did not merely steal plaintiffs' equity interests and distributions after the investment, but that the initial acquisitions of equity in the plaintiffs' portfolio companies were entered into specifically for the purpose of advancing the defendants' "fraudulent scheme." *Id.* at 648–49.

The same is true here given Plaintiffs' allegation that the Defendants orchestrated the purchase and sale of WSM bonds with full knowledge that the company was a sham. Am. Compl. ¶¶ 106–07, 116. While "an otherwise legitimate stock transaction that is antecedent, but not integral, to the alleged fraud does not meet the 'in connection with' requirement" set forth in Section 10(b), that principle is inapplicable here because the transactions themselves were both illegitimate and essential to the execution of the scheme. *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 242 (S.D.N.Y. 2006). As in *Zohar*, the purchase of securities was "integral to the scheme to defraud since, without it, Defendants would have lacked the position" to execute the fraudulent misappropriations about which Plaintiffs complain. 286 F. Supp. 3d at 649.

It is irrelevant that the Amended Complaint characterizes the fraudulent withdrawals as "wire fraud" or "bank fraud" rather than securities fraud. Am. Compl. ¶¶ 276, 279, 283, 285, 295–96, 299–300, 302. "[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." *Blythe v. Deutsche Bank AG*, 399 F. Supp. 2d 274, 278 (S.D.N.Y. 2005) (quoting *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 328 (3d Cir. 1999)); *see also MLSMK*, 651 F.3d at 277 (purpose of the RICO Amendment is to "prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages").

It is also irrelevant that some of the other predicate acts alleged in the Amended Complaint, such as sale of stolen goods, the fraudulent misattribution of revenue, and bankruptcy fraud, do not sound in securities fraud. Am. Compl. ¶¶ 275, 281–82, 313, 325. Plaintiffs allege that Defendants coordinated "a single nationwide RICO conspiracy." *Id.* ¶ 90. When a complaint alleges that a RICO enterprise is engaged in a single scheme of racketeering activity, if "any predicate act is barred by the PSLRA it is fatal to the entire RICO claim." *In re LIBOR-*

*Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 730 (S.D.N.Y. 2013), *vacated on other grounds sub nom. Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016); *see also Gilmore v. Gilmore*, 503 F. App'x 97, 100 (2d Cir. 2012) (a single predicate act sounding in securities fraud destroys a civil RICO claim where all "predicate acts shared an alleged purpose and result").

Accordingly, Plaintiffs' civil RICO claims are barred by the RICO Amendment, meaning the first, second, and third causes of action in the Amended Complaint must be dismissed.

## II. The Court Declines to Exercise Supplemental Jurisdiction over the Remaining Claims

Having disposed of the only federal claims in the Amended Complaint, the Court must determine whether to exercise supplemental jurisdiction over the remaining state law claims. To make that determination, the Court must consider whether declining jurisdiction serves "the values of judicial economy, convenience, fairness, and comity." *Id*. at 350; *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (quotation marks and citation omitted). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *KeyCite Red FlagCarnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). In declining to exercise supplemental jurisdiction, the state law claims "may be dismissed without prejudice and left for resolution to state tribunals." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 613 F. Supp. 2d 437, 442 (S.D.N.Y. 2009) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966)).

The Court finds that it would not be appropriate to exercise supplemental jurisdiction in this case. Although the parties have made significant progress on fact discovery, under the

schedule set by the Court, discovery will not close until the end of this year. *See* Civil Case Management Plan & Scheduling Order, Dkt. 46, ¶ 5. Trial or summary judgment, therefore, remains many months away. The resources the parties have expended on discovery thus far will not have been for naught because any materials the parties have exchanged may be repurposed if Plaintiffs re-file their claims in state court. Given this context, Court sees no reason to deviate from the ordinary rule that the dismissal of all federal claims deprives the federal court of subject matter jurisdiction.

### III. The Default Judgments Are Vacated

Finally, the Court addresses how this Opinion affects the default judgments it issued earlier in this case. *See* Order for Default Judgment, Dkt. 201. "[A] default judgment that creates an 'incongruity' with a judgment on the merits is 'unseemly and absurd, as well as unauthorized by law. . . . [I]f the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike—the defaulter as well as the others.'" *Henry v. Oluwole*, 108 F.4th 45, 54 (2d Cir. 2024) (quoting *Frow v. De La Vega*, 82 U.S. 552, 554 (1872)); *see also Moore v. Booth*, 122 F.4th 61, 63 (2d Cir. 2024) (district court abused its discretion when it granted a default judgment against one defendant "after it had already dismissed identical claims on the merits against the litigating defendants based on a defense that applied equally" to the defaulting defendant).

The Court has concluded as a matter of law that the Amended Complaint fails to state a federal claim. Allowing a federal default judgment to remain in effect as to some Defendants, while dismissing the action against all other Defendants notwithstanding the deficiencies, would create precisely the sort of "incongruity" against which the Second Circuit and Supreme Court have warned. Accordingly, the Court finds it appropriate to vacate the default judgments.

15

## CONCLUSION

For the foregoing reasons, the first, second, and third causes of action set forth in the Amended Complaint are DISMISSED for failure to state a claim. The remaining causes of action are DISMISSED for lack of subject matter jurisdiction. The default judgments previously issued in this case are VACATED. The Clerk of the Court is respectfully directed to terminate all open motions, to STRIKE the Order for Default Judgment at Dkt. 201, and to CLOSE this case.

**SO ORDERED.**

**Date: May 20, 2025**
**New York, New York**

　　　　　　　　　　　　　　　　　　　　　　　　**VALERIE CAPRONI**
　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**